Jason R. N. Monteleone (ISB #5441)
Jacob D. Bottari (ISB #9556)
MONTELEONE LAW OFFICES, P.L.L.C.
350 North Ninth Street, Suite 500
Boise, Idaho 83702
Telephone:  (208) 331-2100
Facsimile:  (208) 947-2424
*jason@treasurevalleylawyers.com*
*jake@treasurevalleylawyers.com*

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CITY OF WARREN GENERAL EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>     vs.<br><br>TELEPERFORMANCE SE, DANIEL JULIEN, OLIVIER RIGAUDY, and AKASH PUGALIA,<br><br>                    Defendants. | **Case No.**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND DEMAND FOR JURY TRIAL** |

Plaintiff City of Warren General Employees' Retirement System ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the

investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of the French Market Authority ("AMF") filings by Teleperformance SE ("Teleperformance" or the "Company"), U.S. Securities and Exchange Commission ("SEC") filings, Company press releases and other public disclosures, Company conference call transcripts, media reports, and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired Teleperformance American Depositary Receipts ("ADRs") between July 29, 2020 and November 9, 2022, inclusive (the "Class Period"), against Teleperformance and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

3.      Venue is proper here pursuant to §27 of the 1934 Act.  Teleperformance maintains offices in this District and many of the acts and practices giving rise to the violations of law complained of occurred here.  The allegations that have been levied against Teleperformance regarding its treatment of its social content moderation employees center on, *inter alia*, the Company's Boise, Idaho operations, and the Company commissioned a review of, *inter alia*, its

Boise, Idaho social content moderation operations because it is one of the primary loci for the events at issue. In addition, Teleperformance has disseminated the statements herein alleged to be materially false and misleading into this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

5.      Plaintiff City of Warren General Employees' Retirement System purchased Teleperformance ADRs during the Class Period, as described in the attached certification incorporated herein, and was damaged thereby.

6.      Defendant Teleperformance is a provider of outsourced omnichannel customer experience management services and related digital services. Teleperformance is headquartered in Paris, and has branch offices in the United States, including in Boise, Idaho, and around the globe. Teleperformance ADRs each represent one-half of one share of Teleperformance common stock and trade over-the-counter ("OTC") in the United States under the ticker symbol "TLPFY." As of December 31, 2022, Teleperformance had 148 million shares of its common stock issued and outstanding.

7.      Defendant Daniel Julien ("Julien") is, and at all relevant times was, the Chairman and Chief Executive Officer ("CEO") of Teleperformance. Defendant Julien founded Teleperformance in 1978.

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**
**AND DEMAND FOR JURY TRIAL -- 3**

8.      Defendant Olivier Rigaudy ("Rigaudy") is, and at all relevant times was, the Deputy CEO and Chief Financial Officer ("CFO") of Teleperformance.

9.      Defendant Akash Pugalia ("Pugalia") is, and at all relevant times was, the Global President of Trust & Safety at Teleperformance.

10.     Defendants Julien, Rigaudy, and Pugalia (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Teleperformance's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

11.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Teleperformance.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Teleperformance ADRs was a success, as it: (i) deceived the investing public regarding Teleperformance's operations and business; (ii) artificially inflated the prices of Teleperformance ADRs; and (iii) caused plaintiff

and other members of the Class (defined herein) to purchase Teleperformance ADRs at inflated prices.

## BACKGROUND

12.     Teleperformance is a provider of outsourced omnichannel customer experience management services and related digital services, headquartered in Paris, France.   Although Teleperformance's ordinary shares trade on the Paris Stock Exchange under the ticker symbol "TEP.PA," its ADRs trade on the U.S. OTC market under the ticker symbol "TLPFY."

13.     The Company's services include content moderation for social media platforms, such as TikTok.  Content moderation for social media refers to the act of checking user-generated content against applicable laws and regulations and community guidelines to validate if the content is suitable to be posted online.  It is essentially a "first responder" service to protect the public from bad actors in the digital world.  Teleperformance content moderators are tasked with monitoring, flagging, filtering, reviewing, and escalating violating content to the social media platform so it can take immediate, necessary action.

14.     Teleperformance content moderators may be tasked with identifying and removing "egregious" materials such as graphic violence and child sexual abuse.  Because of the sensitive nature of these materials, it is critical that sufficient protections are put in place to protect both the employees tasked with reviewing the materials, as well as any victims which may be portrayed in the materials.  Such protections for workers can include providing sufficient rest breaks, offering adequate psychological support and counseling services, and limiting the amount of exposure to the most egregious materials, for example by not imposing unrealistic or damaging quotas.

Protections for victims can include removing and destroying the content, maintaining victim anonymity, treating the content as contraband (*i.e.*, segregating the material and preventing its distribution), and, where appropriate, alerting law enforcement.

15.     As the use of social media has exploded in recent years, Teleperformance's content moderation services have provided an increasingly important growth driver for the Company's business. According to market research firm Everest Group, the content moderation market was worth over $8 billion globally in 2022 and had grown at 40% CAGR since 2018. In 2022, content moderation for social media accounted for about 7% of Teleperformance's revenue and approximately 9% of its profitability, up to a quarter of which involved the review of egregious materials.

16.     Teleperformance was one of a few key players who dominated the content moderation business, with JPMorgan estimating the Company's 2022 market share to be about $600 million, second only behind its competitor Accenture. According to JPMorgan, content moderation has contributed 200bps to Teleperformance's 12% organic growth since 2019 and represented a significant profit driver. Similarly, Deutsche Bank has deemed content moderation to be "the group's most significant growth opportunity." Teleperformance's President of Transformation confirmed that "a lot" of the Company's 2022 growth came from content moderation, and defendant Julian, CEO and Chairman of Teleperformance, has characterized content moderation as a "big business in itself."

17.     Throughout the Class Period, Teleperformance and the Individual Defendants claimed to be providing effective content moderation services while maintaining a superior

workplace environment and employee well-being practices. As detailed below, these and similar representations were materially false and misleading when made. As defendants knew, or recklessly disregarded, the Company's content moderators were subjected to grotesque and horrifying working conditions, ranging from the maintenance, use, and distribution of extremely disturbing training materials that included real-life child sexual abuse images and videos, thereby inflicting occupational trauma, to inadequate psychological support, paltry pay, unrealistic performance targets, punitive salary deductions, extensive surveillance, and aggressive union-busting tactics.

18.     As would later be revealed by two investigative exposés, Teleperformance had subjected its content moderation employees to extremely inappropriate – and potentially criminal – working conditions which directly contradicted defendants' representations during the Class Period, exposing Teleperformance to a material undisclosed risk of severe reputational fallout, business disruptions, and government investigations.

19.     First, on August 4, 2022, *Forbes* published an article entitled "TikTok Moderators Are Being Trained Using Graphic Images of Child Sexual Abuse." The article stated in pertinent part as follows:

> **A largely unsecured cache of pictures of children being sexually exploited has been made available to third-party TikTok content moderators as a reference guide, former contractors say.**
>
> Nasser expected to be confronted with some disturbing material during his training to become a content moderator for TikTok. But he was shocked when he and others in his class were shown uncensored, sexually explicit images of children.

Nasser, who was working for a third-party company, Teleperformance, that moderates content for the social media giant, had been assigned to a special project: teaching TikTok's AI to spot the worst of the worst posted in the app. Just a few days into onboarding, he and his colleagues were shown graphic images and videos of children involved in sexual acts – all material that had been removed from TikTok.

"I have a daughter, and I don't think it's right – just a bunch of strangers watching this," Nasser, who left Teleperformance in 2020, told *Forbes*. "I don't think they should use something like that for training." (His last name, and some others in this story, have been omitted for privacy reasons.)

Whitney Turner, who worked for Teleperformance's TikTok program in El Paso for over a year and departed in 2021, also recalled being shown sexually exploitative imagery of kids as part of her training. Whitney was given access to a shared spreadsheet that she and other former employees told *Forbes* is filled with material determined to be violative of TikTok's community guidelines, including hundreds of images of children who were naked or being abused. Former moderators said the document, called the "DRR," short for Daily Required Reading, was widely accessible to employees at Teleperformance and TikTok as recently as this summer. While some moderators working in unrelated functions were restricted from viewing this material, sources told *Forbes* that hundreds of people across both companies had free access to the document. The DRR and other training materials were stored in Lark, internal workplace software developed by TikTok's China-based parent company, ByteDance.

Whitney was so aghast at the casual handling of the material that she reported it to the FBI, and subsequently met with an agent in June. The FBI did not respond to multiple requests for comment on whether it will investigate the matter.

**These parents don't know that we have this picture, this video, this trauma, this crime saved. If parents knew that, I'm pretty sure they would burn TikTok down.**

Whitney Turner, former moderator for TikTok

"I was moderating and thinking: This is someone's son. This is someone's daughter. And these parents don't know that we have this picture, this video, this trauma, this crime saved," Whitney told *Forbes*. "If parents knew that, I'm pretty sure they would burn TikTok down."

Teleperformance's Global President of Trust & Safety Akash Pugalia told *Forbes* the company does not use videos featuring explicit content of child abuse in training, and said it does not store such material in its "calibration tools," but would not clarify what those tools are or what they do. He declined to answer a detailed list of other questions regarding how many people have access to child sexual abuse material through the DRR and how Teleperformance safeguards this imagery.

