UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 23-24580-CIV-ALTONAGA/REID

| | | |
|---|---|---|
| CITY OF WARREN GENERAL EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TELEPERFORMANCE SE, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CLASS ACTION |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................................................1

II.    STATEMENT OF FACTS ..................................................................................................1

III.   ARGUMENT.......................................................................................................................4

     A.     Plaintiffs Are Not Attempting an Extraterritorial Application of Section
           10(b)............................................................................................................................4

     B.     Plaintiffs Plead Actionable Material Misstatements and Omissions ......................5

           1.     The AC Is Not an Improper "Puzzle Pleading" ...........................................6

           2.     Defendants' Statements About Their Commitment to CSR and
                 Employees Were Materially False and Misleading ....................................6

           3.     Defendants' Statements About Content Moderators Were
                 Materially False and Misleading.................................................................8

           4.     Defendants' Statement About Collective Bargaining Was
                 Materially False and Misleading...............................................................10

           5.     Defendants' Statements About the *Forbes* and *Time* Articles Were
                 Materially False and Misleading...............................................................11

            6.     Defendants' Statements About Exiting "Highly Egregious"
                 Content Moderation Were Materially False and Misleading.....................11

     C.     Defendants' Challenged Statements Were Not Inactionable Puffery,
            Opinion, or Forward-Looking.................................................................................12

            1.     Defendants' Statements Were Not Puffery................................................12

            2.     Defendants' Statements Were Not Opinion and Are Actionable .............13

            3.     Defendants' Misstatements Are Not Forward-Looking and Not
                 Protected by the PSLRA's Safe Harbor.....................................................14

     D.     Plaintiffs Adequately Plead Defendants' Scienter.................................................15

     E.     The Complaint Adequately Pleads Loss Causation ...............................................18

     F.     The Complaint Adequately Pleads a Claim Under Section 20(a)..........................20

ii

**Page**

IV.    CONCLUSION......................................................................................................20

V.    REQUEST FOR HEARING...............................................................................21

ii

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)........................................................................................5

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ...................................................................16, 18

*Banco Safra S.A. v. Samarco Mineração S.A.*,
2019 WL 2514056 (S.D.N.Y. June 18, 2019) ...........................................................5

*Biedermann v. Ehrhart*,
2021 WL 1061794 (N.D. Ga. Mar. 19, 2021)...........................................................13

*Bruhl v. PricewaterhouseCoopers Int'l, Ltd.*,
2006 WL 8431886 (S.D. Fla. Apr. 3, 2006) ............................................................19

*Bush v. Blink Charging Co.*,
2023 WL 8263037 (S.D. Fla. Nov. 27, 2023)...........................................................15

*Busic v. Orphazyme A/S*,
2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ...........................................................18

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020) .......................................................................8

*Cambridge Ret. Sys. v. MEDNAX, Inc.*,
2019 WL 4893029 (S.D. Fla. Oct. 3, 2019)..............................................................16

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
2002 WL 34089163 (N.D. Ga. Aug. 20, 2002) ........................................................11

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ..........................................................................7, 14

*City of Pompano Beach Gen. Emps.' Ret. Sys. v. Synovus Fin. Corp.*,
2011 WL 13130185 (N.D. Ga. May 19, 2011)...........................................................6

*City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*,
806 F. Supp. 2d 1267 (N.D. Ga. 2011) .....................................................................6

**Page**

*City of Roseville Emps.' Ret. Sys., v. Sterling Fin. Corp.*,
    691 F. App'x 393 (9th Cir. 2017) ........................................................................................10

*City Pension Fund for Firefighters & Police Officers in Miami Beach v. Aracruz Cellulose S.A.*,
    41 F. Supp. 3d 1369 (S.D. Fla. 2011) ................................................................................18

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336, 346-47 (2005) .......................................................................................18, 19

*Eastwood Enters. v. Farha*,
    2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ..................................................................18

*Edge v. Tupperware Brands Corp.*,
    2023 WL 6310236 (M.D. Fla. Sept. 28, 2023) ..................................................................15

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
    905 F.3d 892 (5th Cir. 2018) .............................................................................................13

*FindWhat Investor Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ..........................................................................5, 7, 11, 19

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ...........................................................................................6

*Henningsen v. ADT Corp.*,
    161 F. Supp. 3d 1161 (S.D. Fla. 2015) .............................................................................8, 9

*In re Acadia Pharms. Inc. Sec. Litig.*,
    2020 WL 2838686 (S.D. Cal. June 1, 2020).......................................................................13

*In re Equifax Inc. Sec. Litig.*,
    357 F. Supp. 3d 1189 (N.D. Ga. 2019) .........................................................................10, 12

*In re Flowers Foods, Inc. Sec. Litig.*,
    2018 WL 1558558 (M.D. Ga. Mar. 23, 2018).................................................................16, 19

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
    843 F.3d 1257 (11th Cir. 2016) ...........................................................................................7

*In re Netbank, Inc. Sec. Litig.*,
    2009 WL 2432359 (N.D. Ga. Jan. 29, 2009).......................................................................11

**Page**

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. Jan. 29, 2008) ........................................................................20

*In re Paincare Holdings Sec. Litig.*,
  541 F. Supp. 2d 1283 (M.D. Fla. 2008) ...................................................................................20

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d
  1015 (11th Cir. 2004)...............................................................................................................12

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., &Prods. Liab. Litig.*,
  2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ...................................................................................4

*In re Winn-Dixie Stores, Inc. Sec. Litig.*,
  531 F. Supp. 2d 1334 (M.D. Fla. 2007) ...................................................................................10

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  620 F. Supp. 3d 167 (D.N.J. 2022) ..........................................................................................16

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)......................................................................................................17

*Keippel v. Health Ins. Innovations, Inc.*,
  2019 WL 5698329 (M.D. Fla. Nov. 4, 2019) ...........................................................................13

*Lee v. Frost*,
  2021 WL 3912651 (S.D. Fla. Sept. 1, 2021) ............................................................................20

*Lemen v. Redwire Corp.*,
  2023 WL 2598402 (M.D. Fla. Mar. 22, 2023) ...........................................................................8

*Luczak v. Nat'l Beverage Corp.*,
  812 F. App'x 915 (11th Cir. 2020) ..........................................................................13, 15, 18, 19

*MacPhee v. MiMedx Grp.*,
  73 F.4th 1220 (11th Cir. 2023) ................................................................................................20

*McBride v. Vision Twenty-One, Inc.*,
  2000 WL 33996239 (M.D. Fla. Aug. 21, 2000) .......................................................................15

*Meide v. Pulse Evolution Corp.*,
  2020 WL 5350325 (M.D. Fla. Sept. 4, 2020) .............................................................................6

**Page**

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ...................................................................................19

*Mich. Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*,
2019 WL 1429667 (M.D. Fla. Mar. 29, 2019) ...........................................................10

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010).......................................................................................................5

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) .......................................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).................................................................................................12, 14

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
572 F. App'x 713 (11th Cir. 2014) .............................................................................13

*Police & Fire Ret. Sys. of Detroit v. Axogen, Inc.*,
2020 WL 13547449 (M.D. Fla. Apr. 21, 2020).........................................................14

