**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-24580-CIV-ALTONAGA/Reid**

**CITY OF WARREN GENERAL**
**EMPLOYEES' RETIREMENT SYSTEM**,
on behalf of itself and all others similarly
situated,

      Plaintiffs,

v.

**TELEPERFORMANCE SE**, *et al.*,

      Defendants.

                                            /

**SUPPLEMENTAL DECLARATION OF CHRISTOPHER S. TURNER**
**IN SUPPORT OF DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION**
**COMPLAINT**

**LASHGOLDBERG LLP**
Martin B. Goldberg
Benjamin R. Shiekman
100 S.E. 2nd Street
Suite 1200
Miami, Florida 33131
Tel:   (305) 347-4040
Email: *mgoldberg@lashgoldberg.com*
       *bshiekman@lashgoldberg.com*

**LATHAM & WATKINS LLP**
Michele D. Johnson (admitted *pro hac vice*)
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Tel:   (714) 540-1235
Email: *michele.johnson@lw.com*

**LATHAM & WATKINS LLP**
Colleen C. Smith (admitted *pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
Tel:   (858) 523-5400
Email: *colleen.smith@lw.com*

**LATHAM & WATKINS LLP**
Christopher S. Turner (admitted *pro hac vice*)
Donald Lee Thompson
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel:   (202) 637-2200
Email: *christopher.turner@lw.com*
       *donald.thompson@lw.com*

*Attorneys for Defendants Teleperformance SE, Olivier Rigaudy,*
*Daniel Julien, and Akash Pugalia*

I, Christopher S. Turner, declare under the penalty of perjury that the foregoing is true and correct:

1.       I am a partner with the law firm of Latham & Watkins LLP, 555 Eleventh Street, NW, Washington, DC 20004-1304.  I am admitted to the Bars of the State of Georgia (Bar No. 719102) and the District of Columbia (Bar No. 494637).  I am attorney of record for Defendants Teleperformance SE ("Teleperformance"), Olivier Rigaudy, Daniel Julien, and Akash Pugalia (collectively, "Defendants"), in the above-captioned action (the "Action").  I was admitted to this Court *pro hac vice* pursuant to Rule 4(b) of the Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys for the Southern District of Florida, for the purpose of appearing in the Action.  *See* ECF No. 53.

2.       I submit this supplemental declaration in support of the Reply Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint, filed concurrently herewith.

3.       Attached hereto as **Exhibit 3** is a true and correct copy of the transcript of Teleperformance's Shareholder/Analyst Call, held on November 17, 2022, incorporated by reference in paragraphs 79–81, 131–33, and 136 of the Amended Complaint.

Executed on this 2nd day of February, 2024, in Washington, D.C.

Respectfully submitted,

*/s/ Christopher S. Turner*
Christopher S. Turner (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel:    (202) 637-2200
Email: *christopher.turner@lw.com*

*Attorney for Defendants Teleperformance SE, Olivier Rigaudy, Daniel Julien, and Akash Pugalia*

2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 2, 2024, I electronically filed the foregoing document, **SUPPLEMENTAL DECLARATION OF CHRISTOPHER S. TURNER IN SUPPORT OF DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**, with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Martin B. Goldberg*
**MARTIN B. GOLDBERG**

# EXHIBIT 3

**S&P Global**
Market Intelligence

# Teleperformance SE ENXTPA:TEP
# Shareholder/Analyst Call
### Thursday, November 17, 2022 6:00 PM GMT

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**Contents**

---

# Table of Contents

Call Participants ........................................................................... 3

Presentation ........................................................................... 4

Question and Answer ........................................................................... 5

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Agustin Grisanti**
*Group Chief Operating Officer*