TikTok is hardly alone in its struggle to purge child sexual abuse material. The most powerful social media platforms on the planet have long used machine learning and third-party human reviewers to catch and remove such content before it's widely shared, and many companies work with the National Center for Missing & Exploited Children, or NCMEC, to alert law enforcement of such problematic imagery in their apps.

What is unique, however, is the way TikTok and its outside consultants are handling this material – an approach experts say is ham-handed and cavalier at best, and harmful and re-traumatizing at worst. They say showing sexual images of kids in content moderation training, censored or not, only re-victimizes them. And storing the images in a widely accessible document is reckless and unnecessary.

TikTok spokesperson Jamie Favazza said that the company's "training materials have strict access controls and do not include visual examples of CSAM," but conceded that it works with third party firms who may have their own processes. TikTok declined to answer questions about how many employees have access to the DRR and where the document is hosted. TikTok's parent company ByteDance, purveyor of the Lark platform, did not respond to repeated requests for comment.

### "Free and loose is not going to work here"

Images of child abuse and exploitation are illegal, and there are strict rules for handling them when discovered. The material must immediately be taken down and reported to NCMEC's CyberTipline, where staff then analyze the files, and work to track down where they came from, so they can alert the appropriate law enforcement agency. Once a company has reported this material to NCMEC, it's statutorily granted immunity to retain it for 90 days to aid authorities. But federal law explicitly requires companies to "minimize the number of employees that are provided access" to that content, "maintain the materials in a secure location," and "ensure that any such visual depiction is permanently destroyed, upon a request from a law enforcement agency."

Top legal and online safety experts said making abusive and exploitative content featuring minors widely available to Teleperformance and TikTok workers with lax safeguards runs counter to that mandate and could cross the line from a safety or privacy problem to a crime.

"You have to have incredibly strict parameters for how it's being kept, how it's being viewed, how it's being shared – it is simply not something that you can just save on a computer or in a training file," said NCMEC's general counsel, Yiota Souras. Asked what could make such handling of child sexual abuse material a crime, Souras said it would depend on how the company is preserving and protecting it; who has access to it; and how it's being distributed, downloaded or otherwise replicated (in a document, for instance).

"How locked down is it?" Souras said. "Free and loose is not going to work here."

TikTok's Favazza said, "We aim to minimize moderators' exposure in line with industry best practices." Asked whether TikTok had provided Teleperformance with guidelines for handling child abuse material, Teleperformance did not respond. Pugalia, the company's Trust & Safety leader, said only that Teleperformance follows applicable laws wherever it operates.

**To use real-life examples and expose those examples to generations of new employees – that just strikes me as being irresponsible.**

David Vladeck, former director of the FTC's Bureau of Consumer Protection

David Vladeck, faculty director of Georgetown Law's Center on Privacy and Technology, added that while it's important for companies to train their employees and contractors to recognize posts that are out-of-bounds, they should not be using content scraped from the platform to do it.

"It's not hard to just come up with teaching tools that help staff delineate between what's okay and what isn't," said Vladeck, a former director of the Federal Trade Commission's Bureau of Consumer Protection. "But to use real-life examples and expose those examples to generations of new employees – that just strikes me as being irresponsible."

**"Guardians of The Internet"**

Teleperformance is a global customer service titan that has been around since the 1970s. The company saw record growth last year, raking in north of $8 billion in revenue. It boasts some 1,000 clients spanning nearly every sector, from healthcare to hospitality to retail to telecom – only recently adding social media to its portfolio.

Teleperformance launched its "Trust & Safety" arm in 2019, and its El Paso, Texas-based moderation program with TikTok was live by the end of that year, according to former moderators who were brought on at the time. (Neither company would say when the contract began.) The partnership is a feather in the cap of a decades-old business eager to show it's keeping up with the times. The company's most recent annual report touted its partnership with "the fastest growing video platform in the world," and said many of its employees now fashion themselves "Guardians of the Internet."

Teleperformance told *Forbes* it has a comprehensive recruitment process for content moderators and that it's committed to their wellbeing. But conversations with former employees reveal the extent to which moderators were both under-trained and overworked.

As TikTok grew rapidly and the volume of content on the platform surged, the company began punting more and more moderation tasks to Teleperformance, according to Richard, a former moderator and supervisor in El Paso who left the company in July after nearly three years there. He described a chaotic training department rife with communication problems and high turnover that often left young or inexperienced employees leading the work.

TikTok "has hardly any control of the training taking place now," Richard said. And Teleperformance is "at this point where they can't manage it accordingly or correctly . . . They're just overwhelmed."

Angel, who worked at Teleperformance in El Paso from February 2020 to December 2021, first as a content moderator and then as a manager, echoed those sentiments, noting Teleperformance's moderation arm simply couldn't handle TikTok's explosive growth.

"They were pretty much spread thin, that's for sure, at least in the training department," he said. As Teleperformance ramped up its work with TikTok, moderators were often trained and led by supervisors and other higher-ups who themselves did not have the proper clearances, according to Angel. As trainers scrambled to bring on more moderators, "they were pressured by management to

go ahead and get the people through" even with inadequate preparation, he explained.

Whitney added that when she asked her bosses "why we couldn't just be transparent with TikTok to let them know that we needed more time and training, I was repeatedly told it was because the contract was signed [and] we were expected to live up to the contract – or they would simply replace us with people that could."

### "Daily Required Reading"

The so-called "DRR" is one of several files that TikTok moderators have used as a resource on the job. (Neither TikTok nor Teleperformance would confirm whether it's still live today, but three former moderators who left this past May, June and July said the DRR was in use when they departed.)

Angel and other former staffers described the DRR as a spreadsheet filled with examples of violative content that had been removed from TikTok. Moderators said they were instructed to refer back to it for guidance on how to "tag" which policies that material violated. The spreadsheet had various tabs for different kinds of content – one related to terrorist organizations, another on nudity, for example. Child sexual abuse material was also given its own, designated tab, Angel said.

Whitney estimated that pictures, videos and descriptions of child sexual abuse made up about a quarter of the spreadsheet, which contained thousands of examples of violative material. She believed that the DRR dated back to when TikTok first brought on Teleperformance. Marjorie Dillow, who until May worked as a moderator for another Teleperformance hub in Boise, Idaho, left with a similar impression. "They don't really delete anything off of that DRR," she said.

Provided with all of this information, TikTok told *Forbes* it did not have enough details to confirm the existence of the DRR or answer a list of questions about it. Teleperformance also declined to answer a list of queries about the document. Neither would say how many people and companies have access to it – given it lives on ByteDance's Lark software, and ByteDance has had access to U.S. TikTok data in the past – or what company controls access to the material. They also would not say how far back the examples of child sexual abuse material on the DRR go, and what if any process there might be for purging it 90 days after reporting it, as law enforcement requires.

While there is not yet a common set of industry best practices for handling this material, the leader of the Tech Coalition, a group fighting child sexual abuse online that counts TikTok as a member, said there is a framework.

"There are certain laws that are sort of bright lines – like you have to maintain it for 90 days, it has to be embargoed, once you become aware of it, you must report it to NCMEC, it's generally a felony to possess this stuff," said Sean Litton, the coalition's executive director.  But "each company has set up their own way to process it."

**Because the Supreme Court and everyone else has recognized the subjects of this content are re-victimized every time someone looks at it, it shouldn't be bandied about in a light manner**.

Mary Graw Leary, former federal prosecutor

Former federal prosecutor Mary Graw Leary, an expert on child pornography and exploitation who previously helped lead NCMEC's legal work, said child sexual abuse material should be treated as "contraband," like guns or drugs.

"If you came across drugs in the workplace, or drugs at school, and you're a vice principal, you wouldn't put it in your desk and whip it out at the next faculty meeting to say, 'This is what cocaine looks like,'" she said.  "Similarly, because the Supreme Court and everyone else has recognized the subjects of this content are re-victimized every time someone looks at it, it shouldn't be bandied about in a light manner."

Asked how many people have access to the DRR spreadsheet, Angel estimated hundreds of people at the El Paso office alone and potentially anyone working with TikTok at Teleperformance's other U.S. locations, like Boise; as well as TikTok employees themselves.  Angel also noted that despite the El Paso site being "a no paper kind of office" where moderators caught with a phone "would automatically be fired," remote work during the pandemic made those privacy and security measures harder to enforce.  Seventy percent of Teleperformance's 420,000 employees worked from home in 2021, according to the company's most recent annual report.

Nasser said remote employees could access this sensitive spreadsheet from home.  "If somebody wanted to, they could pull up their phone and just start recording whatever they're seeing," he said.  "[They could] send it to their friends

or their buddies or whoever they wanted to. I don't think they would have any way of tracking any of this down in Teleperformance."

Former moderator AnaSofia Lerma told *Forbes* that despite being shown a sexual video of a child during training, she never encountered such material while on the job. She wondered why she'd been required to view it in the first place.

"I don't think it was necessary at all," said Lerma, who worked at Teleperformance in 2020. "If someone else uploads it, they should just take it down and just erase it from existence . . . . I did wonder, 'Why are they saving these videos?'"

"Honestly," she added, "I had to take a few minutes off."