*Police & Fire Ret. Sys. of Detroit v. Axogen, Inc.*,
2021 WL 1060182 (M.D. Fla. Mar. 19, 2021), *aff'd sub nom. Einhorn v. Axogen, Inc.*, 42
F.4th 1218 (11th Cir. 2022) .......................................................................................14

*Primavera Invs. v. Liquidmetal Tech., Inc.*,
403 F. Supp. 2d 1151 (M.D. Fla. 2005)......................................................................15

*Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus.*,
564 F. Supp. 3d 1272 (N.D. Ga. 2021) ......................................................................15

*Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*,
645 F.3d 1307 (11th Cir. 2011) ....................................................................................5

*SEC v. Kingdom Legacy Gen. Partner, LLC*,
2017 WL 417093 (M.D. Fla. Jan. 31, 2017)................................................................6

*Sewell v. D'Alessandro & Woodyard, Inc.*,
2008 WL 4459260 (M.D. Fla. Sept. 29, 2008) ............................................................4

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................11, 17

**Page**

*Sherleigh Assocs v. Windmere-Durable Holdings*,
   178 F. Supp. 2d 1255 (S.D. Fla. 2000) ................................................................20

*Stein v. Aaron's, Inc.*,
   2022 WL 4588410 (N.D. Ga. Sept. 29, 2022) .......................................................16

*Stevens v. GlobeTel Commc'ns Corp.*,
   2007 WL 9701197 (S.D. Fla. Apr. 4, 2007) ..........................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).........................................................................................4, 15

*Theodore v. Purecycle Techs., Inc.*,
   2023 WL 4035880 (M.D. Fla. June 15, 2023).......................................................17

*Thompson v. RelationServe Media, Inc.*
   610 F.3d 628 (11th Cir. 2010) ...............................................................................16

*Tung v. Dycom Indus.*,
   454 F. Supp. 3d 1244 (S.D. Fla. 2020) .................................................................15

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013).......................................................................................5

*Va. Bankshares v. Sandberg*,
   501 U.S. 1083 (1991)..............................................................................................12

*Vancouver Alumni Asset Holdings, Inc. v. Daimler AG*,
   2017 WL 2378369 (C.D. Cal. May 31, 2017) .........................................................5

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §78j(b)...........................................................................................4, 7, 10, 20
   §78t(a) ...................................................................................................................20
   §78u-4(b)(1)............................................................................................................8
   §78u-4(b)(1)(B).......................................................................................................5

**Page**

Federal Rules of Civil Procedure
    Rule 8(a)(2) ......................................................................................................................18
    Rule 9(b) ............................................................................................................................5
    Rule 12(b)(6)......................................................................................................................4

17 C.F.R.
    §240.10b-5 ......................................................................................................................4, 5

Lead Plaintiffs ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint (ECF 65) ("Motion" or "Mot.").[1]

## I.   INTRODUCTION

Throughout the Class Period, Teleperformance – which performs content moderation services for social media platforms – portrayed itself publicly as a good corporate citizen that treated its employees exceptionally well.  At every opportunity, Defendants burnished this reputation by emphasizing the Company's status as a "Great Place to Work," highlighting the specific steps it took to protect its content moderators, and constantly reaffirming their commitment to Corporate Social Responsibility ("CSR") and Environmental, Social, and Governance ("ESG") issues, to name just a few.  This CSR/ESG-friendly, pro-employee reputation was a central pillar of the Company's appeal to investors.  But in truth, Teleperformance subjected its content moderators to a variety of inhumane working conditions – including *unnecessary* exposure to depictions of child sexual abuse, cannibalism, murder, and other similarly horrifying content.  When this truth emerged via extensively sourced media reports and the announcement of a government investigation into the Company's labor practices, Defendants attempted to stem the backlash by announcing that Teleperformance would cease moderating egregious content.  But here, too, they misled investors – this time by representing that Teleperformance could wash its hands of egregious content moderation, and the accompanying reputational stain, without losing significant business.

As set forth below, the AC establishes that Defendants' actions violated the federal securities laws.  Defendants' Motion should be denied.

## II.   STATEMENT OF FACTS

Teleperformance provides a variety of outsourced services for businesses, including, as relevant here, the provision of content moderation services for social media companies.  ¶13.  The Company is headquartered in France and its common shares trade on the Paris Stock Exchange; however, its American Depositary Receipts ("ADRs") – the securities purchased by Plaintiffs and

---

[1]   Citations to "¶__" refer to paragraphs of the Amended Class Action Complaint (ECF 62) ("Complaint" or "AC").  All capitalized terms herein shall have the same definitions as set forth in the AC.  Unless otherwise noted, all emphasis is added and citations are omitted.

1

at issue in this action – are traded over-the-counter in the U.S. *Id.* In 2018, prior to the start of the Class Period, Teleperformance entered the business of content moderation for social media companies and took on TikTok as a client; since that time, TikTok has become the most popular social media platform in the U.S. and now represents approximately 50% of Teleperformance's content moderation business. ¶35. The meteoric rise of social media companies, and TikTok in particular, has fueled a corresponding rise in the content moderation industry, and despite its relative youth, Teleperformance's content moderation arm has become a critical driver of the Company's growth. ¶¶29-31, 43-46.

At all relevant times, Teleperformance held itself out as a premier employer that cared about its employees' wellbeing as a matter of corporate ethics and decency. In their communications to the market – in the form of press releases, conference calls, regulatory filings, and other formats – Defendants consistently highlighted the exceptional treatment of Teleperformance's employees as one of the Company's core values, and as the cornerstone of its steadfast commitment to CSR. *See* ¶¶16-25, 90-114, 119-125, 133-134. Even the Company's entry into the content moderation business was spun as a feel-good CSR story, with the moderators portrayed as "digital first responders." ¶47.

The Company's pro-CSR, employee-friendly message was well-received by the investing community, who increasingly consider corporations' social and ethical reputations when making investment decisions. ¶26. Stock indexes have emerged that include only companies that meet certain CSR standards – a way of identifying, and measuring the performance of, socially responsible companies. *Id.* Throughout the Class Period, Teleperformance was included on such indexes, and highlighted that inclusion in its communications to investors at least once per quarter. ¶¶26-28.

However, the Company's commitment to CSR and the wellbeing of its employees was a carefully crafted fiction. In truth, the Company's content moderators worked in awful conditions: they were underpaid, overworked, held to unrealistic performance standards, surveilled in their homes, and deprived of the opportunity to unionize. ¶¶65-67. And most heinously – as first revealed in a *Forbes* article published in August 2022 – Teleperformance trained its moderators with "graphic images and videos of children involved in sexual acts." ¶55. While some degree of exposure to such materials is an unfortunate reality of the content moderation business, such

exposure ought to be extremely rare.  Daniel Julien ("Julien"), the Company's CEO, himself told investors that highly egregious material only made up around "1 per 1 million" pieces of actual reviewed content, and he characterized it as an "extremely small part of the business" requiring the "use of 5 people, 10 people, 15 people out of thousands when it's segregated."  ¶¶69, 80.  Yet Teleperformance unnecessarily exposed its employees to far more of this material than was necessary through training materials, including through a spreadsheet known as the "Daily Required Reading," or "DRR," that contained hundreds, or even thousands, of examples of egregious material.  ¶¶54-55.  This treatment did not comply with best practices for handling this kind of sensitive materials, potentially violated federal law governing such handling, and, most importantly, harmed the mental health of its moderators – who reported symptoms that included suicidal thoughts.  ¶¶55-56.  The allegations in the *Forbes* article were later corroborated by further reporting published in *Time*, as well as a confidential witness.  ¶¶58, 62-67.