**Bhupender Singh**
*President of Transformation*

**Daniel Julien**
*Executive Chairman & CEO*

**Eric Dupuy**
*President of Global Business
Development*

**Miranda Collard**
*Group Chief Client Officer*

**Olivier Rigaudy**
*Deputy CEO & Group CFO*

**ANALYSTS**

**Antonin Baudry**
*HSBC, Research Division*

**Anvesh Agrawal**
*Morgan Stanley, Research Division*

**Ben Wild**
*Deutsche Bank AG, Research
Division*

**David Cerdan**
*Kepler Cheuvreux, Research
Division*

**Nicole Manion**
*UBS Investment Bank, Research
Division*

**Oscar Val Mas**
*JPMorgan Chase & Co, Research
Division*

**Simon LeChipre**
*Stifel, Nicolaus & Company,
Incorporated, Research Division*

**Simona Sarli**
*BofA Securities, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Hello, welcome to the Teleperformance Information Update Meeting Call. My name is Sharon, and I will be your coordinator for today's event. Please note this call is being recorded. [Operator Instructions] I will now hand you over to your host, Mr. Daniel Julien, CEO and Founder, to begin today's conference. Thank you.

**Daniel Julien**
*Executive Chairman & CEO*

Thank you very much. Good morning, everybody, and thank you for being here. I'm here to announce a decision that has been very difficult to take. As one of our clients just stated, we got so many commendation from [ FBI ] because we were helping to catch criminal when monitoring some highly grease content and TP has been a truly protected in this space. So you can imagine our decisions are be difficult.

Having said that, I also want to state that we is support, trust and safety as an essential service for the community. What has also become clear through our own personal due diligence is that the employee that does this job are deeply committed and want to continue to do it.
However, we have made this decision as a result of listening carefully to the concern of our shareholders -- we have discussed these decisions to remove ourselves from the highly agrees content with our key trust and safety clients, while disappointed, they understand what we are doing and why. And right now, we are working with them to continue to develop our partnership in the future. This is my introduction, and now we are ready to answer your questions. Thank you very much.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] We will now take our first question from Anvesh Agrawal from Morgan Stanley.

**Anvesh Agrawal**
*Morgan Stanley, Research Division*

I got a few. And if I can ask them one by one, that would be easier. The first one is, just to be absolutely clear, are you exiting the entire trust and safety business or only a part of it? And if it's part of it, how much sort of revenue you are exiting? And what are the margins on that? That's the first one, please.

**Daniel Julien**
*Executive Chairman & CEO*

Okay. First, we are absolutely not exiting the old trust and safety business. There are so many things to protect the integrating the business, the anti-scam so many things. What we are exceeding are the cues with highly agree content and highly egregious content means Flag rant, [indiscernible] and audios content. For the rest of the answer I'm going to let Bhupender Singh to answer.

**Bhupender Singh**
*President of Transformation*

In terms of the quantum of business, it's not a straightforward answer because the work is some clients is segregated, which means the high egregious work is segregated. It goes to more dedicated teams. In some cases, it is not segregated it goes to a wider queue. And so that needs to be worked out.

And second, even where it is in segregated cues, dedicated ques, the client has to think about their own vendor and bundling strategy. Having said that, basis the initial discussions, the also a business that we will be giving up does not look substantial. In terms of exact quantum, we will take some time working with our clients, what that means, and we are targeting before the year-end to come to you with an estimate.

**Daniel Julien**
*Executive Chairman & CEO*

And if I may add, our clients deeply appreciate Teleperformance and want to find ways to continue to work with us as much will be convenient for them.

**Anvesh Agrawal**
*Morgan Stanley, Research Division*

That's clear. The second question is the clients with whom you are sort of exiting the business, do you also have them as your clients in other areas of the business? And any sort of ripple effect from this action of yours?

**Daniel Julien**
*Executive Chairman & CEO*

We do not anticipate any ripple effect.

**Anvesh Agrawal**
*Morgan Stanley, Research Division*

Okay. And finally, slightly unrelated question to today's call, but can you shed some light on the discussions you had with the Colombian government yesterday? And does that play any part in your decision today?

**Daniel Julien**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Executive Chairman & CEO*

I don't think that it plays any part in our decision. These are 2 separate topic. But Agustin Grisanti, Chief Operating Officer is going to give you the update.