Whitney from the El Paso office said she jumped at the opportunity to earn $18.50 an hour at Teleperformance – an upgrade from a past hourly wage of $16 working for a company that renovates Walmarts. A recruiter told Whitney she'd be like "a police officer for TikTok," and the prospect of protecting people excited her.

But after spending just over a year at Teleperformance, "I have been struggling to just function properly," Whitney said. She frequently loses her train of thought, becomes filled with rage at random and has feelings of suicide.

Nasser, a veteran with combat-related PTSD, has struggled, too, having found some of his experiences at Teleperformance to be more challenging than his time with the U.S. Army. As for the graphic videos of children he was forced to watch to land the job, he said, "Just talking about it, mentioning it alone, would be sufficient."

"I know what we saw, and it was pretty fucked up," he told *Forbes*. "We shouldn't have had to see any of that stuff."

20.     Second, on October 20, 2022, *Time* published an article entitled "Behind TikTok's Boom: A Legion of Traumatized, $10-A-Day Content Moderators." The article was the product of *Time*'s collaboration with *The Bureau of Investigative Journalism*, a nonprofit news organization based in London. The article stated in pertinent part as follows:

Luis, a 28-year-old student from Colombia, works through the night moderating videos for TikTok. During the day, he tries to get some sleep, but sometimes the videos haunt his dreams.

He remembers one video taken at a party, with two people holding what initially looked to him like pieces of meat. When they turned around, it appeared they were holding skin and gristle which had been flayed off human faces. "The worst thing was that the friends were playing games and started using the human faces as masks," he says.

Luis reeled off a list of the kind of content he sees on a regular basis: "Murder, suicide, pedophilic, pornographic content, accidents, cannibalism."

For Carlos, a former TikTok moderator, it was a video of child sexual abuse that gave him nightmares. The video showed a girl of five or six years old, he says. "She was dancing, like pointing her back to the camera, it was so close."

It hit him particularly hard, he says, because he's a father himself. He hit pause, went outside for a cigarette, then returned to the queue of videos a few minutes later.

Horrific videos such as these are part and parcel of everyday work for TikTok moderators in Colombia. They told the Bureau of Investigative Journalism about widespread occupational trauma and inadequate psychological support, demanding or impossible performance targets, punitive salary deductions and extensive surveillance. Their attempts to unionize to secure better conditions have been opposed repeatedly.

*"I would just cover up my screen and wait for 10 seconds to pass."*

TikTok's rapid growth in Latin America – it has an estimated 100 million users in the region – has led to the hiring of hundreds of moderators in Colombia to fight a never-ending battle against disturbing content. They work six days a week on day and night shifts, with some paid as little as 1.2 million pesos ($254) a month, compared to around $2,900 for content moderators based in the U.S.

The workers interviewed by the Bureau worked on TikTok content, but were contracted through Teleperformance, a multinational services outsourcing company that has more than 42,000 workers in Colombia, making it one of the country's largest private employers. The nine moderators could only speak anonymously for fear they might lose their jobs, or undermine their future employment prospects.

Neither TikTok nor Teleperformance responded to detailed lists of allegations for this story. Both companies issued statements saying they are committed to the wellbeing of their employees.

**Human Labor: Cheaper Than AI**

TikTok's recommendation algorithm is widely considered to be one of the most effective applications of artificial intelligence (AI) in the world. With almost alarming accuracy, it learns what an individual user finds funny or appealing, and serves them more content that they are likely to enjoy.

But TikTok's AI expertise only goes so far. The company uses human workers alongside AI to help keep its platform scrubbed of harmful content. And when content moderators at TikTok and other platforms mark a piece of content for removal, they are not just taking it down. They are also collecting data about the specific policies it violates – data that can be used to train the platform's machine learning systems to better identify such content in the future.

Some social media platforms struggle with even relatively simple tasks, such as detecting copies of terrorist videos that have already been removed. But their task becomes even harder when they are asked to quickly remove content that nobody has seen before. "The human brain is the most effective tool to identify toxic material," says Roi Carthy, the chief marketing officer of L1ght, a content moderation AI company. Humans become especially useful when harmful content is delivered in new formats and contexts that AI may not identify.

"There's nobody that knows how to solve content moderation holistically, period," Carthy says. "There's no such thing."

The existence of a low-paid, insecure global workforce may be exacerbating the problem, Carthy says. More computing power is required to analyze videos, which are more complex than photos and text. This means creating AI for moderating video is especially expensive.

"If you're looking at this from a monetary perspective, then content moderation AI can't compete with $1.80 an hour," Carthy says, referring to atypical wage for content moderators based in the global south. "If that's the only dimension you're looking at, then no content moderation AI company can compete with that."

**Psychological support 'just for show'**

Claudia, a current TikTok moderator, told the Bureau she felt anxious and panicked at work after watching successive videos of people eating live animals. These trending videos were impossible to escape and triggered a phobia of hers. "I would just cover my screen and wait for 10 seconds to pass," she says.

Claudia requested support through the Teleperformance scheme, which had to be approved by a supervisor, but she did not receive any help for two months. When the company's mental health support staff finally did get in touch, they said they were unable to help her and told her to seek out support through the Colombian healthcare system.

The mental harms of content moderation work are well-documented, and the moderators the Bureau spoke to reported many symptoms caused or exacerbated by their work, including depression, anxiety, loneliness, tremors and sleep loss.

A slick PR video produced by Teleperformance promotes the psychological support it offers. "Some call them angels," the voiceover says, describing its moderators while vaguely melancholic classical music plays in the background. "We know them as our friends, members of our family."

However, several moderators say the company's mental health support scheme is woefully inadequate.

Just one of those interviewed, a former moderator, felt Teleperformance did care about the mental health of its employees. Daniela said the company was particularly concerned about those who, like her, worked on the R1 team dealing with the most extreme content – although she personally had never felt the need to use the support.

But Luis, the man haunted by the video of flayed faces, says the in-house offering was "just for show." He also works on R1, but ended up seeking psychological support outside of work, through the Colombian healthcare system.

**Missing the metric**

The TikTok moderation system described by these moderators is built on exacting performance targets. If workers do not get through a huge number of videos, or return late from a break, they can lose out on a monthly bonus worth up to a quarter of their salary.

It is easy to lose out on the much-needed extra cash. Álvaro, a current TikTok moderator, has a target of 900 videos per day, with about 15 seconds to

view each video.  He works from 6am to 3pm, with two hours of break time, and his base salary is 1.2m pesos ($254) a month, only slightly higher than Colombia's minimum salary.  All the moderators interviewed by the Bureau were based in the capital Bogotá when they were working for TikTok, where rent and living expenses are above the national average.

For Álvaro, hitting his productivity, timekeeping, and accuracy targets can be worth an extra 300,000 pesos ($64).  But he says he usually earns closer to his base salary of 1.2m pesos.

A single slip up can be enough.  He once received a disciplinary notice known internally as an "action form" for only managing to watch 700 videos in a shift, which was considered "work avoidance".  Once a worker has an action form, he says, they cannot receive a bonus that month.

Álvaro worries these disciplinary actions will affect any future reference and hamper his job prospects.  "If I put this work in my work experience, they're gonna say I was avoiding work, not getting the metric, being a bad worker."

He adds: "You have to just work like a computer.  You pick the policies, no more.  Don't say anything, don't go to bed, don't go to the restroom, don't make a coffee, nothing."

Other moderators who spoke to the Bureau also had daily targets of 900-1,000 videos, while another who worked on longer videos of up to a minute reported targets of 200-250 per shift.

While some say they usually received their bonus, others say they only received it some of the time, and one moderator described it as impossible to attain.  Two say they felt they had unfairly missed out despite meeting their targets or being a top performer in their department.

Teleperformance spokesperson Mark Pfeiffer says: "Teleperformance is committed to employee wellbeing and staff diversity, equity and inclusion.  People care has been, is and will continue to be a global top priority for our business."

**Home surveillance**

Teleperformance, based in Paris, has become a market leader in content moderation services, with more than 7,000 of these types of workers around the world, according to analysis by Market Research Future.  It sees Colombia –where moderators told the Bureau it worked with Meta, Discord and Microsoft as well as

TikTok – as a key hub for cementing this position of dominance. Teleperformance documents name Colombia as one of two major hubs for content moderation in Latin America, the other being Brazil.

During the pandemic, business was booming. Last year, Teleperformance reported record revenue of €7.1 billion ($8.1 billion) and €557 million ($620m) in profit.

The widespread shift to working from home was partly behind this huge rise in profits, as companies contracted Teleperformance to help them manage their newly remote workforce, according to Aarti Dhapte, a senior analyst with Market Research Future.

At the same time, a large proportion of Teleperformance's own staff were shifted to remote work, cutting the cost of office maintenance. Teleperformance says that 70% of its global workforce is now remote, as were most of the moderators interviewed by the Bureau.

To reassure clients that this shift would not lead to a drop in standards, Teleperformance rolled out extensive surveillance systems, using both proprietary and third-party software to monitor its employees. NBC news revealed last year that Teleperformance workers in Colombia, including those subcontracted to Apple and Uber, had been pressured to sign contracts giving the company the right to install cameras in their homes.