Teleperformance's practices contravened not only its employee-friendly façade, but published standards for content moderation that the Company had helped create.  A white paper titled, "The Content Moderation Playbook" that had been "developed in partnership with Teleperformance" stated, unequivocally, that "[f]or sensitive content, the eight hour a day, five-day work week is ***simply not valid from an employee experience and wellness standpoint*.**"  ¶¶37, 41.  Teleperformance's actual practices did not conform to this standard, nor to other practices outlined in the white paper for minimizing harm to moderators.  ¶¶41, 54, 58, 116, 122.

The publication of the *Forbes* article caused the price of Teleperformance ADRs to fall approximately 5%, and led to a bipartisan U.S. Senate inquiry into the allegations.  ¶¶57, 59.  In the ensuing months, Teleperformance claimed to have found "no evidence of the use of or access to CSAM images in training" and repeatedly referred to the media reports as "misleading" and a "polemic."  ¶60.  However, on November 9, 2022, *Time* reported that "Colombia's Ministry of Labor has launched an investigation into TikTok subcontractor Teleperformance, relating to alleged union-busting, traumatic working conditions and low pay[.]"  ¶74.  On this news, the price of Teleperformance ADRs declined nearly 19%.  ¶75.

Just over a week later, facing enormous backlash, on November 17, 2022, Defendants finally took concrete steps to address the scandal, announcing that the Company would exit the egregious portion of the content moderation business.  ¶78.  But Defendants misled the market

3

again, this time by downplaying the impact this exit would have on the Company.  Defendants gave the impression that egregious material was merely a tiny part of the content moderation business, one that could be jettisoned – along with its reputational baggage – without serious financial consequences.  As one executive put it during a conference call with analysts, the "business that we will be giving up does not look substantial."  ¶80.  The move was well received by the market; a Deutsche Bank analyst later explained that the purported exit had (temporarily) "mitigated reputational and ESG concerns[.]"  ¶87.  When the Company announced its 2022 earnings results two months later, Defendants doubled down, portraying its response to the allegations as evidence of the Company's "strong, enduring CSR commitment," and stating that they had "not lost anything" while forecasting growth in the content moderation arm.[2]  ¶¶84-85.

However, on March 22, 2023, Teleperformance reversed course and announced it would continue moderating highly egregious content.  ¶86.  The market interpreted this as an admission that egregious content could not be easily separated from other kinds of content.  ¶87.  The news quickly resurrected the reputational concerns that Teleperformance had tried to escape, and accordingly, the news caused the price of Teleperformance ADRs to decline nearly 6%.  ¶¶86-88.

## III.    ARGUMENT

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court considers the AC in its entirety, "accept[s] all factual allegations . . . as true[,]" and construes all reasonable inferences in Plaintiffs' favor.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10, 322 (2007).  The AC amply pleads violations of §10(b) and Rule 10b-5.

### A.    Plaintiffs Are Not Attempting an Extraterritorial Application of Section 10(b)

This case involves losses incurred by *American* pension funds following their purchase of *American* Depositary Receipts that are traded over-the-counter *in the U.S.*, ¶¶1, 5-7, and courts routinely reject extraterritoriality arguments in such circumstances.  *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., &Prods. Liab. Litig.*, 2017 WL 66281, at \*6-7 (N.D. Cal. Jan. 4, 2017) (denying motion to dismiss on extraterritoriality grounds where U.S. investors purchased

---

[2]    Defendants attached copies of two documents referenced in the AC to their Motion. ECF 65-2 (*see* Mot. at 2 n.1).  While the Court may consider the existence of these documents, it should not consider them for the truth of their contents or to resolve factual disputes in Defendants' favor. *Sewell v. D'Alessandro & Woodyard, Inc.*, 2008 WL 4459260, at \*4 (M.D. Fla. Sept. 29, 2008).

ADRs over-the-counter); *Vancouver Alumni Asset Holdings, Inc. v. Daimler AG*, 2017 WL 2378369, at \*11-12 (C.D. Cal. May 31, 2017) (same).  Defendants' attempt to characterize Plaintiffs' claims as an impermissible extraterritorial application of the Exchange Act is a red herring.  The inapposite cases on which Defendants rely involve complicated transactions in which foreign plaintiffs purchased unusual assets in bizarre circumstances, and accordingly it was necessary for plaintiffs to allege various details of those transactions to establish their domestic nature.  *See, e.g.*, *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310-11 (11th Cir. 2011) (Bahamian corporation purchasing stock of another Bahamian corporation from a Brazilian corporation in a private sale for purposes of acquiring the cruise ship from *The Love Boat*).[3]  But Defendants have put forward no cases involving the pedestrian practice of corporations listing ADRs in the U.S. for the purchase of U.S. investors, and the Court should reject their extraterritoriality argument.

### B.      Plaintiffs Plead Actionable Material Misstatements and Omissions

The AC establishes that Defendants made material false statements and omissions during the Class Period.  "Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (cleaned up).   Under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed. R. Civ. P. 9(b), a securities complaint alleging that the defendants made a false or misleading statement must also "specify each statement alleged to have been misleading [and] the reason or reasons why the  statement  is  misleading[.]" 15 U.S.C. §78u-4(b)(1)(B).  This means that a plaintiff must specify the time, place, and content – "the who, what, when[,] where, and how:  the first  paragraph  of  any newspaper story."

---

[3]    The remainder of Defendants' authorities are similarly flawed. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) (Australian plaintiffs suing Australian bank for stock purchased on Australian exchanges); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012) ("Cayman Islands hedge funds that invested . . . on behalf of hundreds of investors around the world" suing an investment manager for its purchases of penny stocks in private offerings); *Banco Safra S.A. v. Samarco Mineração S.A.*, 2019 WL 2514056, at \*2 (S.D.N.Y. June 18, 2019) ("Brazilian/Cayman Island plaintiff against Brazilian defendants regarding Brazilian bonds and claims which relate to a Brazilian catastrophe."); *see also United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) (rejecting argument that *Morrison* did not apply in criminal cases).

*Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).  The AC amply satisfies this requirement.    *See* AC §VI (detailing Defendants' material misstatements and omissions). Nothing more is required.