**Agustin Grisanti**
*Group Chief Operating Officer*

Yes. The minister had asked us to reschedule the meeting due to some conflicts in his agenda. Today, we just half an hour ago. We've got a confirmation that the new date for the meeting is going to be the 29 November. And also taking advantage of the question, I tell you that, as we speak, a senior team of Teleperformance is meeting with the union representatives today.

**Daniel Julien**
*Executive Chairman & CEO*

Excuse me, the senior team of Teleperformance Colombia.

**Operator**

Next up, we have Antonin Baudry from HSBC.

**Antonin Baudry**
*HSBC, Research Division*

So I do not understand exactly the answer about the proportion of this business in your content moderation business because you told us during that week that highly egregious content representing less than 1 interaction per million. So indeed, it's very small. So could we have more details just to evaluate what it represents. And I have a second question after that.

**Daniel Julien**
*Executive Chairman & CEO*

Yes. As we were speaking about a specific client, and we confirm this number. The second point, highly egregious content moderation represents effectively an extremely small part of the business, sometimes use of 5 people, 10 people, 15 people out of thousands when it's segregated. Still from our client point of view, they may tend to prefer to work with a partner who is going to accept to deal with this part of business rather than a partner who says, I just take the easy non-challenging part and make your own of this difficult part. And this is what we are doing now managing.

**Antonin Baudry**
*HSBC, Research Division*

Okay. And you speak specifically about TikTok…

**Daniel Julien**
*Executive Chairman & CEO*

Clearly, the answer that we gave you last week or beginning of this week, I don't remember about TikTok was accurate. There is an extraordinarily rare occurrence of highly egregious content -- so TikTok is even not necessarily in the picture.

**Antonin Baudry**
*HSBC, Research Division*

Okay. My second question is not on this particular subject, but on ESG, in general, it becomes very important, the rating in asset allocation. I just want to know if you discuss with MSCI and specifically on their controversy rating and how do you assess the risk of a potential downgrade of this controversy rating on Teleperformance?

**Daniel Julien**
*Executive Chairman & CEO*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Olivier Rigaudy is going to answer your question.

**Olivier Rigaudy**
*Deputy CEO & Group CFO*

We had interaction with MSCI recently, the 25 October, we have been rerate AA. And in that sector, they have gave us not a good note on the controversy. So this is not going to change our rating. So -- but we are going to engage with them on in the next days, and we will see how it's -- what will be the outcome, but it's not going to -- today, it's not going to change.

**Operator**

Next up, we have Ben Wild from Deutsche Bank.

**Ben Wild**
*Deutsche Bank AG, Research Division*

Yes, a few questions from me as well, and I'll take them one by one also. Just firstly, from what I can tell, content moderation provided about 1/4 of your ex- COVID with like-for-like growth last year. What share of your growth is coming from content moderation as a whole this year? And how -- I know it's early stages, but how does this decision affects your growth pipeline going forward?

**Daniel Julien**
*Executive Chairman & CEO*

Maybe who wants to answer Bhupender ?

**Bhupender Singh**
*President of Transformation*

Yes. So yes. So firstly, I think you also touched upon it, Ben. This year, we have been able to absorb a substantial decline of the COVID line of business in our numbers and still being able to demonstrate growth. So that's something that I just want to highlight. Yes, a lot of that growth did come from content moderation, but there is a substantial growth that came from sort of other lines of business. So I think from that [indiscernible]. And we'll give you the exact numbers later on, but we expect our growth trajectory to continue despite the decision that we've announced today.

**Daniel Julien**
*Executive Chairman & CEO*

And if I may be specific, we had 2 super performing sector, traditional business sector in 2022 that BFSI and Travel & Transportation.

**Ben Wild**
*Deutsche Bank AG, Research Division*

Understood. My second question is just around the time line for this decision. How quickly will you exit this work? And can you clarify that the third-party audit that is taking place in the coming months will continue to examine your highly egregious content moderation operations.