Carolina, a former TikTok moderator who worked remotely for Teleperformance between June and September 2020, says supervisors asked her to be on camera continuously during her night shift. She was also warned that nobody else should be in view of the camera, and that her desk should be empty, apart from a drink in a transparent cup.

"That was terrible, because my family lives in my house as well," Carolina says. "So I felt very guilty telling them, 'Please don't pass behind the camera because I could be fired'. Teleperformance is especially paranoid with people seeing what we do."

Current moderators did not say they had to work on camera, but they do have to clock in and out and log any breaks on an app called Timekeeper. When Álvaro was once a few minutes back from the break on his overnight shift, his supervisor subsequently contacted him and put him on an action form.

A TikTok spokesperson says: "We strive to promote a caring working environment for our employees and contractors. Our Trust and Safety team partners with third party firms on the critical work of helping to protect the TikTok platform and community, and we continue to expand on a range of wellness services so that moderators feel supported mentally and emotionally."

**Union busting**

Outsourcing moderation to countries in the global south like Colombia works for businesses because it is cheap, and workers are poorly protected. Carolina, who left Teleperformance two years ago, says: "It's very important for people to get to know that this is abusive, and they're just companies taking advantage of the terrible economical situation that we've got for young people in Latin America."

Utraclaro, a Colombian union which represents IT and call center workers, has been trying to organize Teleperformance staff – including TikTok moderators –for more than two years. It has been a slow and laborious process, with push back from the company at every stage.

The union's key demands are that the company must allow workers to form a union without intimidation and that union reps are allowed access to the workplace to talk to their colleagues.

Teleperformance did not comment on specific allegations of union-busting in Colombia.

Eyewitnesses who asked to remain anonymous said they had seen union organizers harassed several times by security staff while trying to speak to Teleperformance workers at a business park in Bogotá.

When organizers gave out flyers or attempted to speak to workers taking their breaks outside the Teleperformance offices, the park's private security guards followed them and told them to stop. One person said she had seen a Teleperformance worker watch the organizers, and then speak with security guards. After this, more security guards were watching the workers.

On another occasion, the guards called the police after arguing with the organizers about their right to be there.

"Even if you're in a public area they don't care, they will harass you, they'll call the police," said another source.  "And because it's a big company, the police also will be in their favor."

After Utraclaro officially notified Teleperformance of its demands in August 2021, Teleperformance filed a legal claim at a labor court in Bogotá, alleging Utraclaro did not follow the proper processes when ratifying its bargaining demands.

The lawsuit is an attempt to intimidate workers, said UNI Global Union, an international trade union federation which is supporting Utraclaro in their dispute.

Teleperformance's lawyers have sought the "suspension, dissolution, liquidation and cancellation of the union registration," public court records show.

Change, however, may be on the horizon.  There has been some progress in discussions between Utraclaro and Teleperformance in recent weeks.  "The union in Colombia still has a frivolous lawsuit hanging over its head but at least there are some ongoing discussions which could potentially move things forward," says Christy Hoffman, secretary of UNI Global Union.

If Teleperformance reaches a deal with the union, it would be a significant moment for the outsourcing sector, which has historically been hostile to labor organizing.

"I've been in this kind of business since 2013," says one Teleperformance customer service employee, "I can tell you that if you say that word [*sindicato*, Spanish for trade union], you will be out the next day.  *Sindicato*?  You can't say that."

Claudia says she had joined the union to win a better salary and improved mental health support.  Luis also hoped staff would get a pay rise, and that the intense pressure on moderators would be reduced.

Álvaro, who lives alone in Bogotá and worked six days a week for the whole of last December after a holiday request was denied, says he just wants to spend Christmas with his family this year.

For now, however, TikTok's low-paid moderators will keep working to their grueling targets, sifting through some of the internet's most nightmarish content.

21.     Following the release of these articles, Teleperformance suffered severe reputational fallout and investor backlash.  The price of Teleperformance ADRs declined over 50% from its Class Period high, inflicting substantial economic losses and damages on Class members.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

22.     On July 29, 2020, the first day of the Class Period, Teleperformance issued a press release announcing its financial results for the interim period ended June 30, 2020.  The release highlighted the Company's performance in Core Services and Digital Integrated Business Services ("Core Services"), which included content moderation services, stating that Core Services revenue had increased 4.5% during the quarter to €1.165 billion.  The release highlighted Teleperformance's "'constant commitment to our employees and the quality of our training programs, career development systems and workplace environment'" and its "'priority to social responsibility,'" stating in pertinent part as follows:

> "The large number of Great Place to Work® certifications that we've earned or renewed since the beginning of the year also offer compelling recognition of our *constant commitment to our employees and the quality of our training programs, career development systems and workplace environment*.  These certifications further attest, in very real terms, to *our priority to social responsibility*, to the extent that today, on five continents, more than 70% of Teleperformance employees work in a subsidiary that has been specifically honored for its workplace environment."

23.     On November 3, 2020, Teleperformance issued a press release announcing its financial results for the third quarter ended September 30, 2020.  The release highlighted the

Company's performance in Core Services, which included content moderation services, stating that Core Services revenue had increased 8% during the quarter to €1.265 billion.

24.     On February 25, 2021, Teleperformance issued a press release announcing its financial results for quarter and year ended December 31, 2020.  The release highlighted the Company's performance in Core Services, which included content moderation services, stating that Core Services revenue had increased 16.9% during the quarter to €1.471 billion.  The release went to on to emphasize that Teleperformance "has made the well-being of its employees a key priority worldwide," stating in pertinent part as follows:

> ### A record year for "top employer" certifications
>
> As of December 31, 2020, *Teleperformance, which has made the well-being of its employees a key priority worldwide*, had been certified as a first-rate employer by independent experts such as Great Place to Work in 28 countries: Albania, Argentina, Brazil, China, *Colombia*, Costa Rica, Dominican Republic, Egypt, El Salvador, Germany, Greece, India, Indonesia, Kosovo, Madagascar, Malaysia, Mexico, Morocco, Peru, Philippines, Portugal, Russia, Saudi Arabia, Spain, Tunisia, United Arab Emirates, United Kingdom and the *United States*. These certifications cover 87% of the Group's global workforce, versus 70% in 2019 (22 countries certified).

25.     That same day, on February 25, 2021, Teleperformance held a related earnings call, hosted by defendants Julien and Rigaudy.  During the call, defendant Julien represented that "[w]e are extraordinarily focused on delivering an outstanding environment and social responsibility, at delivering an environment and social good governance."  Specifically, defendant Julien stated in pertinent part as follows:

> *We are extraordinarily focused on delivering an outstanding environment and social responsibility, at delivering an environment and social good governance. This is in our values, and in our philosophy of diversity and equity*.  We signed

the UN Global Compact 9 years ago. In 2020, we got Certified Great Place To Work. I remind you that Great Place To Work is independent third-party organization that makes a deep survey to our employee base country per country and that the status of Great Place To Work is definitely given by Teleperformance employees. We were able to pass from 70% of our employee base working in Great Place To Work to 87% at the end of the year. And we got the usual certification, Verego, Vigeo, MSCI, FTSE4Good. We got certified by all the actor who survey the environment and social responsibility governance.

26.     Later, during the call, defendant Julien stated that Teleperformance would be a "force of good" and employee well-being was first and foremost in the Company's operations, stating in pertinent part as follows:

> *[O]ur purpose is to be a force of good and to bring positive outcome for our different stakeholders*. Of course, for our shareholders. But first, for our clients. And even before our clients, *first, for the employees and the communities where we operate*. And we decided to have now a global sustainable ESG management model. *And that's why for 2021, we are going to make sure that we have more than 90% of our employees working in a Great Place To Work Teleperformance organization*.

27.     On April 12, 2021, Teleperformance issued a press release announcing its financial results for the first quarter ended March 31, 2021. The release highlighted the Company's performance in Core Services, which included content moderation services, stating that Core Services revenue had increased 30.3% during the quarter to €1.536 billion.

28.     On April 22, 2021, Teleperformance held an annual shareholders meeting, hosted by defendants Julien and Rigaudy, as well as Teleperformance's lead independent director, Patrick Thomas, and Teleperformance SVP Securities and Corporate Law, Sonia Cheurfa ("Cheurfa"). During the meeting, defendant Rigaudy represented that "[w]e want to be the preferred employer or the employee of choice on our market," which "means that we have to look at engagement of

staff, well-being in the workplace, professional development, health and safety, human rights, diversity and inclusion." Defendant Rigaudy continued, claiming that "in the most part, the group has been satisfied by independent third parties as being a great place to work." Defendant Rigaudy further claimed that Teleperformance had already met its high standards for employee satisfaction, stating, "to be the preferred employer on the market, well, our objective is to reach 90% by 2021, and we've already reached 87% . . . 90% and then 93% and then 95%, et cetera."

29.    On July 28, 2021, Teleperformance issued a press release announcing its financial results for the interim period ended June 30, 2021. The release highlighted the Company's performance in Core Services, which included content moderation services, stating that Core Services revenue had increased 32.1% during the quarter to €1.539 billion. In addition, the release emphasized the Company's purportedly "strong commitment to employees, with operations in 60 countries representing more than 90% of the workforce now certified as Best Employers." The release further represented that "Teleperformance has made the well-being of its employees a key priority worldwide," stating in pertinent part as follows:

### Best Employer certifications: 60 country organizations certified

***Teleperformance has made the well-being of its employees a key priority worldwide***. As of June 30, 2021, the Group had been certified in 60 countries as a "Best Employer" by independent experts like Great Place to Work. These certifications cover more than 90% of the Group's global workforce, versus 87% as of end 2020 (26 country organizations certified) and 70% at year-end 2019 (22 country organizations certified).