### 1.    The AC Is Not an Improper "Puzzle Pleading"

Contrary to Defendants' assertion that the AC is a "puzzle pleading" (Mot. at 6-7), the AC organizes the misstatements and omissions under an identifiable heading and at the conclusion of each set of statements, clearly delineates the specific reasons why Defendants' statements were misleading.  This structure allows Defendants and the Court both to understand and evaluate the nature of Plaintiffs' claims, and to read precisely why Defendants' statements and omissions during the Class Period were knowingly false and misleading.  *See* AC §VI; ¶¶115, 126, 136; *see also City of Pompano Beach Gen. Emps.' Ret. Sys. v. Synovus Fin. Corp.*, 2011 WL 13130185, at *7 (N.D. Ga. May 19, 2011) (declining to dismiss complaint as a "puzzle pleading" where, unlike examples "where plaintiffs simply state that all of the press release was misleading, Plaintiffs do attempt to plead at the conclusion of each time period how they believe the statements made by Defendants were misleading."); *SEC v. Kingdom Legacy Gen. Partner, LLC*, 2017 WL 417093, at *4 (M.D. Fla. Jan. 31, 2017) (declining to characterize complaint as a "puzzle pleading" because "[t]he nature of the allegations within the Complaint are such that the alleged misstatements and omissions are listed under separate headings with the reasons they are false or misleading").  Thus, Plaintiffs' AC is not a "puzzle pleading" that warrants dismissal.[4]

### 2.    Defendants' Statements About Their Commitment to CSR and Employees Were Materially False and Misleading

Defendants are liable for disseminating a series of materially false and misleading statements and/or for concealing material adverse information.  In protesting about what the AC does not allege, Defendants obscure what this case is really about: their failure to tell the whole

---

[4]    Defendants' cited cases involved pleadings that bear no resemblance to the AC.  *See Meide v. Pulse Evolution Corp.*, 2020 WL 5350325, at *3-4 (M.D. Fla. Sept. 4, 2020) (denying, after repeated warnings to comply with applicable rules, an untimely motion to amend a complaint that had been filed *pro se*, involved a variety of both state and federal claims, and violated clear Eleventh Circuit precedent against incorporation of successive counts by reference); *City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1292 (N.D. Ga. 2011) (complaint included paragraphs spanning multiple pages and including multiple misstatements without identifying the portions alleged to be false).

truth about the treatment of their employees.  Defendants' statements violated the Exchange Act in large part because of what those statements did ***not*** disclose.

Throughout the Class Period, Defendants consistently emphasized the working conditions of its employees as a central component of the Company's CSR efforts, and paraded its "Best Place to Work" certifications as evidence that those efforts were successful.  ¶19.  Rather than focus exclusively on financial metrics or operations in its public filings and conference calls, Defendants consistently included discussions of CSR factors.  ¶17.  This included, for example, statements that the Company "made the well-being of its employees a key priority worldwide," "makes its employees the focus of its business," and "is committed to being an employer of choice in its market, an essential prerequisite in creating value for all stakeholders[,]" in addition to misrepresenting the specific working conditions of its moderators.  ¶¶91, 95, 100, 105, 113; *see* §III.B.3, *infra*.  By speaking on these topics, Defendants created a duty to disclose the whole truth.[5] *FindWhat*, 658 F.3d at 1305.

The AC identifies and explains the above misleading statements and omissions regarding employee well-being that make Defendants liable under §10(b).  *See* ¶¶90-115.  For example, the AC details, among other things: (a) that Teleperformance's growth had been achieved, in part, by requiring its content moderators to engage in traumatic, abusive, and potentially criminal activities; (b) that the content moderator hiring process include psychometric tests designed to identify resilient candidates who would be well-suited to the difficult work of content moderation; (c) that Teleperformance had failed to provide adequate training or emotional and psychological support to content moderators exposed to egregious materials, including those exposed to extreme graphic violence and sexual images; (d) that Teleperformance had imposed unreasonable time and performance targets that compounded the occupational trauma suffered by its content moderators; and (e) that Teleperformance had failed to implement or maintain the working conditions represented to investors, including by subjecting the Company's content moderation workers to widespread occupational trauma without psychological support, and with paltry pay, punitive salary deductions, extensive surveillance, and aggressive union-busting tactics.  ¶115.

---

5   Defendants' authorities demonstrate only that corporations do not have an affirmative duty to disclose facts prior to speaking on the subject – ***not*** that they may create misleading impressions with impunity.  *See In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1275 (11th Cir. 2016); *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).

Defendants' characterizations notwithstanding, the AC properly explains the statements quoted (and many more) and tethers the statements to the reasons they are false and/or misleading. Each grouping of statements, including ¶¶90-114, about Defendants' commitment to CSR and employee well-being, are followed by a corresponding explanatory paragraph, which is broken down into subparts that articulate the reasons why the statements are false and/or misleading. This is more than sufficient to meet the PSLRA's pleading standard. *See* 15 U.S.C. §78u-4(b)(1).

Defendants' argument that their statements could only convey a misleading impression if they addressed the conditions of content moderators in particular (rather than employees as a whole) is flawed both factually and legally. As a factual matter, the statement that "the challenged statements say nothing about Teleperformance's content moderation practices" (Mot. at 8) is simply false. *See, e.g.*, ¶109 (stating "Teleperformance places great importance on the wellbeing and mental health of its moderators" and describing the "[s]pecific procedures" developed to safeguard that wellbeing); ¶125 (denying allegations related to content moderators and claiming to take "special care" of moderators); *see also* §III.B.3, *infra*. And as for the law, there is no specific level of detail required to trigger a duty to disclose. *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 963 (E.D. Va. 2020) (holding that once defendants speak on a topic, a duty to disclose arises "regardless of the level of detail [defendants] used to discuss the topic"). For example, statements about a company's "management prowess and commitment to business ethics and transparency" were actionable based on an undisclosed "tone at the top" problem, *i.e.*, "the attitude of a company's management towards internal controls and ethics." *Lemen v. Redwire Corp.*, 2023 WL 2598402, at *1-2 (M.D. Fla. Mar. 22, 2023).

### 3. Defendants' Statements About Content Moderators Were Materially False and Misleading

Defendants next challenge Plaintiffs' allegations of false and misleading statements regarding the Company's content moderation business, arguing the AC includes no factual allegations to show the reasons why the Company's description of its content moderation services is false or misleading.[6] This is demonstrably false; Plaintiffs demonstrate how the challenged

---

[6] Defendants' claim that Plaintiffs' allegations reflect "isolated" or "anecdotal incidents" (Mot. at 9) is nothing more than an invitation to disregard inconvenient, well-pleaded facts. The attempt to reduce the allegations to "two former employees" (*id.*) is simply inaccurate. ¶¶58, 63-67. As an initial matter, the suggestion that Plaintiffs need some higher number of witnesses to come forward is incorrect. Moreover, the case Defendants rely upon is inapposite. In *Henningsen v.*

statements were false and misleading when made.  For example, the Company's 2021 Universal Registration Document states that "[s]pecial attention is paid to employees in charge of social media content management and moderation, as their job tends to generate a good deal of stress[,]" including "resilience training[,]" "a positive working environment enhanced by custom-developed infrastructure, expert counseling to foster psychological and emotional wellbeing and a 24/7 on-site and remote support program."  ¶103.  Defendants' 2021 Report further emphasized the robust training and support services purportedly provided to its content moderators: "Teleperformance places great importance on the wellbeing and mental health of its moderators," and specific procedures were developed for them, including:

- an appropriate hiring procedure involving a series of psychometric tests;

- resilience training provided to all managers, trainers, team leaders, and advisors;

- relaxation times, wellbeing workshops, regular employee surveys, the chance to disconnect, regular rotation on the most sensitive positions;

- continuous access to counseling, including by certified therapists; and

- a 24/7 support program during and after the work cycle.

¶109.