**Daniel Julien**
*Executive Chairman & CEO*

Clearly, Answer number one, all the audit that we have announced clearly maintained and already engaged. And I'm going to let Olivier Rigaudy to give you more details on that.

**Olivier Rigaudy**
*Deputy CEO & Group CFO*

Yes, we have already agreed with a global standard and compliance edit term to start an audit of our compliance to labor load, notably in Colombia. And this audit will go as an exactly on time. The finding, I can tell you that the funding will be public as soon we will be able to publish them. Now for your question

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

on how fast we are exiting, we are not going to exit like robbers. Clearly, in the first stage, we are honoring the contract that are related to this content, except if the client accept to release us from the contract, but we clearly stated that we will not renew it. And second, we are totally stopped to sell to offer this service to the market.

**Ben Wild**
*Deutsche Bank AG, Research Division*

Very [ first ] that you had with your clients? Can you outline in more detail, perhaps conceptually, how you can continue to provide social media players with content moderation services without doing a highly egregious content moderation. That's my final question.

**Daniel Julien**
*Executive Chairman & CEO*

I understand very well, and it's an excellent question because it's dedicated and [indiscernible]. I'm going to let Miranda Collard, who is our Global Chief Client Officer to give you some color. And maybe Eric Dupuy can give you some color. And finally, Bhupender Singh is going to make a global synthesis on your question because it's a very important one.

**Miranda Collard**
*Group Chief Client Officer*

Yes. Thank you, Daniel. I think the overarching themes right now for us is like our employees, our clients would really like to continue with this work, but they are completely understanding about the issue this has created overall for Teleperformance. They trust us. They trust Teleperformance to be very professional during this time and really work through and navigate the issues and how we can partner to evaluate the business and how we move forward to segregate it out.

**Daniel Julien**
*Executive Chairman & CEO*

Thank you. Eric, do you have something to add?

**Eric Dupuy**
*President of Global Business Development*

Not much to add. It is strong that our client trust, and we have already engaged discussion with them on how we're going to continue to support this business and exceeding smoothly from highly egregious content.

**Daniel Julien**
*Executive Chairman & CEO*

Bhupender, do you want to wrap up?

**Bhupender Singh**
*President of Transformation*

I will. So let's understand, and we've made this point before also. The buyers of these services, the clients that we have, actually are large, sophisticated organizations. And they don't take the vendor selection decision that easily. It's a fairly extensive process and Teleperformance has gone to through that process. And the number of clients benchmarks, Teleperformance has been rated either the benchmark or very close to the benchmark. So just because of what has happened over the past 1 week, the clients also don't want to give up on all the investments that the 2 parties have done in essentially evolving and building this line of business because this is an evolving field.

It's something that did not exist and there are a lot of things that everyone is learning. So we are contributing to the line of service development and maturity, and they want to leverage on that knowledge of TP, especially real experience of TP doing things, doing interactions, doing processes at very large scale. And that's why they want to continue with the partnership. Ultimately, what it means in terms of exact

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

quantum of business that needs to work out, but that's one of the primary drivers where clients want to engage with -- continue to engage with TP on this topic.

**Operator**

Next up, we have Oscar Val Mas from JPMorgan online.

**Oscar Val Mas**
*JPMorgan Chase & Co, Research Division*

Yes. Daniel and team, I have a couple of questions. I'll take them one by one. The first one is going back to the magnitude of the potential impact, could you give us a sense of how much or how many employees you have in the segregated part of content moderation dealing with egregious? And then at the worst case of the 7% of the group that is content moderation, how much could be at risk? And how much is unrelated like advertising or labeling?