30.    The release then went to list the "[c]ountry organizations certified by activity and region," which included "Columbia" and "the United States."

31.     On July 28, 2021, Teleperformance held a related earnings call, which was hosted by defendant Rigaudy.  During the call, defendant Rigaudy represented that Teleperformance had "a strong commitment for employee[s]" and had been "certified best employer in 60 countries, as we speak, more than 90% of the group workforce."  Defendant Rigaudy further highlighted the Company's "strong commitment to employee and support."

32.     On September 29, 2021, Teleperformance issued a press release entitled "Teleperformance wins Great Place to Work award in Colombia for fifth year in a row," which announced that "award-winning operations in Colombia have been recognized for the fifth consecutive time with the prestigious Great Place to Work® (GPTW®) Award."  The release highlighted that "[w]ith a top global priority of employee well-being, 60 separate Teleperformance country operations are currently independently recognized as great employers by third party evaluators" including in "Colombia" and "the United States of America."  The release also quoted defendant Julien, who emphasized that "'[e]xceptional employee care, safety and well-being are top priorities,'" stating in pertinent part as follows:

> "***Exceptional employee care, safety and well-being are top priorities for our Group***.  We are pleased with the independent audit findings, and, especially, the unbiased endorsements of our own employees that make us a consistently Great Place to Work® in Colombia.  ***Our goal is to be the number one employer of choice everywhere we operate***.  More than 90% of our entire worldwide staff are now working in independently certified best employer operations across all geographies.  ***This validates we are helping set a strong, cross-industry employee care benchmark for large global enterprises all around the world***."

33.     The release further quoted Teleperformance's CEO of the MAR Region (Colombia, Guyana, Nicaragua, Peru), Andrés Bernal Gutierrez, who represented that "'[w]e are very proud of this independent Great Place to Work certification,'" and continued in pertinent part as follows:

> "A great workplace is about the level of trust that employees experience in their leaders, the level of pride they have in their jobs, and the extent to which they enjoy their colleagues.  The best part about achieving this certification is it shows we are on the right track, earning the trust of our team members and ***ongoing commitment to our employees*** to be a great organization."

34.     On November 3, 2021, Teleperformance issued a press release announcing its financial results for the third quarter ended September 30, 2021.  The release highlighted the Company's performance in Core Services, which included content moderation services, stating that Core Services revenue had increased 20.9% during the quarter to €1.529 billion.

35.     On February 17, 2022, Teleperformance issued a press release announcing its financial results for the year and quarter ended December 31, 2021.  The release highlighted the Company's performance in Core Services, which included content moderation services, stating that Core Services revenue had increased 15% during the quarter to €1.691 billion.  The release boasted about the "***Best Employer certification*** currently held in 60 countries covering 98% of the Group's workforce and ranking among the ***25 World's Best Workplaces™ by Fortune magazine*** in partnership with Great Place to Work®."  The release also claimed that "Teleperformance has made the well-being of its employees a key priority worldwide," stating in pertinent part as follows:

> ***Teleperformance has made the well-being of its employees a key priority worldwide***.  As of December 31, 2021, the Group had been certified in 60 countries as a "Best Employer" by independent experts like Great Place to Work.  These

certifications cover 98% of the Group's global workforce, versus 87% as of end 2020 (26 country organizations certified) and 70% at year-end 2019 (22 country organizations certified).

Extensive certification is one reason why Teleperformance was named in October 2021 *one of the 25 World's Best Workplaces™ across all industries by Fortune magazine* in partnership with Great Place to Work® (*Fortune World's Best Workplaces list*).

36.     The release then went on to list the "[c]ountry organizations certified by activity and region," which included "Columbia" and "the United States."

37.     On February 28, 2022, Teleperformance filed a Universal Registration Document with the AMF. The Universal Registration Document represented that the Company was "[a] preferred employer" "strongly committed to its employees' well-being [and] safety" and that "[s]pecial attention is paid to employees in charge of social media content management and moderation, as their job tends to generate a good deal of stress," including "resilience training," "a positive working environment enhanced by custom-developed infrastructure, expert counseling to foster psychological and emotional wellbeing and a 24/7 on-site and remote support program."

38.     The Universal Registration Document also quoted defendant Julien as stating that "'[o]ur commitment to our employees was recognized in September 2021 when we were named one of the 25 World's Best Workplaces™ by Fortune magazine in partnership with Great Place to Work®,'" which purportedly recognized "'a record number of 60 countries in the network with «Best Employer» certification, covering nearly 100% of our workforce.'" The Universal Registration Document further highlighted the Company's "STRONG COMMITMENT to employee well-being."

39.     In a section entitled "Employer of Choice," the Universal Registration Document represented that Teleperformance "makes its employees the focus of its business," "deploys a number of initiatives and tools in the areas of . . . wellbeing, and occupational health and safety," "places human aspects and emotional intelligence at the center of its operations," and has a "high-touch strategy [that] aims to boost employee happiness," stating in pertinent part as follows:

> *Teleperformance makes its employees the focus of its business.  The Group is committed to being an employer of choice in its market, an essential prerequisite in creating value for all stakeholders*.  A happy employee is the first step towards ensuring end-user satisfaction and therefore satisfying Teleperformance's clients.
>
> *To this end, the Group deploys a number of initiatives and tools in the areas of hiring, professional training and development, human rights, diversity and inclusion, wellbeing, and occupational health and safety, to monitor progress and the achievement of this goal*.
>
> *The Group also launched a high-touch strategy spanning the entire human resources value chain, with several key pillars*:
>
> - attract, recruit and retain talent;
>
> - *train and support employees in their professional development*;
>
> - *foster employee engagement*;
>
> - *listen to employees on an ongoing basis*;
>
> - continue to digitalize HR processes to enhance the employee experience and increase agility.
>
> This high-touch strategy, which places human aspects and emotional intelligence at the center of its operations, is aimed at Group employees, corporate clients and final end customers alike.  It is illustrated by the catchphrase that encapsulates Teleperformance's identity and mission: "Each Interaction Matters." *The Group believes that, as a responsible corporate citizen, it has a duty to help all of its employees fulfill their maximum potential through each interaction of their career at Teleperformance*.

\*      \*      \*

*Teleperformance's high-touch strategy aims to boost employee happiness and help it stand out as a forward-looking company.*

Teleperformance is fully committed to providing a unique work environment, including with regard to teleworking, and earns recognition from independent entities on a regular basis. ***In 2021, the Group was recognized as one of the World's 25 Best Workplaces™ for the first time.*** This exclusive distinction is awarded to leading employers worldwide by the Great Place to Work® Institute and Fortune magazine. Selected companies stood out for creating globally exceptional employee experiences, hightrust relationships, and workplaces that are fair and equal for all. Great Place to Work® Institute, the global authority on workplace culture, selected the list using rigorous analytics and confidential employee feedback across multiple evaluative criteria and incorporating strict, third-party validation.

In 2021, Teleperformance also ranked as one of the 25 Best Workplaces in Europe™ in the Multinationals category, a Top Five Best Multinational Workplace in Latin America™, and a Great Place to Work® in 60 countries across all world regions. This represents 98% of the entire Teleperformance workforce worldwide (see section 2.3.2.1).

40.     In another section entitled "Employee engagement," the Universal Registration Document claimed that "[e]mployee engagement is a Group priority. As such, Teleperformance has built a corporate culture based on trust and an exceptional employee experience. It is based on a safe and secure work environment, in which everyone is able to maximize their potential and share in the Group's success." The Universal Registration Document continued in pertinent part as follows:

In 2021, over 183,000 of our employees from all over the world participated in independent employee trust surveys conducted by Great Place to Work® to confidentially rate us on the job we are doing as an employer. Great Place to Work® Institute, the global authority on workplace culture, awards the world's only independent certification based on the quality of the employee experience.

The average score of 79% obtained by Teleperformance in the Trust Index© surveys is well above the minimum requirement of 65%. ***The high scores reflect well on fairness, inclusion, equality, trust and teamwork in a highly diverse Group comprising over 100 different nationalities.  They have enabled Teleperformance to obtain or renew Great Place to Work® or Best Places to Work® certifications in 60 countries, and to be ranked among the World's 25 Best Workplaces™.  These awards cover 98% of the Group's workforce.***

41.     On March 3, 2022, Teleperformance filed its annual Integrated Report for fiscal 2021 ("2021 Report").  In a forward to the report, defendant Julien stated that "[o]ur commitment to corporate and social responsibility is total and unconditional."