Contrary to Defendants' assertions, the AC refutes the accuracy of these statements, highlighting, *inter alia*, that: (a) Teleperformance trained social media content moderators with illicit images of child sexual exploitation; (b) Teleperformance's content moderator hiring process did not include psychometric tests designed to identify resilient candidates; (c) Teleperformance had failed to provide adequate training or emotional and psychological support to content moderators; (d) Teleperformance had imposed unreasonable time and performance targets; and (e) Teleperformance had failed to implement or maintain the working conditions represented to investors, including by subjecting the Company's content moderation workers to widespread occupational trauma without psychological support, and with paltry pay, punitive salary deductions, extensive surveillance, and aggressive union-busting tactics.  ¶115.   These

---

*ADT Corp.*, the plaintiffs alleged that the company had "understated" operational issues that it had actually disclosed, and therefore needed to "allege adequate facts demonstrating the actual magnitude of these operational problems to rebut Defendants' statements" – because the statements would only be false if the problems exceeded the disclosures.  161 F. Supp. 3d 1161, 1188 (S.D. Fla. 2015).  Teleperformance made no such disclosures warranting similar treatment.

explanations are supported by both reputable reporting and a confidential witness. *See, e.g.*, ¶¶58, 64, 116.[7]

Lastly, contrary to Defendants' assertions, the thrust of the allegedly false and misleading statements attributed to Defendants do not concern mismanagement, rather than actionable non-disclosure. *See In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1217-18 (N.D. Ga. 2019) ("[A]llegations that the Defendants made false or misleading statements or omissions concerning . . . corporate mismanagement . . . can constitute basis for a section 10(b) claim."). As demonstrated above, Defendants repeatedly highlighted their commitment to the well-being of their employees, specifically their content moderators, to investors, when, in fact, Defendants were aware of the horrible conditions the moderators were exposed to including a lack of promised services intended to promote their mental health and overall well-being. Thus, Plaintiffs' argument is not that Defendants were guilty of corporate mismanagement. Rather, it is that they are guilty of misrepresenting or failing to disclose material information to investors.[8]

### 4. Defendants' Statement About Collective Bargaining Was Materially False and Misleading

Defendants argue that, because Teleperformance's union-busting tactics were not reported until after Defendants misstated their commitment to workers' rights, the statement was not false when made. *See* Mot. at 9-10. But Plaintiffs' allegations regarding Defendants' union-busting tactics – and the subsequent investigation into the Company's labor practices – are well-pleaded and far from conclusory. The AC details the October 22, 2022 *Time* article reporting efforts to organize Teleperformance staff – as well as Defendants' efforts and harassment in opposition to those efforts – ***for more than two years prior*** to the article.[9] ¶67. This is a factual dispute, and on a motion to dismiss "all well-pleaded facts are accepted as true, and the reasonable inferences

---

[7]  The above explanations and corroboration showing falsity renders Defendants' citation to *Mich. Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc*., 2019 WL 1429667 (M.D. Fla. Mar. 29, 2019), inapposite, as those plaintiffs failed to identify any false statements.

[8]  Defendants' reliance on *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1348 (M.D. Fla. 2007), is inapposite because the plaintiffs there alleged only mismanagement, and failed to show that statements regarding the defendants' corporate strategy were false when made.

[9]  This fact distinguishes Defendants' sole cited case, in which there was no backward-looking component showing that the wrongdoing had occurred when the misstatements were made. *See City of Roseville Emps.' Ret. Sys., v. Sterling Fin. Corp.*, 691 F. App'x 393, 395 (9th Cir. 2017).

therefrom are construed in the light most favorable to the plaintiff." *FindWhat*, 658 F.3d at 1296. Defendants' fact-based argument should be rejected.

### 5. Defendants' Statements About the *Forbes* and *Time* Articles Were Materially False and Misleading

Defendants next challenge falsity as to their denials of the accuracy of the *Forbes* and *Time* articles released in 2022. *See* Mot. at 10. This too lacks merit. Defendants argue that the articles themselves were inaccurate, and therefore their denials – *e.g.*, claiming that the articles were "misleading" and that the resulting trust crisis had been "totally fabricated" and a "polemic," ¶¶70, 133 – were true. *See* Mot. at 10. This contention is wholly premised on a factual dispute, and Defendants' argument must therefore be rejected at this stage. *See, e.g.*, *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *5 (N.D. Ga. Jan. 29, 2009).

### 6. Defendants' Statements About Exiting "Highly Egregious" Content Moderation Were Materially False and Misleading

As with their arguments about challenged statements above, Defendants miss the mark as to their statements about their purported exit from highly egregious content moderation. The AC does not rely on "fraud by hindsight" (Mot. at 11), but rather demonstrates how Defendants' responses to exiting this once critical business sector were false and/or misleading when made. While Defendants acknowledged that "a lot" of their growth came from content moderation, they claimed that they would be able to withdraw from the highly egregious portion (and its scandals) without giving up significant business – *e.g.*, that the "***business that we will be giving up does not look substantial***," that "***[w]e do not anticipate any ripple effect***." ¶¶131-132. They doubled down on that position in February, stating affirmatively (and falsely) that we "***haven't lost anything***." ¶135. But shortly thereafter, despite these representations, Defendants abruptly reversed course and announced Teleperformance's return to the business – reacquiring the reputational issues that dogged that segment. ¶¶137-138. Such quick turnarounds indicate that the original statements were not only false, but made with scienter. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017); *see also Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2002 WL 34089163, at *16 (N.D. Ga. Aug. 20, 2002).

**C.      Defendants' Challenged Statements Were Not Inactionable Puffery, Opinion, or Forward-Looking**

Defendants argue that certain of the alleged misstatements are not actionable because they are inactionable puffery, opinion, and/or protected by the PSLRA's safe harbor provision.  Each of these arguments fails.

**1.      Defendants' Statements Were Not Puffery**

First, this Court should reject Defendants' assertions that certain false and misleading statements identified by Plaintiffs are inactionable "puffery."  "A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available."  *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004).  Such statements must be "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance to be deemed inactionable puffery."  *Equifax*, 357 F. Supp. 3d at 1224.  Moreover, the context surrounding the statements is important to this determination.  *Id.*

Here, Defendants' repeated Class Period statements regarding the Company's commitment to its employees' wellbeing and superior working conditions, when considered in context, are capable of objective verification.  ¶¶17, 19, 91, 95, 100, 103, 105, 109, 113, 121, 124; *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) ("The CEO's assertion [that '[t]he TVs we manufacture have the highest resolution available on the market'] is not mere puffery, but a determinate, verifiable statement about her company's TVs[.]"); *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1093 (1991) ("[C]onclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading.").

To be sure, the AC alleges, contrary to Defendants' statements, that employees were subjected to grotesque and horrifying working conditions, ranging from the maintenance, use, and distribution of extremely disturbing training materials that included real-life child sexual abuse images and videos, to inadequate psychological support, paltry pay, unrealistic performance targets, punitive salary deductions, extensive surveillance, and aggressive union-busting tactics. ¶¶14, 54-55, 58, 64-67, 115, 166, 122.  In fact, subject to an investigation by Colombia's Ministry of Labor and an inquiry by the U.S. Senate (¶¶59, 74, 118, 128, 146, 161), the Company even

12

exited the high egregious content moderation business (¶¶78-79, 130, 150).   Clearly, such statements were not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020).   Under such circumstances, and given the repetition of these statements, Defendants' claim that their statements constitute immaterial puffery fall flat.[10]  *See Keippel v. Health Ins. Innovations, Inc.*, 2019 WL 5698329, at \*7 (M.D. Fla. Nov. 4, 2019) (concluding that "[w]hile some of Defendants' vague, generalized descriptions of compliance or customer service . . . *standing alone*, could be considered puffery that a reasonable investor would not necessarily rely upon," such statements were not puffery because defendants repeatedly emphasized the importance of compliance and customer satisfaction as a competitive strength).