**Daniel Julien**
*Executive Chairman & CEO*

Okay. It's, again, extraordinarily difficult to give an answer at this specific moment on the second part of your question. But -- the initial interaction that we had with our clients, the Miranda's team and Eric team make us pretty confident. The first part of your question, the number of employees that have been in, in the segregated highly egregious file is in the magnitude of -- and here, we have to check exactly how we define and country to country and process by process, but is in the magnitude of maybe the couple of percent or, in any case, not above 5% of our total content moderation workforce. Now yes, the impact can be larger than that. But for me personally, I do not expect this impact even in my worst perception to represent more -- I mean, even in the case of snowball, more than -- okay, maybe 20%, 25% of our total business in content moderation. But this is subjective, this is a perception, and this is because I want to give you an answer from deep of my heart and my understanding.

**Oscar Val Mas**
*JPMorgan Chase & Co, Research Division*

That's incredibly useful. The second question is actually related to the call you hosted 2 nights ago. Just to clarify, when Teleperformance talk about attrition, the kind of 80%, 90% a year, does that include if an employee moves from one work stream and customer to another or not. So it's -- okay, so the attrition at a group level should be less than that in terms of employees that leave Teleperformance.

**Daniel Julien**
*Executive Chairman & CEO*

Yes. Somehow the attrition is less, but less bigly there is a reality of the customer experience frontline business, which is -- it's not a job that people do for a long time, depending on the community, economic condition where the people are, this job can be more or less attractive. So there are a lot of differences in the attrition. And I would say the attrition standards, the attrition of the industry. There is no way to transform it with a magic stick. And somehow, it has always been the case. Maybe it has been exaggerated over '21, '22 due to the great due to the work movement in some countries.

But it's part of the equation of this industry. It's an entry job employees learn a lot. They are very happy to progress within the company, to have an experience to find another job somewhere hedge and an experience at Teleperformance as an outstanding value, but it's also a very demanding job, and I speak about normal content -- normal customer experience and not content moderation. And by the way, content moderation, as we told you, experience a ratio of attrition that are less than half of the normal ratio of attrition. I can tell you, I was myself 2 days ago, making one-to-one fire chat and questions with content moderator employees. And these people are proud of what they do, and they like their job.

**Oscar Val Mas**
*JPMorgan Chase & Co, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

But just to be clear, the attrition that tell performance fees on a contract to contract level, but on the group could be less than 80% or 90%.

**Daniel Julien**
*Executive Chairman & CEO*

Yes. Excuse me. And by the way, when we speak about attrition, we also penalize ourselves somehow because I mean 8 out of 10. And the 2 other employees that are not front line to absolutely not -- have this level of attrition. It's -- I would say, it's almost the opposite. The seniority of the middle management and the top management at Teleperformance is such that it is very often perceived as a competitive advantage by the market and by our clients. And by the way, you have a testimony of that with the team that is speaking to you today because their combined seniority is way above. We are - how many are we 3, 6, 7 is way above 150 years.

**Operator**

Next up, we have Simon LeChipre from Stifel.

**Simon LeChipre**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Yes. A few questions, please. First of all, as a follow-up on previous question. Is there any risk that this decision impact your ability to win future business development opportunities, again, some peers operating the full content moderation business and so being more likely to win contract?

**Daniel Julien**
*Executive Chairman & CEO*

There are always a possibility, but the point is, is Teleperformance who is a kind of reference and benchmark in this market come to such kind of decision. And if new negative story come in the press without clearly understanding the essential role of content moderation. There is also a possibility that a significant number of our competitors are going to make the same choice. And so -- it's not a certitude. But we could infer that this might start a change in the content moderation management strategy of our largest client, our largest client keeping inside the highly segregated file and outsourcing the non-highly egregious file. Am I clear?

**Simon LeChipre**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Yes, very clear. And similarly, looking at the other segments of the content moderation business, basically, what are the market dynamics and the level of growth? And what is the competitive landscape? Is it a more tougher compared to this idea?

**Daniel Julien**
*Executive Chairman & CEO*

No, it's the same. It's content moderation has a lot to do with process, scalability, structure, audits and somehow trust and safety against scam, fake news, intellectual property or I'm going to take you another element that is not generally classify interest and safety, but that is stress and safety. In the banking business, anti-money laundering, fraud risk prevention, I mean we are in everybody has to understand that we are entering into a world that is more and more digital in which the risks are increasing and not only from data security breach, but from bad actors impersonating legitimate actors. Okay.