42.     The 2021 Report highlighted Teleperformance's content moderation business, characterizing Teleperformance content moderators as the "Guardians of the Internet."  The 2021 Report claimed that Teleperformance was a leader in providing Trust & Safety solutions, which the report characterized as a rapidly growing business opportunity.  The 2021 Report emphasized Teleperformance's "Impact Sourcing partnership with one of its clients, the fastest growing video platform in the world" – an apparent reference to TikTok.  The 2021 Report continued in pertinent part as follows:

> **The number of digital platforms and social media networks continues to rise.  Their use generates a huge amount of data and content that needs to be monitored.**
>
> For three years now, Teleperformance's Trust & Safety solutions have provided ongoing protection of customer and client data, ensuring regulatory compliance, safeguarding brand reputation and making platforms safer in a wide range of sectors such as social media, e-commerce, technology, travel, financial services and online gaming.
>
> **Innovative high-performance SOLUTIONS**
>
> Guided by the Group's balanced high-touch, high-tech approach, our Trust & Safety teams stand out for their mastery of cultural and linguistic subtleties,

technical expertise, training in problem solving and extensive knowledge of user expectations, while continuously helping to improve algorithms.

43.     The 2021 Report further emphasized the robust training and support services that Teleperformance purportedly provided to its content moderators, stating in pertinent part as follows:

**SOLUTIONS focused on employee wellbeing**

**Teleperformance places great importance on the wellbeing and mental health of its moderators. Specific procedures have been developed for them, including:**

- an appropriate hiring procedure involving a series of psychometric tests designed to identify resilient candidates suited to this type of position;

- resilience training provided to all managers, trainers, team leaders and advisors to help them identify signs of emotional stress and know how to deal with them;

- personalized organization and infrastructures to provide the right working environment: relaxation times, wellbeing workshops, regular employee surveys, the chance to disconnect, regular rotation on the most sensitive positions;

- continuous access to counseling, including by certified therapists;

- a 24/7 support program during and after the work cycle.

44.     On April 14, 2022, Teleperformance held an annual shareholders meeting, which was hosted by defendants Julien and Rigaudy, as well as the Company's General Manager in charge of Group Corporate Social Responsibility, Clementine Gauthier ("Gauthier"), and Cheurfa. During the meeting, Gauthier represented that "[t]he first commitment has to do with the commitment to our employees," which "means adhering to best HR practices in all countries of establishment" and being "a preferred employer in all countries where we operate with good practices in terms of compensation, job, and private life balance and social benefits and so forth."

Gauthier further emphasized the Company's "first objective, which is to be the preferred employer in the markets," stating in pertinent part as follows:

> *Let's talk about our first objective, which is to be the preferred employer in the markets*. We're continuing to get certification of best employer from the independent institute, which is well known in this matter called Great Place to Work. Last year, over 180,000 of our employees answered the anonymous questionnaires, which entail about 60 questions on their job satisfaction, their well-being and their commitment. Our employees gave us a 79% trust score, trust index, well above the threshold of 65%, which is required to be qualified. 87% of our employees feel that we are a reference employer. And that's significant as well, we need to underscore. All of this made possible for us to be certified as a best employer in 60 of our countries, covering 98% of our global head force. We're one of the top the 25 places to work by Fortune and in Great Place to Work.

45. On April 19, 2022, Teleperformance issued a press release announcing its financial results for the first quarter ended March 31, 2022. The release highlighted the Company's performance in Core Services, which included content moderation services, stating that Core Services revenue had increased 11.4% during the quarter to €1.711 billion.

46. On May 25, 2022, Teleperformance issued a press release stating that the Company had been "recognized as a leader in Trust and Safety Content Moderation." In the release, defendant Pugalia, the Company's Global President of Trust & Safety, highlighted the critical importance of content moderation to Teleperformance's business and claimed that the Company had implemented effective safeguards to protect its employees tasked with content moderation, stating in pertinent part as follows:

> *"Creating a safe and secure online environment is critically important to our company, our clients and their users and partners* . . . . Bad actors, hackers and people who want to do harm via online channels can cause extensive damage to others. *We have designed and implemented policies to safeguard the users of these platforms and our digital first responders while ensuring brand trust for*

*our clients. We continue to invest heavily in moderator training, coaching and education along with multiple additional safeguards to address content moderation realities for all stakeholders including users, brands and clients.*"

47.    In the release, defendant Julien similarly stated that protecting the well-being of Teleperformance's content moderators was a "top" Company priority, stating in pertinent part as follows:

"*The safety and well-being of our employees and protecting our clients and their brands are top Group priorities. Teleperformance constantly enhances training, support services and analytical technologies to protect our people and to assist our clients in identifying and removing harmful content*."

48.    On July 27, 2022, Teleperformance issued a press release announcing its financial results for the interim period ended June 30, 2022. The release highlighted the Company's performance in Core Services, which included content moderation services, stating that Core Services revenue had increased 10.5% during the quarter to €1.7 billion. The release also represented that "Teleperformance has made the well-being of its employees a key priority worldwide," stating in pertinent part as follows:

*Teleperformance has made the well-being of its employees a key priority worldwide*. As of June 30, 2022, the Group had been certified in 64 countries as a "Best Employer" by independent experts like Great Place to Work. These certifications cover more than 95% of the Group's global workforce, versus 70% pre-Covid (22 country organizations certified as of end-2019).

49.    That same day, Teleperformance held a related earnings call hosted by defendant Rigaudy. During the call, defendant Rigaudy stated that "we continue to support our employees because we do believe that we cannot win against our employee, and we push for them or help them." Defendant Rigaudy continued: "And we have been able to be certified in 64 countries today, 4 more in the last year, representing more than 90% of the group workforce."

50. Defendants' statements referenced in ¶¶22-49 above were materially false and misleading when made because they misrepresented and failed to disclose material adverse facts about Teleperformance's business, operations, and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a) that Teleperformance's growth in Core Services had been achieved, in part, by requiring its content moderators to engage in inappropriate, traumatic, abusive, and potentially criminal activities;

(b) that certain Teleperformance social content moderators had been trained with materials which included illicit images of child sexual exploitation;

(c) that contraband images had been included in Teleperformance Daily Required Reading reports for its content moderation staff;

(d) that Teleperformance had failed to safeguard child sexual abuse material and had potentially violated strict rules governing the handling of such materials, including rules relating to the National Center for Missing & Exploited Children;

(e) that Teleperformance had failed to provide adequate training or emotional and psychological support to content moderators exposed to egregious materials, including those exposed to extreme graphic violence and sexual images;

(f) that Teleperformance had imposed unreasonable time and performance targets that compounded the occupational trauma suffered by its content moderators;

(g) that Teleperformance had failed to implement or maintain the working conditions represented to investors, including by subjecting the Company's content moderation

workers to widespread occupational trauma without psychological support, and with paltry pay, punitive salary deductions, extensive surveillance, and aggressive union-busting tactics; and

(h)     that, as a result of (a)-(g) above, Teleperformance was subject to a material, undisclosed risk of legal, regulatory, business, and reputational harm if the truth regarding the Company's content moderation services, treatment of its content moderation workers, and handling of contraband materials was ever publicly revealed.

51.     On August 4, 2022, *Forbes* published a shocking article entitled "TikTok Moderators Are Being Trained Using Graphic Images Of Child Sexual Abuse," revealing that Teleperformance had subjected its workers to unconscionable working conditions.  The article cited former employees at Teleperformance's offices in Boise, Idaho and El Paso, Texas who told *Forbes* that Teleperformance used real-life extremely graphic images and videos of child sexual abuse to train its TikTok content moderators.  *Forbes* reported, for example, that although a former Teleperformance employee "expected to be confronted with some disturbing material during his training to become a content moderator for TikTok," "he was shocked when he and others in his class were shown uncensored, sexually explicit images of children." One employee was reportedly so aghast she reported her concerns to the FBI.  This horrifying material was reportedly contained in a spreadsheet called the Daily Required Reading ("DRR"), which had various tabs for different kinds of content, including a dedicated tab for child sexual abuse, and was stored in an internal workplace software developed by TikTok's parent company, ByteDance, and which was widely accessible to employees at Teleperformance, including remote employees.  These materials were reportedly potentially illegal for the Company to maintain and distribute, let alone use as training

materials.  The *Forbes* article also noted that although "Teleperformance told *Forbes* it has a comprehensive recruitment process for content moderators and that it is committed to their wellbeing," "conversations with former employees reveal the extent to which moderators were both under-trained and overworked" as Teleperformance's content moderation arm "simply couldn't handle TikTok's explosive growth," with moderators "pressured by management to go ahead . . . even with inadequate preparation."

52.     As a result of this news, the market price of Teleperformance ADRs declined nearly 5% from $168.69 per ADR when the market closed on August 4, 2022 to $160.94 per ADR when the market closed on August 5, 2022.  However, because the full truth was not disclosed and defendants continued to make materially false and misleading statements, the price of Teleperformance ADRs remained artificially inflated.

53.     The revelations in the August 4, 2022 *Forbes* article sparked intense scrutiny of Teleperformance's practices, including a bipartisan U.S. Senate inquiry.  Senator Richard Blumenthal of Connecticut and Senator Marsha Blackburn of Tennessee, who led the Senate Commerce consumer protection subcommittee, wrote a letter to defendant Julien asking for information about the DRR, including "how many people had access to the document, the volume of child sexual abuse material it contained, how long the file had existed and whether it's still being used" as well as "how it had obtained the sexually explicit materials involving minors in the first place."  Senators Blumenthal and Blackburn further wrote to defendant Julien: "This is incredibly disturbing . . . .  By using these explicit images and videos as training materials, not

only has Teleperformance subjected content moderators to the most repugnant subject matter imaginable, but it has actively promoted what it ostensibly sought to remove from TikTok."