### 2.    Defendants' Statements Were Not Opinion and Are Actionable

Next, Defendants argue that a subset of the misstatements are "opinions" for which Plaintiffs fail to plead falsity.  Mot. at 12.  At the outset, many of the statements Defendants identify as "opinions" are statements of concrete fact with no discernable "opinion" element.[11]  *See, e.g.*, ¶132 ("highly egregious content moderation represents effectively an extremely small part of the business, sometimes use of [5-15] people out of thousands"); ¶133 (calling the "trust crisis" caused

---

[10]   Defendants' cited authorities are again distinguishable.  In *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, the statements involved generalizations about the "rigor . . . efficiency and accuracy" of the company's operations.  572 F. App'x 713, 716 (11th Cir. 2014).  The statements are of the kind that every corporation makes, and were entirely devoid of specifics about the company itself.  Teleperformance, by contrast, made its treatment of employees a specific focus of its corporate reputation – an example of what set them apart from other companies.  *See, e.g.*, ¶17; *see generally* AC §V.A.  And in *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, the Fifth Circuit held that generalized statements about the company's ethical standards were puffery – while acknowledging that ethicality itself was, in fact, something that mattered to investors – because reasonable investors would "not simply take Whole Foods' word for it."  905 F.3d 892, 902 (5th Cir. 2018).  Here, Defendants' statements were more specific, and moreover, included claims that Teleperformance had achieved various outside certifications (*e.g.*, ¶121) backing their claims.

[11]   Along with the arguments set forth in their Motion, Defendants filed an Appendix (ECF 65-1) purporting to classify each statement into various objectionable categories.  This Appendix acts as an extension of Defendants' arguments and circumvents the page limits imposed by L.R. 7.1(c)(2). *See In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at \*3 (S.D. Cal. June 1, 2020) (striking similar exhibit submitted for "sole purpose" of presenting arguments "which [defendants] could not fit in their Memorandum"); *Biedermann v. Ehrhart*, 2021 WL 1061794, at \*1-2 (N.D. Ga. Mar. 19, 2021) (brief exceeded page limit by incorporating other briefs by reference). Accordingly, Plaintiffs respectfully request that the Court disregard the Appendix.

by the allegations of worker abuse "totally fabricated").  Moreover, as the Supreme Court has recognized, even "sentences that begin with opinion words like 'I believe' contain embedded statements of fact" that are actionable if false.  *Omnicare*, 575 U.S. at 185.  Similarly, real statements of opinion or belief can be actionable due to a material omission when a plaintiff alleges "specific facts about the speaker's knowledge or the nature of the speaker's inquiry the omission of which renders the statement misleading[.]"  *Police & Fire Ret. Sys. of Detroit v. Axogen, Inc.*, 2021 WL 1060182, at *3 (M.D. Fla. Mar. 19, 2021), *aff'd sub nom. Einhorn v. Axogen, Inc.*, 42 F.4th 1218 (11th Cir. 2022); *see also Omnicare*, 575 U.S. at 188-89, 194.  Just so here – the so-called opinions contain both false embedded facts and omit material facts.  For example, the statement that "Teleperformance places great importance on the wellbeing and mental health of its moderators" and "[s]pecific procedures have been developed for them" (¶109) both contains facts (regarding the "[s]pecific procedures") and omits material information (that the Company, in fact, subjected these moderators to a variety of abusive conditions).  Accordingly, the Court should reject Defendants' argument that their statements were inactionable opinions.

### 3. Defendants' Misstatements Are Not Forward-Looking and Not Protected by the PSLRA's Safe Harbor

Next, Defendants characterize a handful of statements as "forward-looking" and argue that these are protected by the PSLRA's safe harbor.  Mot. at 12-13.  Defendants' statements are not protected by the PSLRA's "safe harbor" for two reasons.

First, the safe harbor does not apply because Defendants seek protection for statements that are not actually forward-looking; they cherry pick portions of longer statements while omitting substantive portions couched in the present tense and which refer to present or historical facts.[12] *See, e.g.*, ¶132 ("egregious content moderation ***represents*** effectively an extremely small part of the business"); ¶135 (Defendants "***haven't*** lost anything" with respect to the content moderation business).  Defendants cannot immunize the present or historical aspects of a statement by weaving in other forward-looking elements.  *See Carvelli*, 934 F.3d at 1328 ("To the extent that a lengthy statement includes distinct present-tense and forward-looking components, it makes sense to

---

[12]  This fact distinguishes the cases on which Defendants rely, in which the statements were forward-looking.  *See, e.g.*, *Police & Fire Ret. Sys. of Detroit v. Axogen, Inc.*, 2020 WL 13547449, at *8-10 (M.D. Fla. Apr. 21, 2020) (involving "estimates of the maximum revenue the company might achieve" and similar statements of possibility).

14

afford safe-harbor protection to the forward-looking portion (if applicable) and then evaluate the present-tense statement on its own."). Moreover, the safe harbor does not apply to "material omissions or misstatements of historical or contemporaneous facts." *Edge v. Tupperware Brands Corp.*, 2023 WL 6310236, at *4 (M.D. Fla. Sept. 28, 2023). Here, Defendants' statements are primarily misleading because of what they omitted – namely, the truth regarding the treatment of Teleperformance's workforce and their ability to seamlessly exit egregious content moderation – and accordingly do not qualify for safe harbor protection.

Second, even if some statements had met the requirements for safe harbor protection, there is an exception to the safe harbor where the statements are made with actual knowledge that the statement was false or misleading. *Tung v. Dycom Indus.*, 454 F. Supp. 3d 1244, 1255-56 (S.D. Fla. 2020). A defendant is liable for a forward-looking statement if the defendant "knew at the time of the statement of false and misleading content and thus lacked a reasonable basis for making the statement." *Primavera Invs. v. Liquidmetal Tech., Inc.*, 403 F. Supp. 2d 1151, 1156 (M.D. Fla. 2005); *McBride v. Vision Twenty-One, Inc.*, 2000 WL 33996239, at *4 (M.D. Fla. Aug. 21, 2000). As discussed below, Defendants were aware of the mistreatment of Teleperformance's content moderators, as well as the infeasibility of exiting egregious content moderation without losing significant business. *See* §III.D, *infra*. The PSLRA Safe Harbor is inapplicable.