**Simon LeChipre**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

And so we can understand that the other segment or the content moderation businesses are also growing at kind of 20% or so.

**Daniel Julien**
*Executive Chairman & CEO*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes.

**Simon LeChipre**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Okay. And just lastly, to come back on the third-party audit that you did in the U.S. Do you think you will be able to share more details and notably the name of the [indiscernible] -- or it will never happen.

**Daniel Julien**
*Executive Chairman & CEO*

When you have a legal contract and specifically in the U.S., you are clearly you better clearly respect it. But if our Chief Legal Officer is on the floor, I know she could not be here by video, but if he yes, I would like her to give her point of view and our Chief Legal Officer is more than 40 years senior U.S. lawyer. Lee are you around? No, it doesn't seem that Lee is around. But clearly, we will do our best, and we are doing our best to try to get a minimum an edited version or whatever, but a contract is a contract. And we are not known to breach contracts. excuse me. But I say that because there might be a mismatch in understanding between the French or the European community and the U.S. community. U.S. is the rule of law and the strict rule of law and a contract is a saturated document.

**Operator**

Next, we have Simona Sarli from Bank of America.

**Simona Sarli**
*BofA Securities, Research Division*

So the first one, please, and I will take it again one by one. It's a question for Bhupender and some of the initial remarks where I mentioned that some of the egregious content is part of segregated cues. How much is roughly is instead dealt more generally by a broader group of content moderators and therefore, operationally, how easy it is to terminate that part of the business?

**Bhupender Singh**
*President of Transformation*

Yes. So Simona, in terms of the number of -- the quantum of business that is not segregated -- it's in a similar order as the remaining, which is segregated, so you can just kind of double that. That's the same order because for some clients, it's aggregated for some clients, it is not segregated. In some places, it is segregated in some cases, it's not segregated, but I think we can just double that number. And how difficult or easy it is, it's not that straightforward because the routing is done by the AI engine. And so in some cases, it can be done. In some cases, it cannot be done. So as we move forward, as AI becomes more intelligent, the routing will become more intelligent. So it will be easier to segregate as we go ahead. Today, it may be somewhat more difficult.

**Simona Sarli**
*BofA Securities, Research Division*

Okay. And then a second question. So is highly egregious content, higher margin than other lines in trust and safety, like, for example, [indiscernible].

**Daniel Julien**
*Executive Chairman & CEO*

The answer is no. And probably that was a mistake of the market because in my own perception, it should be higher price allowing for higher selection, higher pay, higher protection, higher everything, but this is not a market condition today. By the way, I would say the same thing. The people who are in the SWAT team in the police should be way better compensated than the people who are not in the SWAT team. I am not sure that the difference is sufficient, but that's another topic.

**Simona Sarli**
*BofA Securities, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

And lastly, even if, obviously, it is, as you mentioned, it's a very small percentage of your total number of content moderators. So you were talking about less than 5%. What will happen to these people that have been working on segregated egregious content? Will they be allocated -- reallocated to other business lines?

**Daniel Julien**
*Executive Chairman & CEO*

Normally yes. You know what? The beauty of Teleperformance is that we are a growing company. And typically, we add between 20,000 to 30,000 net jobs in a year. So these very good people, and we appreciate them. We respect them. I am sure that they are going to be said that we take their decision -- but we are not going to put them in trouble. That's a promise. And it's our best interest.

**Olivier Rigaudy**
*Deputy CEO & Group CFO*

The 5% we are speaking of is for the content moderation, not for the sales group.

**Operator**

Next up, we have David Cerdan from Kepler.

**David Cerdan**
*Kepler Cheuvreux, Research Division*

Yes. I have a couple of questions. The first one is just on the rewarding. In the press release, you mentioned you stop the highly egregious content moderation activity. Does it include the only the egregious content moderation because in some previous calls, you have separated highly egregious from egregious. So just to be clear on this point. And my second question is regarding your discussion with shareholders. So how many shareholders have you discussed with on this point? And what was the results of the discussion when I think that you had also some investors favorable to continue the business. So can you explain this?