54.    Teleperformance denied the allegations and continued to claim that it promoted a safe and accommodating workplace environment.  For example, on August 18, 2022, *Forbes* reported that in response to the Senators' letter, Teleperformance spokesperson Mark Pfeiffer ("Pfeiffer") told *Forbes* in an emailed statement that "'we take these allegations very seriously and we recently conducted an internal audit which found no evidence of the use of or access to CSAM images in training.'"  Pfeiffer added that they are "'now in the process of having an independent third party audit conducted in order to examine all of our content moderation operational standards and processes.'"

55.    On September 8, 2022, Teleperformance issued a press release entitled "Teleperformance certifies record 64 countries as Great Place to Work® locations," which represented that the Company's "operations in 64 countries have received Great Place to Work® certifications, up four countries from 2021."  The release continued: "With this achievement, Teleperformance increases its number of certified countries two years in a row, and confirms over 97% of its 420,000 global employees are working in a Great Place to Work® location."  The release also stated that the "sheer scale and magnitude of this global people initiative sets a very high standard in employee care for large global companies in all industry sectors."  The release also quoted defendant Julien as stating that "'we all share a common global commitment to be a great and welcoming worldwide employer'" and that "'we are committed to continuing our efforts to improve even when every single employee is working in a Great Place to Work certified

location.'"   The release further quoted Teleperformance's Chief People Officer and Chief Diversity Officer, Alan Winters ("Winters"), who stated that "'[t]aking care of our people is always our number one priority, which has guided every decision we've made during the past two years.'" Winters continued: "'It is a tremendous vote of confidence that our employees recognize and appreciate our efforts to create an inclusive and caring workplace.'"

56.     On October 18, 2022, Teleperformance issued a press release entitled "Teleperformance named one of the 25 World's Best Workplaces™ in 2022 by Fortune and Great Place to Work® for the second consecutive year and scores industry best global ranking."  The release boasted that "Great Place to Work® and *Fortune* magazine have independently ranked the company as one of the 25 World's Best Workplaces™ in 2022."  The release emphasized that "[w]ith this important achievement in 2022, Teleperformance increases its number of certified Great Place to Work countries two years in a row, with over 97 percent of its global employees currently working in independently certified Great Place to Work operations," which the release claimed "helps set a new standard of employer workplace excellence for large companies operating worldwide across all industries."  The release also quoted defendant Julien who stated that "'[b]eing again named one of the 25 World's Best Workplaces™ and rising to the 11th overall best worldwide position shows our 420,000 global employees feel *we are living up to our shared values and that we really care about them*,'" and that "'*[t]he well-being of our people is always a top priority*.'"

57.     On October 20, 2022, *Time* published an article entitled "Behind TikTok's Boom: A Legion of Traumatized, $10-A-Day Content Moderators."  The *Time* article corroborated many

aspects of the *Forbes* article, including the provision of explicit images depicting child sexual abuse to Teleperformance content moderators. The article quoted anonymous Teleperformance content moderators in Colombia who detailed widespread occupational trauma as a result of the content they reviewed on a daily basis, including "'[m]urder, suicide, pedophilic, pornographic content, accidents, cannibalism'" and "child sexual abuse." The content moderators also detailed woefully inadequate psychological support, characterizing the in-house offering as "'just for show'" as they were told to seek out support through the Colombian healthcare system instead. In direct contradiction of defendants' prior statements to the market, the Teleperformance workers interviewed by *Time* cited paltry pay for working six days a week on day and night shifts, unrealistic performance targets and excessively punitive measures that made it practically impossible to earn a monthly bonus worth up to a quarter of their salary, extensive surveillance, and the use of aggressive union-busting tactics.

58. Defendants, however, continued to deny the allegations and claimed that the Company offered one of the best workplaces in the world, causing the price of Teleperformance ADRs to remain artificially inflated.

59. On November 3, 2022, Teleperformance issued a press release announcing its financial results for the third quarter ended September 30, 2022. The release highlighted the Company's performance in Core Services, which included content moderation services, stating that Core Services revenue had increased 14.4% during the quarter to €1.749 billion. In addition, the release stated that "[i]n October 2022, for the second year running, Teleperformance was

named *one of the World's 25 Best Workplaces™ across all industries by Fortune magazine* in partnership with Great Place to Work®."

60.     On November 4, 2022, Teleperformance held a corporate sales call, which was hosted by defendants Julien and Riguady.   At the beginning of the call, defendant Julien represented that "we have been awarded being in the top 25 best company to work for in the world" and that "97% of our employees that are in the country where we are certified best employees." Defendant Julien denied the allegations in the *Forbes* and *Time* articles, claiming that "we take . . . special care of [content moderators]," including "[h]igher salaries, much more break in the shift and constant psychological support."   Defendant Julien continued by stating that "AI eliminates 97% of the egregious content," "leaving 3%, that is questionable" and "has to be reviewed by a human moderator," that the highly egregious content is "more or less around 1 per 1 million reviewed content," "has nothing to do with what you have read in the press" and that both the internal and external audits that were conducted following the publication of the *Forbes* article with regard to Teleperformance's U.S. content moderation operations showed "minor element[s] that could be improved," but that "the allegation[s] in the press are really misleading."

61.     Defendants' statements referenced in ¶¶54-60 above were materially false and misleading when made because they misrepresented and failed to disclose material adverse facts about Teleperformance's business, operations, and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that defendants' denials of the corporate actions and workplace environment detailed in the *Forbes* and *Time* articles described above were materially false and misleading; and

(b)     that, as a result of (a) above, Teleperformance was subject to a material, undisclosed risk of legal, regulatory, and reputational harm if the truth regarding the Company's content moderation services, treatment of its content moderation workers, and handling of contraband materials was ever publicly revealed.

62.     On November 7, 2022, Teleperformance published a letter claiming that the external audit did not find any inconsistencies with its internal audit and that the Company "found no Child Sexual Abuse Material (CSAM) content in Company-provided ongoing education materials or guidance documents." The audit reports themselves, however, were not made public, and Teleperformance did not explain why two separate reputable news organizations had reportedly received contrary information from multiple Teleperformance employees and why a criminal referral had been made to the FBI by a former Teleperformance content moderator. As noted by a November 10, 2022 RBC Capital Markets analyst report: "An investor question as to why some conclusions could not be redacted, aggregated and issued in a press release to refute journalists' allegations was objectively not particularly well answered, in our view."

63.     Then, on November 9, 2022, *Time* reported that "Colombia's Ministry of Labor has launched an investigation into TikTok subcontractor Teleperformance, relating to alleged union-busting, traumatic working conditions and low pay."

64.     As a result of this news, the price of Teleperformance ADRs declined nearly 19% from $132.32 per ADR when the market closed on November 9, 2022, to $107.77 per ADR when the market closed on November 10, 2022, with similar declines occurring with respect to trading in the Company's ordinary shares on the Paris Stock Exchange.  The drop was of such magnitude that on November 10, 2022, Teleperformance's executive management requested a brief suspension of Teleperformance's market listing and convened a conference call aftermarket.

65.     On November 10, 2022, Teleperformance held a conference call hosted by defendants Julien and Rigaudy, Teleperformance's Chief Operating Officer Agustin Grisanti ("Grisanti"), and Teleperformance's President of Transformation Bhupender Singh ("Singh"). The call opened with defendant Julien stating that he "got in the middle of the night a kind of very violent wake-up call with the news of a massive sale of the Teleperformance stock on the market" and that "this massive sales came following a tweet posted by the Minister of Labor of the new recently elected Government of Colombia and the tweet was stating that they have decide[d] to start control on Teleperformance Colombia labor conditions and environment."

66.     On November 14, 2022, Teleperformance issued a press release entitled "Teleperformance Colombia to meet with representatives of the Colombian government."  The release announced that "a meeting between Teleperformance Colombia and the country's Ministry of Labor will take place on Wednesday, November 16, 2022 . . . to engage and collaboratively discuss its operations in Colombia, where Teleperformance is a major employer with over 41,000 employees, with the recently elected new government of Colombia."

67.     The results of a Company-sponsored external audit of Teleperformance's content moderation operations in Colombia was made public on December 7, 2022.  The summary report stated that Teleperformance Colombia received the independent assurance by Bureau Veritas about the use and inclusion of International Standard ISO 26000, Guidance on Social Responsibility, in its operations.  However, the ISO 26000 norm provides guidance rather than requirements.  The summary report stated that "[t]his engagement was undertaken to provide a limited level of security – which is substantially lower than reasonable assurance – about the use made by Teleperformance in Colombia of guidelines and recommendations in International Standard ISO 26000 to integrate and address social responsibility within its operations in Colombia," "does not pretend to serve for certification or conformity purposes," and relied on "procedures and evidence [that] are substantially inferior to those that would be used for a reasonable assurance engagement."

68.     On November 17, 2022, Teleperformance issued a press release entitled "Teleperformance exits the highly egregious part of the Trust and Safety business."  Despite defendants' repeated denials of any wrongdoing, the release abruptly announced the Company's exit from the business of moderating "highly egregious" materials.  The release further stated that "[a]fter reflecting on the consistent feedback received in the recent days from a vast majority of shareholders and the financial community regarding the perception of its trust and safety business, Teleperformance has decided to exit the highly egregious part of the trust and safety business."