**D. Plaintiffs Adequately Plead Defendants' Scienter**

The Court must accept Plaintiffs' scienter allegations as true and "assess all the allegations holistically." *Tellabs*, 551 U.S. at 310; *see Bush v. Blink Charging Co.*, 2023 WL 8263037, at *9 (S.D. Fla. Nov. 27, 2023) ("[T]he Court does not have to infer scienter from individual facts alone. Rather, scienter can be inferred from an aggregation of particularized facts."). "[S]cienter need not be irrefutable . . . or even the most plausible of competing inferences[.]" *Tellabs*, 551 U.S. at 324 (cleaned up). Rather, "a fifty-fifty chance" that Defendants "knew about the alleged fraud (or were severely reckless in not knowing . . .)" is sufficient. *Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus.*, 564 F. Supp. 3d 1272, 1303 (N.D. Ga. 2021). Moreover, scienter is a "mixed question[]" "typically . . . resolved by the factfinder." *Luczak*, 812 F. App'x at 924. Plaintiffs pleaded five grounds that collectively establish each Defendant's scienter.[13]

---

[13] These grounds apply to each Defendant, and, accordingly, scienter is pleaded with particularity as to each. The cases cited by Defendants (Mot. at 13-14) demonstrate only that scienter cannot automatically be imputed from one defendant to another; they do not prohibit an inference of

*First,* content moderation was a substantial part of Teleperformance's business, and a critical driver of the Company's growth.  Courts routinely infer that company executives are provided with information about critical operations of the companies they manage.[14]  *See, e.g.*, *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at \*14 (M.D. Ga. Mar. 23, 2018).  While Defendants point out that this inference most often applies where the operation in question constitutes a huge percentage of revenues (*see* Mot. at 15), revenue is not the sole metric.  Courts also recognize that segments that are key to *growth* qualify as core operations, even where the segment accounts for a relatively small portion of overall revenue.  *See Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 219 (5th Cir. 2023) (finding segment that was 3% of a large company's revenue was a core operation because the company portrayed it as a "key growth driver").  Likewise, the inference applies where a project has "independent reputational value."  *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 232 (E.D. Pa. 2021) (applying core operations doctrine to project representing approximately 4.5% of the company's EBITDA); *see Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 196 (D.N.J. 2022) ("A product need not have an outsized impact on a company's financial performance to constitute a 'core operation'; products that present substantial reputational risk may suffice as well.").  Here, both circumstances apply.  Content moderation is, as Defendants themselves acknowledged, a significant driver of Teleperformance's growth as well as a "big business in itself."  *See* ¶¶79, 142-143.  And its effect on the brand's reputation is evident

---

scienter as to multiple defendants from the same facts. *See Stevens v. GlobeTel Commc'ns Corp.*, 2007 WL 9701197, at \*10 n.4 (S.D. Fla. Apr. 4, 2007); *Cambridge Ret. Sys. v. MEDNAX, Inc.*, 2019 WL 4893029, at \*21 (S.D. Fla. Oct. 3, 2019).  Moreover, while Defendants characterize the AC as relying on what Defendants "should have known" (Mot. at 14-15), the AC's allegations describe facts leading to the inference that Defendants *did* know – or were severely reckless in disregarding.

[14]   While Defendants claim that the Eleventh Circuit is "skeptical" of the core operations doctrine, this skepticism refers to cases that rely solely on core operations doctrine, without additional allegations – as Defendants' own authority shows.  *See Stein v. Aaron's, Inc.*, 2022 WL 4588410, at \*7 (N.D. Ga. Sept. 29, 2022) (core operations allegations did not support scienter "without more"); *Thompson v. RelationServe Media, Inc.* 610 F.3d 628, 634 (11th Cir. 2010) (rejecting "conclusory" allegation that the fraud "could not have been perpetrated . . .without the knowledge and complicity of the . . . Individual Defendants" based on their positions).  Where, as here, additional allegations support scienter, core operations doctrine bolsters the inference.  *See Flowers*, 2018 WL 1558558, at \*14.

16

both from the Company's initial portrayal of content moderation as a noble undertaking (¶47) and from the fallout when the truth came to light. Indeed, a Teleperformance press release attributed the decision to exit highly egregious content moderation to the backlash and "perception" of that business, and a subsequent analyst report likewise characterized that (short-lived) exit as having "mitigated reputational and ESG concerns[.]" ¶¶78-79, 87.

*Second,* Defendants repeated their misstatements at every opportunity during the Class Period. "When a defendant makes a statement or statements repeatedly, it can more strongly evince an inference that the defendant spoke with scienter." *Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *6 (M.D. Fla. June 15, 2023); *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("[T]he most powerful evidence of scienter is the content and context of [the] statements themselves."). Repetition diminishes the likelihood that a misstatement was made out of carelessness; rather, the appropriate inference is that Defendants acted with *at least* severe recklessness.[15]

*Third,* Defendants' public statements regarding the safeguards in place for content moderators demonstrate their knowledge of the harm that exposure to egregious content would have on the moderators. For example, the Company's 2021 Annual Report highlighted the use of "psychometric tests designed to identify resilient candidates suited to this type of position" in the hiring process, "resilience training," "continuous access to counseling," and other such guard rails. ¶¶52, 109, *see also* ¶¶103, 112. Likewise, the Teleperformance/HFS White Paper set forth a number of best practices, "[t]he strategy for handling [egregious] content must place the safety and wellness of the employee at the center." ¶37. These statements are explicit admissions that Teleperformance was aware of the risks its moderators faced.

*Fourth,* once the truth began to surface, Defendants' handling of the backlash, and responses to legitimate questions from analysts and the public, further support scienter. While Defendants issued general denials, repeatedly calling the allegations "misleading" or a "polemic," they declined to offer specifics. ¶¶69-72, 84, 134, 147. For example, in response to a string of analyst questions about the allegations, Julien deflected by claiming not to understand the scrutiny

---

[15] Similarly, the short period between Defendants' misstatements and corrective disclosures – *e.g.*, claiming to exit egregious content moderation in November 2022 and February 2023 before announcing a reversal in March 2023 (¶¶130-137) – bolsters an inference of scienter. *See Shenwick*, 282 F. Supp. 3d at 1148.

17

and asking the analysts not to pay attention to the media.  ¶¶68, 70.  Likewise, while Defendants claim to have conducted both internal and external audits into the allegations (and that these audits exonerated the Company), they refused to publish the results and rejected an analyst's request that they do so.  These kinds of evasive answers indicate that Defendants knew, and intentionally failed to disclose, the truth.  *See Busic v. Orphazyme A/S*, 2022 WL 3299843, at *22 (N.D. Ill. Aug. 11, 2022); *Energy Transfer*, 532 F. Supp. 3d at 229.

**Fifth,** the Colombian government's investigation into Teleperformance's labor practices supports scienter for statements made after its announcement (¶¶130-135) because "the pendency of an investigation serves to suggest that a fraud may have occurred and may not be ignored." *Eastwood Enters. v. Farha*, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) (collecting cases).

### E.        The Complaint Adequately Pleads Loss Causation

Plaintiffs satisfy the requisite standards for pleading loss causation.  *Dura Pharms., Inc. v. Broudo* requires only that a plaintiff "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind" and rejected a heightened pleading standard for loss causation, stating that the "ordinary pleading rules" of Fed. R. Civ. P. 8(a)(2) provide a "simple test" which do not "impose a great burden upon a plaintiff."  544 U.S. 336, 346-47 (2005); *see also City Pension Fund for Firefighters & Police Officers in Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1398 (S.D. Fla. 2011).  *Dura*'s "simple" loss causation pleading standard is met by alleging a "release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud," a stock price drop soon after the corrective disclosure, and information allowing "the factfinder [to] infer that it is more probable than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a substantial amount of the price drop."  *Luczak*, 812 F. App'x at 920.