**Daniel Julien**
*Executive Chairman & CEO*

Yes. When you take a decisions, you always balance plus the minus and you try to make the decision that is the most appropriate for your own business. Teleperformance has been taken into a kind of [indiscernible] over the last week. That's according and a trust crisis that according to me, was totally fabricated. And it was important to give a strong signal even individually, we can question this decision. But as the global Executive Committee of Teleperformance, each of us unanimously supports this decision. That's the point number one.

The point number 2, the difference between egregious and highly egregious comes from our proximity to the field. [ indiscernible] in Colombia. Bhupender and I, in the U.S., interacting and clearly touching, seeing, listening, it's clear that depending on the cultural environment in which you are, egregious very different perception. I'm going to give you an example. In the U.S., if you see in a post the world as with suspense points, it's okay. If you say the world, like we say it more or less 10 times a day in France is egregious. So you understand that -- it's the same for pictures. If you are in Europe, and if you see a picture of somehow a lady without a lot of close is not highly egregious. In some other countries, it is in the U.S., if you see 2 man kissing because it's a rule of the LGBTQ that is totally accepted by the community.

It's not egregious. If you are in Egypt, where it's illegal, it's egregious. So there is localization. And definitely, they are a level into the egregious. That's why we took highly egregious and highly egregious is and I send you back to the definition, plagued, [ indiscernible] and audio content. The example is obviously the child sexual abuse. There are other kind of examples, and we are going to work with our employees with academics with our clients to try to define a standard. We would love, by the way, if the governments of the world would define the standard. But as the society evolve much faster than the lawmaker, we are going to try to define what is the appropriate standard.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

TELEPERFORMANCE SE SHAREHOLDER/ANALYST CALL | NOV 17, 2022

**David Cerdan**
*Kepler Cheuvreux, Research Division*

Just to be clear on this point, you receive -- just to be on the content moderation processes. So the last 97% of our content is controlled by the artificial intelligence and the rest is controlled by humans. And how do you separate Egregious from normal content? Is it the machines that do the job? Or is it -- is there another process?

**Daniel Julien**
*Executive Chairman & CEO*

It's a machine that does a job. In the machine or, let's be clear. In the case of some clients that I'm not going to mention, but that have been evoked multiple times, it's an internal team at the client company.

**Operator**

We'll take our last question from Nicole Manion from UBS.

**Nicole Manion**
*UBS Investment Bank, Research Division*

I have a couple or 3 actually. Firstly, the work that you said that you've been signing in the last week, can you confirm that, that is an content moderation of the highly egregious kind? Or is that still to be determined? Because you said you've had some wins in last week. Maybe I'll ask that one first.

**Bhupender Singh**
*President of Transformation*

The wins that I referred to were not in the highly egregious content space.

**Nicole Manion**
*UBS Investment Bank, Research Division*

And then. Just wanted to ask that you've obviously spent a lot of time over the last week or so presenting more insights into content moderation, including, again, the highly egregious part, seemingly with a view to sort of being a bit more education around it. Is there something in particular or not?

**Daniel Julien**
*Executive Chairman & CEO*

Absolutely not. Our decisions is a result of a maturation process, integrating all the different components and making a trade-off that we expect to be positive for the group. Yes, makes sense.

**Nicole Manion**
*UBS Investment Bank, Research Division*

And finally, I just wanted to ask on sort of the cost side. As you work with your clients to sort of figure out what is highly egregious and what isn't, do you expect any higher costs in the business that remains given that, that sounds like a sort of a greater effort to run the contracts? And then secondly, and relatedly, could there be any costs associated with contract exits, restructuring that kind of things that we should be aware of?