69.     That day, Teleperformance held a conference call with analysts to answer questions regarding the Company's exit of the highly egregious content moderation business, which was

hosted by defendants Julien and Rigaudy, Grisanti, Singh, and Teleperformance's Global Chief Client Officer, Miranda Collard. During the call, defendant Julien stated that the decision to exit the "egregious" segment of the business was the "result of listening carefully to the concern of our shareholders" and that "the global Executive Committee of Teleperformance . . . unanimously supports this decision." During the call, an analyst asked about the share of growth coming from content moderation in 2022 compared to 2021 where "content moderation provided about 1/4 of your ex- COVID with like-for-like growth last year." In response, Singh confirmed that "a lot" of the Company's 2022 growth came from content moderation. When asked about the impact of the change, defendant Julien noted that the Company's exit of the "egregious" segment could impact up to 25% of all of Teleperformance's content moderation business.

70.     On December 1, 2022, Teleperformance issued a press release announcing that it had signed a global agreement with UNI Global Union, an international union federation, "to strengthen shared commitments to workers' rights to form trade unions and engage in collective bargaining – while advancing principles on key issues such as health and safety and workplace monitoring." Many labor advocates praised the agreement as achieving a commitment to improved labor conditions that had long been resisted by the Company.

71.     Then, on March 22, 2023, Teleperformance unexpectedly announced that it was re-entering the business of "egregious" content moderation despite the Company's prior "unanimous" decision to exit it. The surprise move was seen by market observers as an indication of the difficulty of separating out "egregious" content from other types of content and the critical importance of content moderation to Teleperformance's overall business and growth prospects.

Several analysts panned the move.  For example, a March 24, 2023 HSBC Global Research analyst report stated that the "U-turn on content moderation raises concerns about communication, governance and broad fundamentals."

72.     As a result of this news, the price of Teleperformance ADRs declined nearly 6% over three days from $119.69 per ADR when the market closed on March 21, 2023, to $112.82 per ADR when the market closed on March 24, 2023, with similar declines occurring with respect to trading in the Company's ordinary shares on the Paris Stock Exchange.

73.     As a result of defendants' materially false and misleading statements, Teleperformance ADRs traded at inflated prices during the Class Period.  However, after the above revelations seeped into the market, the price of Teleperformance ADRs was hammered by massive sales, sending the price down over 50% from its Class Period high and causing significant financial losses and economic damage to plaintiff and other members of the Class.

### ADDITIONAL SCIENTER ALLEGATIONS

74.     As alleged herein, Teleperformance and the Individual Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Teleperformance, their control over, and/or receipt and/or modification of Teleperformance's

allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Teleperformance, participated in the fraudulent scheme alleged herein.

75.     In addition, the fact that content moderation was a substantial part of Teleperformance's business and growth strategy further supports a strong inference of scienter as it is implausible that the Individual Defendants would not have closely monitored their content moderation operations, including the workplace environment.  Indeed, the Individual Defendants repeatedly made representations regarding Teleperformance's workplace environment throughout the Class Period.  As defendant Julien has noted, content moderation was a "significant" portion of Teleperformance's business, representing 7% of Teleperformance's revenue and its primary growth driver.  Moreover, according to a BofA Securities analyst report dated November 11, 2022, content moderation accounted for approximately 9% of Teleperformance's profitability. Likewise, during the April 14, 2022 annual shareholder meeting, defendant Julien characterized content moderation as a "big business in itself."  Content moderation is a high-growth business line driven by the explosion of social media.  According to Everest Group, the content moderation market was worth over $8 billion globally in 2022 and had grown at 40% CAGR since 2018.

76.     In addition, Teleperformance was particularly susceptible to reputational harm with respect to Environmental, Social, and Governance ("ESG") issues during the Class Period. Teleperformance stock is relatively well owned by ESG funds who may sell the stock in the event that the Company is perceived to have fallen short of ESG standards.  Following the revelations detailed herein, several analysts noted the particular importance of complying with ESG standards

to the price of Teleperformance stock, with an estimated 9% of Teleperformance shares held by ESG funds towards the end of the Class Period. For example, a December 12, 2022 BNP Paribas analyst report noted: "Fear that ESG funds will reduce their exposure to Teleperformance has penalised the share price. . . . [T]he risk was seeing the company's ESG notation being downgraded and those funds to become forced sellers." The need to satisfy ESG investors provided a strong incentive for defendants to misrepresent the true state of Teleperformance's content moderation services and workplace.

77.     Furthermore, on numerous occasions throughout the Class Period, Defendants emphasized the importance of employee well-being as a "key priority" for the Company and the Individual Defendants. By addressing employee well-being on numerous occasions, including during quarterly conference calls, press releases, and other communications to investors, the Individual Defendants evidenced their involvement in and attention to the underlying facts. Such facts provide a strong inference that defendants were aware of the fraudulent scheme detailed herein, or extremely reckless in failing to be aware of it – particularly in light of the critical importance and public scrutiny attached to such matters.

## NO SAFE HARBOR

78.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ

materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Teleperformance who knew that those statements were false when made.

## LOSS CAUSATION AND ECONOMIC LOSS

79.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Teleperformance ADRs and operated as a fraud or deceit on purchasers of Teleperformance ADRs.  As detailed above, when the truth about Teleperformance's misconduct was revealed, the price of Teleperformance ADRs declined precipitously as the prior artificial inflation no longer propped up the ADRs' price.  The decline in the price of Teleperformance ADRs was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the ADRs' price decline negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Teleperformance ADRs and the subsequent significant decline in the value of Teleperformance ADRs when defendants' prior misrepresentations and other fraudulent conduct were revealed.

80.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Teleperformance's business, operations, and financial results as alleged herein.  Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Teleperformance ADRs to be artificially inflated.  Plaintiff and other Class members purchased Teleperformance ADRs at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

81.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

82.     Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Teleperformance ADRs was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     Teleperformance's ordinary shares were actively trading on the Paris Stock Exchange (Euronext Paris);

(b)     Teleperformance ADRs traded largely in tandem with the ordinary shares on the U.S. OTC market;

(c)     Teleperformance filed periodic public reports with the AMF;

(d)     Teleperformance was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace;

(e)     Teleperformance published material information of significance to investors on its website in the English language;

(f)     Teleperformance regularly communicated with public investors by means of established market communication mechanisms, including the regular dissemination of press releases and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(g)     the market reacted promptly to Company-specific news.

83.     As a result of the foregoing, the market for Teleperformance ADRs promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the ADRs.  Under these circumstances, all those who transacted in Teleperformance ADRs during the Class Period suffered similar injury through their transactions in Teleperformance ADRs at artificially inflated prices and a presumption of reliance applies.

84.     Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Teleperformance ADRs between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed.

Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Teleperformance ADRs, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Teleperformance ADRs during the Class Period.  Excluded from the Class are defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors, or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

86.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Teleperformance ADRs were actively traded on the U.S. OTC market.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Teleperformance or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

87.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

88.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

89.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the 1934 Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations, and management of Teleperformance; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

90.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

91.     Plaintiff incorporates ¶¶1-90 by reference.

92.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Teleperformance ADRs during the Class Period.

94.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Teleperformance ADRs.  Plaintiff and the Class would not have purchased Teleperformance ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

95.     Plaintiff incorporates ¶¶1-94 by reference.

96.     The Individual Defendants acted as controlling persons of Teleperformance within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Teleperformance stock, the Individual Defendants had the power and authority to cause Teleperformance to engage in the wrongful conduct complained of herein.  Teleperformance controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23 and appointing plaintiff as Lead Plaintiff and approving its selection of Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff's reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

DATED:  This <u>19th</u> day of April, 2023.

JOHNSON & MONTELEONE, L.L.P.

<u>   /s/  Jason R.N. Monteleone       </u>
Jason R.N. Monteleone
Attorneys for Plaintiffs


## DEMAND FOR JURY TRIAL

Pursuant to F.R.C.P. 38(b), Plaintiff hereby demands a trial by jury on any and all issues

properly triable by jury in this action.

DATED:  This <u>19th</u> day of April, 2023.

JOHNSON & MONTELEONE, L.L.P.

<u>   /s/  Jason R.N. Monteleone       </u>
Jason R.N. Monteleone
Attorneys for Plaintiffs

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

City of Warren General Employees' Retirement System ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Collinsville Police Pension Board v. Discovery, Inc.*, No. 1:22-cv-08171 (S.D.N.Y.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this *1ST* day of ~~February~~ MARCH eee, 2023.

City of Warren General Employees'
Retirement System

By: *Christine C Cassani*

Its: *CHAIRMAN*

TELEPERFORMANCE

## SCHEDULE A

## SECURITIES TRANSACTIONS

**ADR**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/12/2022 | 24 | $156.20 |
| 07/13/2022 | 159 | $156.31 |
| 07/15/2022 | 159 | $158.98 |
| 07/18/2022 | 172 | $163.03 |
| 08/05/2022 | 163 | $159.48 |
| 08/11/2022 | 91 | $162.60 |
| 08/12/2022 | 127 | $160.93 |

Prices listed are rounded up to two decimal places.