Throughout the Class Period, Defendants' fraud caused the Company's stock to trade at artificially inflated prices.  The AC alleges that the truth of Defendants' fraud was revealed through a series of partial disclosures, which caused the artificial inflation to leak out through a series of statistically significant stock price declines on unusually high trading volume.  ¶¶57, 75, 88, 117, 129, 139, 157.  The AC explicitly connects these partial disclosures to Defendants' prior misstatements and omissions, and pleads how the disclosures individually and collectively operated to inform the market of the Company's true financial condition. Nothing more is required at the pleading stage.  *See Dura*, 544 U.S. at 347; *Luczak*, 812 F. App'x, at 920-21.

18

Here, Defendants do not challenge loss causation as to the August 4, 2022 *Forbes* article, but claim that the November 9, 2022 *Time* article and March 22, 2023 announcement were not corrective.[16]  Mot. at 19.  "In order to qualify as corrective, the disclosure must share the same subject matter" but need not "precisely mirror" the misstatement, or provide a fact-for-fact disclosure of the relevant truth.  *FindWhat*, 658 F.3d at 1311 n.28.  In other words, "Plaintiff need not allege an express admission of fraud . . . the relevant truth concealed by the defendant's misrepresentations may be disclosed directly or indirectly."  *Flowers*, 2018 WL 1558558, at *20 (cleaned up).  Disclosures "can come from any source, and can take any form . . . so long as [they] reveal[] to the market the falsity of the prior misstatements."  *Luczak*, 812 F. App'x, at 921.  Moreover, the relevant truth can leak out "gradually" through a "series of partial disclosures[,]" rather than a single disclosure.  *Id.*; *see also Dura*, 544 U.S. at 342-43.

Defendants first claim that the November 9, 2022 disclosure is "the mere announcement of an investigation" and as such cannot be corrective."  Mot. at 19.  Not so.  The cases Defendants rely upon hold that the mere beginning of an investigation is sufficient "without more."  *See, e.g.*, *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013).  Here, the *Time* article announced not only the investigation itself, but also that the investigation was specifically related to the allegations of employee abuse made in the October 20, 2022 *Time* article as well as comments from workers' rights groups.  Moreover, the market clearly interpreted this disclosure as corrective: the price of Teleperformance ADRs dropped sharply while both the share prices of the Company's competitors and the S&P 500 rose.  ¶161.

Defendants also challenge the March 22, 2023 announcement, claiming that Teleperformance's return to egregious content moderation showed only a change in business strategy – not that its prior representations were false.  While not *every* change in strategy constitutes a corrective disclosure (*see* Mot. at 20), this one does.  Here, Defendants: (1) announced their exit from egregious content moderation in November 2022, claiming there would be no "ripple effect" on the non-egregious moderation business and that the "business that we will be giving up does not look substantial"; (2) reaffirmed that position in February 2023, claiming that they had "not lost anything" and forecasting growth; and then (3) less than five weeks later,

---

[16]  Accordingly, any challenge to the August 4, 2022 corrective disclosure is waived.  *See, e.g.*, *Bruhl v. PricewaterhouseCoopers Int'l, Ltd.*, 2006 WL 8431886, at *3 n.7 (S.D. Fla. Apr. 3, 2006).

announced the reentry.  ¶¶80-81, 84-86.  This sudden reversal shows that, contrary to the misstatements, egregious content moderation was intertwined with the broader business, and Defendants could not have one without the other.  Indeed, if it *were* true that the Company could excise the problematic portion of the business without significant "ripple effect[s]" (¶132) there would be no plausible business justification for the reentry.[17]

F.       **The Complaint Adequately Pleads a Claim Under Section 20(a)**

To state a claim under §20(a) of the Exchange Act, a plaintiff need only allege: (1) a violation of §10(b); and (2) that the alleged control person actually controlled the primary violator when §10(b) was violated.  *Sherleigh Assocs v. Windmere-Durable Holdings*, 178 F. Supp. 2d 1255, 1280 (S.D. Fla. 2000).  Defendants request dismissal of §20(a) claims solely based on the purported absence of a primary violation.  Mot. at 20.  Because, as discussed above, Plaintiffs have pled a primary §10 violation, this argument fails.  *See In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1294 (M.D. Fla. 2008).

IV.   **CONCLUSION**

Defendants' Motion should be denied in its entirety.[18]

---

[17]   Defendants primarily rely on *In re Omnicom Grp., Inc. Sec. Litig.*, where the court concluded, at the class certification stage, that a decision to reacquire certain investments did not mean that the original decision to spin them off (made more than a year prior) was a sham.  541 F. Supp. 2d 546, 553 (S.D.N.Y. Jan. 29, 2008).  But there, market analysts specifically commented that the alleged disclosure "had not revealed any new information," and the court found that the economic expert had failed to account for non-fraud factors.  *Id.* at 550, 554.  Likewise, in *MacPhee v. MiMedx Grp.*, 73 F.4th 1220, 1245 (11th Cir. 2023), the court concluded that the purported disclosure revealed no new information because the fraud continued to be concealed.  Here, however, new information did emerge – the inability of Teleperformance to seamlessly exit highly egregious content moderation – and caused a decline in the price of Teleperformance ADRs.

[18]   If Defendants' Motion is granted, in whole or in part, Plaintiffs respectfully request that any dismissal be without prejudice so that Plaintiffs may file a motion for leave to amend.  *See, e.g.*, *Lee v. Frost*, 2021 WL 3912651, at *15 & n.11 (S.D. Fla. Sept. 1, 2021) (Altonaga, J.).

21

**V.     REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Plaintiffs respectfully request oral argument in connection with Defendants' Motion.   Given the complexity of the case and number of misstatements, Plaintiffs believe that a hearing will substantially assist the Court's understanding of the case and allow Plaintiffs to address any questions the Court may have.   Defendants made a similar request in their Motion.  *See* Mot. at 21.

DATED:  January 26, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
STEPHEN R. ASTLEY (SBN 0139254)
SABRINA E. TIRABASSI (SBN 25521)
LUKE GOVEAS (admitted *pro hac vice*)
ALEX KAPLAN (SBN 1030761)

*s/ Stephen R. Astley*
STEPHEN R. ASTLEY

225 NE Mizner Boulevard, Suite 700
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sastley@rgrdlaw.com
stirabassi@rgrdlaw.com
lgoveas@rgrdlaw.com
akaplan@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*

MONTELEONE LAW OFFICES, P.L.L.C.
JASON R.N. MONTELEONE
(*pro hac vice* forthcoming)
JACOB D. BOTTARI
(*pro hac vice* forthcoming)
350 North Ninth Street, Suite 500
Boise, ID  83702
Telephone:  208/331-2100
208/947-2424 (fax)
jason@treasurevalleylawyers.com

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
(*pro hac vice* forthcoming)
THOMAS C. MICHAUD
(*pro hac vice* forthcoming)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
mvanoverbeke@vmtlaw.com
tmichaud@vmtlaw.com

*Additional Counsel for Lead Plaintiffs*

- 22 -