**Daniel Julien**
*Executive Chairman & CEO*

I don't think so because our intention is to work hand-in-hand with our client and not to approach this decision on a conflictual mode. Then this on the long term, the content moderation management generate more additional cost is we think if we prove that it must -- it will be what it is. The -- there is a market. They are best practice in the market. There is a cost to best practices and clients will choose what they want.

**Operator**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

There are no further questions at this time. I would like to turn the conference back to Mr. Julien for any additional or closing remarks.

**Daniel Julien**
*Executive Chairman & CEO*

This is very nice from you. You know what, I'm going to surprise everybody, I don't want to make any closing remarks, but I would like the member of the Executive Committee, each of them to give the closing remark in one sentence. So you are going to have a better flavor of what we think. So please, we are going to start by our global Chief Client Officer, Miranda Collard, U.S. citizen.

**Miranda Collard**
*Group Chief Client Officer*

Thank you, Daniel. My closing comment would be, I feel very confident that we will be the professional partner that we've always been as Teleperformance that we'll weather through this with our clients and continue to build and be exactly who expected to become in the future. Thank you.

**Daniel Julien**
*Executive Chairman & CEO*

I suggest that the second one being Agustin Grisanti, who is Argentina citizen, but presently in Colombia.

**Agustin Grisanti**
*Group Chief Operating Officer*

Okay. My closing remark is that we are equally convinced about the importance of the content moderation and the role that it plays that we are going to be close to our clients, and we will get the best for our shareholders in the medium and long term.

**Daniel Julien**
*Executive Chairman & CEO*

Then I'm going to ask Eric Dupuy, French citizen living in the U.S.A., and Chief Business Development Officer.

**Eric Dupuy**
*President of Global Business Development*

So as I don't want to repeat what Miranda says about the trust and we have with our clients. I just want to share some numbers. The traditional SIC business in which we play for the last 45 years is 8x to 9x bigger than the trust and safety business. And I'm not even mentioning here that a lot of it is still captive. So even if we will reduce our sales investment against egregious content.

**Daniel Julien**
*Executive Chairman & CEO*

We cannot hear you, Eric. We cannot hear you. So I'm going to pass in the interest of time, I'm going to pass to Bhupender Singh, Indian citizen living in London and currently present in New York City.

**Bhupender Singh**
*President of Transformation*

Thank you, Daniel. I'll just reiterate a few points. One, we fundamentally believe trust and safety is an essential first responder service that is needed for the society. Number 2, for this essential service, TP is possibly one of the very few global companies that can do it at scale professionally. Number 3, our people who do this activity are proud of it and would like to continue doing it. Number 4, our clients also, which are global majors actually like TP and would like to -- would have liked to find ways to continue doing this work. Having said all that, having listened to feedback from many, many of you over the past 1 week, we decided we will not be intellectually arrogant because ultimately, we work for all you guys. We do need

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the commercial establishment. We do need to deliver shareholder returns, and we have decided this tough decision.

**Daniel Julien**
*Executive Chairman & CEO*

Thank you, Bhupender. Our distinguished Chief Financial Officer and delegate CEO Mr. Olivier Rigaudy, French citizen living in Paris, a rarity in Teleperformance.

**Olivier Rigaudy**
*Deputy CEO & Group CFO*

Yes. Thank you, Daniel. I don't want to be long and I'm not going to have many more stuff on what has been said by either Agustin or Bhupender or [indiscernible] that this decision has been made just to make sure that the financial committee that -- with whom we have a very good relationship over the last year. We trust again us, and I believe that this is going to happen tomorrow. And I just wanted to say again that it won't dramatically the P&L on the prospect of the future of Teleperformance. And I'm quite convinced this is going to be easily followed as mentioned earlier on, like the COVID crisis.

**Daniel Julien**
*Executive Chairman & CEO*
And finally, I'm going to finish this presentation by [indiscernible] sentence, which is better to yield when it's fully to resist then to resist stubbornly and be destroyed. Thank you very much. Thank you. That concludes today's conference. Thank you, everyone, for your participation. You may now disconnect.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.