**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-24580-CIV-ALTONAGA/Reid**

**CITY OF WARREN GENERAL
EMPLOYEES' RETIREMENT
SYSTEM**, *et al.*,

      Plaintiffs,

v.

**TELEPERFORMANCE SE**, *et al.*,

      Defendants.

_____/

## ORDER

    **THIS CAUSE** came before the Court on Defendants, Teleperformance SE, Daniel Julien, Olivier Rigaudy, and Akash Pugalia's Motion to Dismiss [ECF No. 65]. Lead Plaintiffs, City of Warren General Employees' Retirement System and City of Westland Police and Fire Retirement System filed a Response [ECF No. 66]; to which Defendants filed a Reply [ECF No. 67]. The Court has carefully considered the Amended Class Action Complaint ("Amended Complaint") [ECF No. 62], the parties' written submissions, and applicable law. For the following reasons, the Motion is granted.

## I. BACKGROUND

    This is a putative securities fraud class action brought by Plaintiffs, arising from alleged misstatements and omissions made by Defendants between July 29, 2020 and March 22, 2023 (the "Class Period"). (*See generally* Am. Compl.).

Teleperformance is a French company headquartered in Paris, France. (*See id.* ¶ 13).[1] Its shares trade on the Paris Stock Exchange, while its American Depositary Receipts ("ADRs")[2] are traded over-the-counter ("OTC") in the United States under the ticker symbol "TLPFY." (*See id.* ¶¶ 7, 13). Teleperformance provides "outsourced omnichannel customer experience management services and related digital services[;]" these "can include the operation of customer service call centers, handling the recruitment of employees, payment collection services, or content moderation for social media companies." (*Id.* ¶ 13 (alteration added)). During the Class Period, Julien, Teleperformance's founder, was its Chairman and Chief Executive Officer; Rigaudy was its Deputy Chief Executive Officer and Chief Financial Officer; and Pugalia was its Global President of Trust & Safety. (*See id.* ¶¶ 8–10). Plaintiffs purchased Teleperformance ADRs during the Class Period. (*See id.* ¶¶ 5–6).

Teleperformance entered the content moderation business and began conducting moderation services for TikTok in July 2018. (*See id.* ¶¶ 34–35). "Content moderation for social media refers to the act of checking user-generated content against applicable laws and community guidelines" and is intended to "protect the public from bad actors in the digital world." (*Id.* ¶ 33). "Content moderation can involve the removal of material that, while impermissible, is not necessarily offensive to the platform's users — for example, the illegal streaming of copyrighted material." (*Id.* ¶ 38). It also involves removal of material that is offensive or disturbing, typically referred to as egregious or highly egregious content, "such as visual depictions of cannibalism or child sexual abuse material ('CSAM')." (*Id.*).

---

[1] The Court relies on the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[2] ADRs represent one-half of one share of Teleperformance's common stock. (*See* Am. Compl. ¶ 7).

Teleperformance's content moderators are tasked with (1) reviewing profile pictures, feeds, and videos; and (2) filtering, flagging, reviewing, and escalating content that violates the social media platform's policies. (*See id.* ¶ 36). Teleperformance's content moderation business accounts for about 7% of its total revenue. (*See id.* ¶ 35). "[T]he review of egregious materials" accounts for "up to a quarter of" Teleperformance's content moderation business. (*Id.* ¶ 43 (alteration added)).

During the Class Period, Defendants allegedly made materially false and misleading statements and omissions related to Teleperformance's: (1) commitment to its employees and "Corporate Social Responsibility" ("CSR") (*see id.* ¶¶ 90–114); (2) content moderation business (*see id.* ¶¶ 103, 109, 111); (3) stance on collective bargaining (*see id.* ¶ 102); (4) response to articles regarding its content moderation business (*see id.* ¶¶ 116–125, 133); and (5) exit from the "egregious" content moderation business (*see id.* ¶¶ 130–135). For example, Defendants stated Teleperformance "made the well-being of its employees a key priority worldwide" (*id.* ¶ 91 (emphases omitted)); was "extraordinarily focused on delivering an outstanding environment and social responsibility" (*id.* ¶ 92 (emphases omitted)); and placed "great importance on the wellbeing and mental health of its moderators" (*id.* ¶ 109 (emphases omitted)). Teleperformance's annual Integrated Report for fiscal year 2020 ("2020 Report") also characterized "'[u]nions and employee representatives' as among [Teleperformance's] 'stakeholders,' and stated that 'Teleperformance respects freedom of association and recognizes the right to collective bargaining.'" (*Id.* ¶ 102 (alterations added; emphases omitted)).

According to Plaintiffs, "two investigative exposés published by two preeminent business and news publications in the United States" eventually revealed the truth about Teleperformance: it "subjected its content moderation employees to extremely inappropriate — and potentially

criminal — working conditions which directly contradicted Defendants' representations during the Class Period[.]" (*Id.* ¶ 15 (alteration added)). Specifically, in August 2022, *Forbes* published an article titled "TikTok Moderators Are Being Trained Using Graphic Images of Child Sexual Abuse[.]" (*Id.* ¶ 53 (alteration added; quotation marks omitted)). The article allegedly revealed that moderators were shown sexually exploitative images of children as part of their training; and part of their training materials included a "widely accessible" document or "DRR" (short for "Daily Required Reading"), which contained hundreds of images of naked or abused children. (*Id.* ¶ 54). The article suggested Teleperformance's practices had adverse and sometimes serious negative effects on its moderators and raised concerns about whether Teleperformance was complying with applicable laws and regulations. (*See id.* ¶¶ 55–56). The *Forbes* article sparked "intense scrutiny" by the United States Senate. (*Id.* ¶ 59).

Teleperformance responded to the *Forbes* article, stating it took the "allegations very seriously" and had "conducted an internal audit which found no evidence of the use of or access to CSAM images in training." (*Id.* ¶ 60 (quotation marks omitted)). It further stated that it was "in the process of having an independent third[-]party audit conducted in order to examine all of [its] content moderation operational standards and processes." (*Id.* (alterations added; quotation marks omitted)).

Plaintiffs allege that the information contained in the *Forbes* article was corroborated by a confidential witness "who worked at Teleperformance as a content moderator from June 2020 to February 2021[.]" (*Id.* ¶ 58 (alteration added)). Prior to being hired, the witness allegedly "received no psychological testing or screening to evaluate [his or her] resilience or fitness for the content moderation role" and was exposed to "'jaw-dropping' videos[,]" including exposed minors. (*Id.* (alteration added)). The witness further stated that "links to unredacted CSAM were

sent to content moderators through TikTok's Lark application — the same application in which the DRR was stored[.]"  (*Id.* (alteration added)).

About two months later, in October 2022, *Time* published an article titled, "Behind TikTok's Boom: A Legion of Traumatized, $10-A-Day Content Moderators[.]"  (*Id.* ¶ 62 (alteration added; quotation marks omitted)).  Like the *Forbes* article, the *Time* article "revealed that Teleperformance content moderators were exposed to egregious content that had an adverse effect on their wellbeing."  (*Id.* ¶ 63).  It also discussed the inadequacy of Teleperformance's mental health support, Teleperformance's employee monitoring, and its alleged union-busting tactics; and reported that Teleperformance was under investigation for these issues by the Colombian Ministry of Labor.  (*See id.* ¶¶ 63–67, 146).

On November 7, 2022, Teleperformance published a letter explaining that the third-party audit did not find any inconsistencies with its internal audit.  (*See id.* ¶ 73).  Less than two weeks later, Teleperformance announced that it was exiting the "highly egregious" content moderation business.  (*See id.* ¶ 78).

During a conference call with analysts regarding the exit, an analyst asked, "about how much revenue Teleperformance would lose by exiting the egregious content business"; non-party Bhupender Singh, Teleperformance's President of Transformation, responded that the "'business that we will be giving up does not look substantial.'"  (*Id.* ¶¶ 79–80 (emphases and quotation marks omitted)).  During the call, Julien also stated, "we do not anticipate any ripple effect" from exiting the egregious content moderation business.  (*Id.* ¶ 80 (alteration adopted; emphases and quotation marks omitted)).  Regarding Teleperformance's entire content moderation business, Julien stated he did "not expect this impact even in [his] worst perception to represent more . . . even in the case of snowball, more than . . . 20%, 25% of [Teleperformance's] total business in content

moderation." (*Id.* (alterations added; third alteration in original; emphases and quotation marks omitted)). Nonetheless, Teleperformance swiftly reentered the highly egregious content moderation business in March 2023. (*See id.* ¶ 86).

Plaintiffs allege that because of Defendants' false and misleading statements, the price of Teleperformance ADRs fell over 50 percent from its Class Period high. (*See id.* ¶ 89). The ADR trading price dropped from $168.69 per ADR on August 4, 2022 to $160.94 on August 5, the day after the *Forbes* article was released. (*See id.* ¶ 117). On November 9, 2022, the ADR trading price was $132.32, but it dropped to $107.77 on November 10, the day after the *Time* article was released. (*See id.* ¶¶ 128–29). On March 22, 2023, when Teleperformance announced it was re-entering the highly egregious content moderation business, the ADR price per share dropped from $119.69 when the market closed on March 21, to $112.82 at close on March 24. (*See id.* ¶¶ 138–39).

Lead Plaintiffs bring this putative class action against Defendants on behalf of all investors who purchased Teleperformance ADRs during the Class Period. (*See generally id.*). In Count I, they allege Defendants made material misrepresentations and omissions during the Class Period, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. (*See id.* ¶¶ 175–79). In Count II, they allege the individual Defendants (Julien, Rigaudy, and Pugalia) were controlling persons of the company whose conduct also violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (*See id.* ¶¶ 180–81). Defendants move to dismiss the Amended Complaint with prejudice for failure to state claims upon which relief can be granted. (*See generally* Mot.).

## II.  LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  *Twombly*, 550 U.S. at 555 (alteration added).  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678 (alteration added; citing *Twombly*, 550 U.S. at 556).  When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take its factual allegations as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc*., 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

Typically, consideration of a motion to dismiss is limited to the complaint and its attached exhibits; if the court considers evidence outside the pleading, the motion to dismiss generally must be converted into a motion for summary judgment.  *See Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (citations omitted).  "There are two exceptions to this conversion rule: (1) the incorporation-by-reference doctrine and (2) judicial notice."  *Id.* (citation omitted).  Under the incorporation-by-reference doctrine, courts may consider evidence attached to a motion to dismiss provided the evidence is referenced in the complaint, central to the plaintiff's claim, and the

document's contents are undisputed — meaning its authenticity is unchallenged. *See id.* (citations omitted).

While run-of-the-mill complaints are adequate if they contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2) (alteration added), securities fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), *see Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 789 (11th Cir. 2010) (citations omitted). Securities fraud claims therefore must state "with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b) (alteration added). To satisfy Rule 9(b), a complaint must include:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (quotation marks omitted; quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)).

"[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Id.* (alteration added). The purpose for this degree of particularity is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges of immoral and fraudulent behavior." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (alterations added; citation and quotation marks omitted).

The relevant pleading requirements do not end with those found in Rule 9(b). Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified as amended in scattered sections of 15 U.S.C.), a complaint must "specify each

statement alleged to have been misleading" and "the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1)(B) (alteration added). "[W]ith respect to each act or omission alleged[,]" the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A) (alterations added).

A "'strong inference' is one that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). The required state of mind, commonly referred to as scienter, "is an 'intent to defraud or severe recklessness on the part of the defendant.'" *Id.* (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011)). "Although scienter may be inferred from an aggregate of factual allegations, it must be alleged with respect to each alleged violation of the statute." *Id.* (citing *FindWhat*, 658 F.3d at 1296).

### III. DISCUSSION

To state a claim of securities fraud under Section 10(b) and Rule 10b-5 in Count I, Plaintiffs must sufficiently allege "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection' between the misrepresentation or omission and the loss, commonly called 'loss causation.'" *Carvelli*, 934 F.3d at 1317 (quotation marks and citation omitted).

Regarding Count II, section 20(a) imposes liability on control persons of companies that violate the securities laws. *See* 15 U.S.C. § 78t(a). To state a section 20(a) claim, Plaintiffs must allege:

(1) [the corporate entity] committed a primary violation of the securities laws; (2) the Individual Defendants had the power to control the general business affairs of [corporate entity]; and (3) the Individual Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability.

*In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017) (alterations added; quotation marks omitted; quoting *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001), *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)). If a plaintiff does not adequately plead that the corporate defendant violated Section 10(b) and Rule 10b-5, a claim under Section 20(a) necessarily fails. *See id.* (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)).

Defendants insist that Plaintiffs' claims should be dismissed with prejudice for several reasons. As to Count I, they argue that Plaintiffs (1) fail to allege a domestic transaction (*see* Mot. 11–12); (2) have not — and cannot — plead an actionable misrepresentation or omission (*see id.* at 13–20); (3) fail to show scienter (*see id.* at 20–26); and (4) do not sufficiently allege loss causation (*see id.* 26–27). Defendants also argue that because Plaintiffs fail to sufficiently allege a Section 10(b) violation, they also cannot state a claim under Section 20(a) in Count II. (*See id.* 27). Ceding no ground, Plaintiffs dispute each argument. (*See generally* Resp.).

While the Court is not convinced by all of Defendants' arguments, the Court agrees the Amended Complaint should be dismissed, but with leave to amend. The Court addresses the parties' arguments below.

## A.    <u>Domestic Transaction</u>

As discussed, Defendants first argue Plaintiffs fail to sufficiently allege a domestic transaction, an omission fatal to their claims under Section 10(b) because the federal securities laws cannot apply extraterritorially. (*See* Mot. 11–12; Reply 7). Plaintiffs contend they are not

seeking extraterritorial application of the federal securities laws.  (*See* Resp. 13–14).  While that may be the case, the Court agrees with Defendants that Plaintiffs' allegations are insufficient.

"Alleging a domestic transaction is necessary" for a securities fraud claim "because Section 10(b) and Rule 10b-5 do not apply extraterritorially — that is, to a securities transaction that occurs outside the United States." *Zalazar v. Cap. Force LLC*, No. 23-21512-Civ, 2023 WL 4186397, at *5 (S.D. Fla. June 26, 2023) (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255–65 (2010)).  Courts apply a "transactional test" to determine whether a transaction is domestic.  *Id.* (quotation marks omitted; quoting *Morrison*, 561 U.S. at 269–70).

The test looks to "whether the purchase or sale [of the security] is made in the United States, or involves a security listed on a domestic exchange[.]"  *Morrison*, 561 U.S. at 269–70 (alterations added); *see also Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310 (11th Cir. 2011) (applying *Morrison*).  Other circuits and courts in this District have concluded that "territoriality under *Morrison* turns on where, physically, the purchaser or seller committed him or herself to pay for or deliver a security." *Zalazar*, 2023 WL 4186397, at *5 (quotation marks omitted; quoting *United States v. Georgiou*, 777 F.3d 125, 136 (3rd Cir. 2015)).  Thus, the "plaintiff must plead facts concerning the formation of contracts to buy or sell securities, the placement of purchase orders, the passing of titles, or exchanges of money, within the United States." *Acerra v. Trulieve Cannabis Corp.*, No. 20-cv-186, 2021 WL 1269919, at *3 (N.D. Fla. Mar. 18, 2021) (citations omitted).

While Plaintiffs allege the ADRs are traded in the United States on the OTC market (*see* Am. Compl. ¶ 14), they do not allege that Plaintiffs purchased the ADRs, the title of the ADRs was passed, or money was exchanged, in the United States (*see generally id.*).  Nor do they allege

the ADRs are traded only in the United States OTC market, from which the Court could plausibly infer that the ADRs were purchased domestically.  (*See generally id.*).

At bottom, Plaintiffs have pleaded only the "mere possibility" that a domestic transaction occurred.  *Iqbal*, 556 U.S. at 679 (2009).  Without more, the Amended Complaint must be dismissed.  *Compare Zalazar*, 2023 WL 4186397, at *6 (concluding plaintiff sufficiently alleged a domestic transaction occurred because she alleged where the purchase documents were prepared and executed and where funds were wired to, and the security agreements provided that they became effective when the domestic defendants' signatures appeared on the documents) *with Baylor v. Honda Motor Co.*, 23-cv-00794, 2024 WL 650415, at *4 (C.D. Cal. Feb. 8, 2024) (dismissing complaint for failure to allege a domestic transaction where plaintiffs alleged American Depository Shares were traded in the United States but failed to allege where they acquired the securities) *and Acerra*, 2021 WL 1269919, at *4 (dismissing complaint for failure to allege a domestic transaction where plaintiffs alleged the securities were listed on a Canadian exchange and OTC market but did not sufficiently allege the OTC market was a domestic exchange).

This deficiency can be easily cured by amendment.  In an effort to narrow the issues that might be raised in a challenge to a second amended complaint, the Court moves on to address Defendants' remaining arguments for dismissal.

### B.    Misrepresentations and Omissions

Defendants next contend that none of the alleged misrepresentations or omissions is actionable, for a variety of reasons.  (*See* Mot. 13–26; Reply 8–13).  Unsurprisingly, Plaintiffs disagree.  (*See* Resp. 14–24).

To be actionable under securities laws, misrepresentations or omissions must be "material[.]"  17 C.F.R. § 240.10b-5(b) (alteration added).  "A misrepresentation or omission is material if, in the light of the facts existing at the time, a reasonable investor, in the exercise of due care, would have been misled by it."  *Carvelli*, 934 F.3d at 1317 (citation and quotation marks omitted).  Put differently, "materiality depends on whether a 'substantial likelihood' exists that a 'reasonable investor' would have viewed a misrepresentation or omission as 'significantly alter[ing] the 'total mix' of information made available.'"  *Id.* (alteration in original; quoting *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012); footnote call number omitted).  "The materiality requirement aims to strike a balance between protecting investors and allowing companies to distribute information without perpetual fear of liability — in essence, to ensure that not every minor misstatement provides litigation fodder for disgruntled investors."  *Id.*

"Materiality, though, is a question of fact that may rarely be resolved at the motion to dismiss stage."  *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1364 (S.D. Fla. 2001) (citing *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000)).  Indeed, "'[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law.'"  *Id.* (alteration added; quoting *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir.1997)).

Corporate puffery is one such obviously unimportant category of misrepresentations.  *See Carvelli*, 934 F.3d at 1318–19.  Corporate puffery consists of "generalized, vague, nonquantifiable statements of corporate optimism[,]" *id.* at 1318 (alteration added; citation omitted); as opposed to "determinate, verifiable statement[s,]" *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015) (alteration added).  The puffery doctrine "presumes a

relatively (but realistically) savvy consumer — the general idea being that some statements are just too boosterish to justify reasonable reliance." *Carvelli*, 934 F.3d at 1318; *see also City of Monroe Emp.'s Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) ("[S]tatements describing a product in terms of 'quality' or 'best' or benefitting from 'aggressive marketing' are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." (alteration added)).

Regarding omissions, "'silence, absent a duty to disclose, is not misleading under Rule 10b-5.'" *Carvelli*, 934 F.3d at 1317 (alteration adopted; quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). "Disclosure is required . . . only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 891 (2024) (alteration added; other alteration adopted; quotation marks omitted; quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).

Plaintiffs allege Defendants violated Section 10(b) and Rule 10b–5 by making approximately 40 misrepresentations and omissions that Defendants contend fall within five rough categories concerning: (1) Teleperformance's commitment to its employees and CSR; (2) Teleperformance's content moderators; (3) the *Forbes* and *Time* articles; (4) Teleperformance's stance on collective bargaining; and (5) Teleperformance's exit from the egregious content moderation business.  (*See* Mot. 14–18; *see also* Am. Compl. ¶¶ 90–136; Mot., App'x A ("Challenged Statements") [ECF No. 65-1] (listing and numbering challenged statements); Resp. 17–27 (not contesting Defendants' five categories of misstatements)).  Defendants argue the misstatements are presented using an improper "puzzle pleading" approach and are otherwise

nonactionable for different reasons.  (*See* Mot. 13–20).  The Court considers the parties' competing arguments.

### 1.    *Puzzle Pleading*

Defendants first make the threshold argument that Plaintiffs engage in improper "puzzle pleading" — that is, they "recit[e] a parade of statements" then "list eleven different 'adverse facts' that Defendants purportedly knew or recklessly disregarded at the time of the challenged statements."  (*Id.* 13 (alteration added; quoting Am. Compl. ¶ 115)).  In Defendants' view, this approach makes it "impossible to discern with any precision the particular 'adverse facts' that purportedly render each particular statement over a two-year period false or misleading[,]" thereby failing to satisfy the PSLRA's pleading requirements.  (*Id.* (alteration added; citations and emphasis omitted; quoting Am. Compl. ¶ 115)).  Plaintiffs insist the structure of the Amended Complaint "organizes the misstatements and omissions under an identifiable heading and at the conclusion of each set of statements, clearly delineates the specific reasons why Defendants' statements were misleading."  (Resp. 15).  Plaintiffs fail to persuade.

The Amended Complaint is prolix, filled with lengthy quotes, and littered with bolded and italicized language.  Despite its length and wealth of content, the pleading lacks specificity.  What Plaintiffs have done, as one court described, is "compile[] a series of statements — almost all of which contain multiple passages presented in the form of lengthy [] quotes — and then pair[] each series of statements to the same conclusory list of deficiencies."  *City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1293 (N.D. Ga. 2011) (alterations added).  Or, as another court described, Plaintiffs identify many lengthy statements with a "laundry list of 'specific' reasons why the statements are allegedly false" but "neglect to make it clear what portion of each quotation constitutes a false representation or which statements link up with which

issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *In re Alcatel Sec. Lit.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (citation omitted).

*City of Pontiac* aptly identified the problem that plagues the pleading here: "Plaintiffs cannot satisfy [the PSLRA's specificity] requirement by transcribing every statement made or issued by [Defendants] on particular topics and then alleging in general terms that the true facts that can be gathered from the rest of the complaint show those statements to be misleading[,]" leaving "the hapless reader" "to sort out the allegations and the allegedly adverse facts." 806 F. Supp. 2d at 1293 (alterations added). This is precisely what the Amended Complaint requires of the reader. Although Defendants identify 40 purported misstatements and omissions, the undersigned has been unable to (1) confirm the number of alleged misstatements and omissions and (2) discern which statements (or portions of statements) are allegedly false or misleading and precisely why. The PSLRA requires more.[3]

As with the issue of a domestic transaction, these deficiencies are easily curable. In revising their pleading, Plaintiffs are encouraged to keep in mind that "the heightened pleading rules [in securities fraud cases] are designed to elicit clarity, not volume. The [C]ourt should not have to play connect-the-dots in order to identify the facts and trends upon which [P]laintiffs base their claim." *In re PETsMART, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 991 (D. Ariz. 1999) (alterations added; footnote call number omitted).

---

[3] The Amended Complaint could alternatively be characterized as a shotgun pleading, in that its confusing nature fails "to give [Defendants] adequate notice of the claims against them and grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015) (alteration added; footnote call number omitted). "[S]hotgun pleadings are routinely condemned by the Eleventh Circuit." *Real Estate Mortg. Network, Inc. v. Cadrecha*, No. 11-cv-474, 2011 WL 2881928, at *2 (M.D. Fla. July 19, 2011) (alteration added; citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir. 1991)).

Despite the confusing nature of the Amended Complaint, Defendants attempt to organize and challenge the alleged misstatements and omissions (*see generally* Mot.), and the parties have spent considerable effort briefing these issues (*see generally id.*; Resp.; Reply).   The Court considers Defendants' remaining arguments.

> 2.   *Statements regarding Teleperformance's commitment to employees and CSR*

Plaintiffs allege Defendants made approximately 20 misrepresentations or omissions regarding Teleperformance's commitment to its employees and CSR during the Class Period.  (*See generally* Am. Compl. ¶¶ 90–101; 103–07; 109–10, 112–14, 120–21, 124–25).  These statements generally consist of Teleperformance touting certifications or recognitions it received, claiming it would continue striving for those certifications and recognitions, and making broad statements about its commitment to its employees and CSR.   (*See generally id.*).

The statements include, among many others, that Teleperformance "has made the well-being of its employees a key priority worldwide" (*id.* ¶ 91 (emphases omitted)); was "extraordinarily focused on delivering an outstanding environment and social responsibility" (*id.* ¶ 92 (emphases omitted)); had a "strong commitment to employees, with operations in 60 countries representing more than 90% of the workforce now certified as Best Employers" (*id.* ¶ 95); and that its "commitment to [its] employees was recognized in September 2021 when [it] w[as] named one of the 25 World's Best Workplaces™ by *Fortune* magazine in partnership with Great Place to Work®" (*id.* ¶ 104 (alterations added); *see also id.* ¶¶ 90, 93–94, 96–103, 105–114, 120, 124 (alleging similar statements)).

While not perfectly clear, it appears Plaintiffs' claim regarding these statements is not based on falsity but rather on a duty-to-disclose theory.  (*See* Resp. 16 (clarifying that the statements "violated the Exchange Act in large part because of what those statements did ***not***

disclose"); *see also* Am. Compl. ¶ 115, 126 (describing why statements in paragraphs 119 through 125 were false or misleading)).  Plaintiffs assert Teleperformance's references to its commitment to its employees and CSR created a duty to disclose that (1) its moderators were required to "engage in traumatic, abusive, and potential criminal activities"; (2) its hiring process for content moderators did not include "psychometric tests designed to identify resilient candidates"; (3) Teleperformance did not "provide adequate training or emotional and psychological support to content moderators exposed to egregious materials"; (4) it imposed "unreasonable time and performance targets that compounded the occupation trauma suffered by its content moderators"; and (5) it "failed to implement or maintain the working conditions represented to investors." (Resp. 16).

Defendants attack the materiality of these statements, asserting they amount to nonactionable "corporate puffery[.]"  (Mot. 18–19 (alteration added)).  The Court agrees.

Several cases illustrate why the statements at issue are puffery.  In *Carvelli*, the Eleventh Circuit upheld the district court's dismissal of a securities class action where the misstatements were "proclamations that [the defendant] was devoting 'substantial resources' to its problems, with 'improved results,' as well as [] boasts that it was taking a 'leading role' and making 'progress' toward compliance[.]"  934 F.3d at 1321 (alterations added).  The court concluded the statements were "precisely the sorts of statements that our sister circuits have — we think correctly — deemed puffery and found immaterial as a matter of law."  *Id.* (citing *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019); *see also Singh*, 918 F.3d at 63 (recognizing that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them" (citation, quotation marks, and footnote call number omitted)); *Emps.' Ret. Sys. v. Whole Foods*

*Mkt., Inc.*, 905 F.3d 892, 901–02 (5th Cir. 2018) (stating "the defendants' comments about Whole Foods' commitments to transparency and quality — even if false — [were] immaterial" because "reasonable investors w[ould] not simply take Whole Foods' word for it" (alterations added)).

*Lopez v. Ctpartners Executive Search Inc.* also proves instructive. *See* 173 F. Supp. 3d 12 (S.D.N.Y. 2016). There, the court was confronted with a similar claim based on a company's statements about its "culture for honesty and integrity" that, according to the plaintiffs, were revealed to be false in an article published by *NY Post* and an EEOC complaint filed against the company. *Id.* at 19. The court held that those generalized statements "'consist of precisely the type of "puffery" that the Second and other circuits have consistently held to be inactionable.'" *Id.* at 28 (alteration adopted; quoting *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996); other citation omitted).

Likewise, in *Oklahoma Law Enforcement Retirement System v. Papa John's International*, the plaintiff brought a securities class action against Papa John's based on the statements that: (1) Papa John's is "committed to the development and motivation of our team members through programs, incentive and recognition programs and opportunities for advancement"; (2) the "most important ingredient is our people"; (3) Papa John's "take[s] care of our people"; and (4) Papa John's "believe[s] our continuous commitment to enhance culture and quality will further differentiate our premium brand from the rest of the industry." 444 F. Supp. 3d 550, 562 (S.D.N.Y. 2020) (alterations added; quotation marks omitted). Similar to *Lopez* and the present case, the plaintiff in *Papa John's* alleged the statements were revealed to be materially misleading when *Forbes* published an article referencing "interviews with 37 then-current and former Papa John's employees" who "described disturbing instances of workplace sexual harassment and misconduct, perpetrated by and with the tacit permission of senior executives[.]" *Id.* at 556 (alteration added).

The court nonetheless found the statements were corporate puffery because they were "too vague to have invited an investor's reasonable reliance." *Id.* at 562; *see also id.* at 561 (describing the statements as "expressions of general corporate optimism" (quotation marks and citation omitted)).

Here, the Amended Complaint in many instances relies on equally generalized statements about Teleperformance's commitment to its employees and CSR, almost all of which were made in press releases "announcing [Teleperformance's] financial results[,]" during "earnings call[s,]" at annual shareholder meetings in Teleperformance's "annual Integrated Report[s,]" or in its "Universal Registration Document" filed with the French Market Authority ("AMF"). (Am. Compl. ¶¶ 90–92, 94–95, 97, 100–103, 107, 110–11, 113 (alterations added)). While Teleperformance's boasts about its certifications and commitment to its employees and CSR are (at least arguably) important to Teleperformance's business, "the challenged statements do not assert specific, verifiable facts that reasonable investors would rely on in deciding whether to buy or sell" Teleperformance ADRs. *Douglas v. Norwegian Cruise Lines*, No. 20-21107-Civ, 2021 WL 1378296, at *5 (S.D. Fla. Apr. 12, 2021) (citation omitted); *see also*, *e.g.*, *Lopez*, 173 F. Supp. 3d at 28; *Okla. L. Enf't Ret. Sys.*, 444 F. Supp. 3d at 562; *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1199, 1212–13 (M.D. Fla. 2014) (holding that a statement by a defendant that "we have operational initiatives underway that we believe will enhance our ability to achieve our long-term growth objectives[,]" among others, was non-actionable puffery (alteration, quotation marks, and citation omitted; other alteration added)); *Plumley v. Sempra Energy*, No. 16-cv-00512, 2017 WL 2712297, at *7 (S.D. Cal. June 20, 2017) (holding that the "alleged fraudulent or misleading statements regarding [the defendant's] commitment to or prioritization of safety . . . [we]re too nonspecific and unmeasurable to state a claim for securities fraud" (alterations added)).

To the extent Plaintiffs allege the statements resulted in actionable omissions, statements that are corporate puffery also cannot be misleading in the absence of disclosure of Teleperformance's issues. *See Carvelli*, 934 F.3d at 1321–22. Indeed, as the *Carvelli* court noted, a "reasonable investor wouldn't have regarded such corporate banalities as relevant in deciding whether to invest[.]" *Id.* at 1322 (alteration added).

In sum, the statements in the Amended Complaint regarding Teleperformance's commitment to its employees, commitment to CSR, and boasts about certifications amount to corporate puffery and are not actionable.

### 3.    *Statements regarding Teleperformance's content moderators*

The next bucket of alleged misstatements relates to Teleperformance's content moderators and includes five alleged misstatements. (*See* Am. Compl. ¶¶ 103, 108–09, 111–12). These statements can be further sub-categorized into generalized comments about content moderation work (*see id.* ¶ 108) and more specific descriptions of Teleperformance's internal training and support offered to content moderators (*see id.* ¶¶ 103, 109, 111–12).

***Content moderator descriptions***. The first subcategory is not actionable. Plaintiffs do not describe why Teleperformance's generalized description of content moderator roles and their impact in the marketplace is false or misleading (*see generally* Am. Compl.), nor do they provide additional context in their Response (*see generally* Resp.). As Defendants correctly note, Plaintiffs' own description of content moderators is aligned with the alleged misstatement. (*Compare* Am. Compl. ¶ 32 (describing content moderators as "first responder[s] to protect the public from bad actors in the world" (alteration added) *with id.* ¶ 108 (alleging Defendants' description of content moderators as "Guardians of the Internet" is a misstatement)). Without

more, Plaintiffs fail to sufficiently allege that Defendants' description of content moderators or the role of content moderators in the marketplace is false or misleading.

**Training and support.**   Regarding the second subcategory, some of the alleged misstatements and omissions are actionable; others are not.

Plaintiffs allege that on "February 28, 2021, Teleperformance filed its 2021 Universal Registration Document with the AMF[,]" which included statements that Teleperformance is "strongly committed to its employees' well-being and safety"; and "special attention is paid to employees in charge of social media content management and moderation, as their job tends to generate a good deal of stress," including the provision of "resilience training " and "a positive working environment enhanced by custom-developed infrastructure, expert counseling to foster psychological and emotional wellbeing and a 24/7 on-site and remote support program."  (Am. Compl. ¶ 103 (alterations adopted; quotation marks omitted)).   They further allege that Teleperformance's March 3, 2022 Integrated Report for fiscal year 2021 ("2021 Report") included statements that "Teleperformance places great importance on the wellbeing and mental health of its moderators" and that it set up specific procedures to that end.  (*Id.* ¶ 109 (emphasis omitted)).

For the same reasons already discussed, sizeable portions of the alleged misstatements contain nonactionable corporate puffery; statements about Teleperformance's commitment to its employees are simply too "boosterish" and unverifiable.  *See, e.g.*, *Carvelli*, 934 F.3d at 1318–19; *Douglas*, 2021 WL 1378296, at *5; *In re Vale S.A. Sec. Litig.*, No. 15-cv-9539, 2017 WL 1102666, at *21–22 (S.D.N.Y. Mar. 23, 2017) (finding that statements by a mining company about its "values and commitment to health, safety, and the environment" were puffery (citation and quotation marks omitted)).

Remaining, then, are the alleged misstatements and omissions about the training and support services offered to content moderators.  Defendants assert two main arguments why those statements are not actionable: (1) the claims are really accusations of corporate mismanagement; and (2) even if the *Forbes* and *Time* articles are taken as true, isolated allegations do not demonstrate the statements' falsity.  (*See* Mot. 15–16; Reply 10).  Here, Defendants fail to persuade.

Section 10(b) and Rule 10b-5 are not meant to regulate "instances of corporate mismanagement[.]"  *Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 477 (1977) (alteration added).  Drawing from this notion, some courts have held that, under *Santa Fe*, "a failure to disclose potential corporate mismanagement will not state a cause of action under federal securities fraud."  *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1182 (S.D. Fla. 2005) (collecting cases).

Yet, the Court is unconvinced by this line of cases.  Unlike the plaintiffs' claims in *Sante Fe*, the "essence" of Plaintiffs' claims here is not "that shareholders were treated unfairly by a fiduciary" or that the terms of the transaction were unfair.  *Santa Fe Indus. Inc.*, 430 U.S. at 477–78 (alterations added; citations omitted).  Instead, Plaintiffs allege Teleperformance made many material misstatements and omissions about Teleperformance's internal controls.  (*See generally* Am. Compl.).  As *Santa Fe* emphasized, "the fundamental purpose of the [Exchange] Act" is "full and fair disclosure[.]"  *Id.* at 477–78 (alterations added; citations and quotation marks omitted).

The Court is persuaded that "'false or misleading statements or omissions concerning material facts about management or internal operations may be actionable,' such as when a defendant 'makes certain statements while that defendant knows that existing mismanagement makes those statements false or misleading.'"  *In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325,

1340 (N.D. Ga. 2012) (quoting *In re Premiere Techs., Inc. Sec. Litig.*, 2000 WL 33231639, at *14 (N.D. Ga. Dec. 8, 2000)); *see also In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1217–18 (N.D. Ga. 2019) (analyzing allegations of misstatements about the adequacy of certain internal controls and finding them to be actionable and not barred by *Santa Fe*).   Thus, the Court rejects Defendants' argument that the statements are not actionable because they are about corporate mismanagement.

Defendants also insist that Plaintiffs' allegations about the hiring and employee support policies are too sparse to satisfy the PSLRA.  (*See* Mot. 16).  Plaintiffs lend support to their accusation that the statements were false or misleading by citing to testimony from a confidential witness and information from the *Forbes* and *Time* articles.  (*See* Resp. 9–10 (citing Am. Compl. ¶¶ 58, 64, 116)).   Defendants nonetheless accuse Plaintiffs of relying on "isolated, anecdotal incidents" that the Court should not extrapolate from.  (*See* Mot. 16 (citation omitted)).  Defendants fail to persuade.

Plaintiffs offer enough to satisfy the PSLRA.  One moderator interviewed for the *Time* article — published in October 2022 — revealed she attempted to receive help for months but was ultimately told to "seek out support through the Colombian healthcare system."  (*Id.* ¶ 54). Moreover, Teleperformance's statements about its workplace policies allegedly omitted material information about the true nature of the employment conditions revealed by the news articles: long hours, under grueling conditions, with little pay.  (*See, e.g.*, *id.* ¶¶ 53–66, 115).

True, requiring a company "to reveal isolated operational problems alongside [its] financial results would be impractical and outside the requirements of the securities laws."  *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1198 (S.D. Fla. 2015) (alteration added) (finding allegations about isolated operational problems were insufficient to demonstrate the falsity of statements

acknowledging the problems and discussing their limited effect).  Nonetheless, Plaintiffs appear to allege widespread issues with employee support services and training that bely the assurances given by Teleperformance.  (*See, e.g.*, Am. Compl. ¶¶ 53–66, 115).

Plaintiffs have alleged the who, what, when, where and how of the allegedly misleading statements and the reasons why the statements were false or misleading.  This satisfies the Federal Rules of Civil Procedure and PSLRA.  Further, since the statements are not "obviously unimportant" to an investor, the Court declines to further assess the inherently factual question of materiality.  *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d at 1364.

In sum, while many statements about content moderators are either not alleged to be false or are corporate puffery, the statements about Teleperformance's training and support services are actionable.

### 4.    *Statements regarding Teleperformance's respect for collective bargaining*

Plaintiffs also allege Defendants violated Section 10(b) and Rule 10b-5 by characterizing, in Teleperformance's 2020 Report, "'unions and employee representatives' as among the Company's 'stakeholders,'" and stating that "Teleperformance respects freedom of association and recognizes the right to collective bargaining" (*id.* ¶ 102 (alteration adopted; emphasis and quotation marks omitted)), while simultaneously engaging in unspecified union-busting tactics (*see id.* ¶ 67).

Once again, these statements are nothing more than corporate puffery.  Like many of the other alleged statements, these are merely optimistic characterizations and do not assert specific and verifiable facts that a reasonable investor would rely on when purchasing Teleperformance's ADRs.  *See, e.g.*, *Douglas*, 2021 WL 1378296, at *5–6; *see also Southland Sec. Corp. v. INSpire Ins. Soluts., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("[A]nalysts rely on facts in determining the

value of a security[;]" and "generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." (alterations added; quotation marks and citations omitted)).

>    5.    *Statements regarding the Forbes and Time articles*

Plaintiffs' next category of statements relates to the *Forbes* and *Time* articles.  (*See* Am. Compl. ¶¶ 60, 119, 125–126, 133–34, 136).  Plaintiffs allege Teleperformance's spokesperson's statements that the company took the allegations in the *Forbes* article "very seriously[,]" "conducted an internal audit which found no evidence of the use of or access to CSAM images in training[,]" and was "having an independent third party audit conducted in order to examine all of [its] content moderation operational standards and processes" were materially false or misleading. (Am. Compl. ¶¶ 119, 126 (alterations added; quotation marks omitted)).  They also rely on Julien's statements during a November 4, 2022 "corporate sales call" where he "denied the allegations in the *Forbes* and *Time* articles" and reported that "both the internal and external audits that were conducted following the publication of the *Forbes* article . . . showed 'minor element[s] that could be improved[.]'" (*Id.* ¶ 125 (first two alterations in original; third alteration added; quotation marks omitted)).  Plaintiffs further cite to a "conference call with analysts" that took place a few days later, on November 17, 2022, during which Julien "continued to insist that the scrutiny on Teleperformance's treatment of its content moderators was unwarranted, referring to the scrutiny as a 'trust crisis that according to [him], was totally fabricated.'" (*Id.*  ¶ 133 (alteration added; emphasis omitted)).

Defendants argue these statements are not actionable (*see* Mot. 17), and the Court largely agrees, with one exception.

CASE NO. 23-24580-CIV-ALTONAGA/Reid

***Spokesperson's statements***.  Defendants first argue that Plaintiffs' claims arising from the spokesperson's statements fail because, even when "accepting the *Forbes* and *Time* allegations as true," Plaintiffs do not allege falsity.  (*Id.*).  That is, they do not allege that: (a) Defendants *did not* take the allegations in the *Forbes* and *Time* articles "seriously"; (b) Defendants *did not* conduct an audit as claimed; or (c) the result of the audit *did not* reveal "only 'minor element[s] that could be improved' for content moderators."  (*Id.* (alteration in original; citation omitted)).  Plaintiffs insist that whether the *Forbes* and *Time* articles are accurate raises a factual dispute, and therefore, dismissal is inappropriate.  (*See* Resp. 10–11).

To start, the statement that Defendants took the allegations "seriously" is — once again — "too hazy and general for any reasonable investor" to have relied upon.  *Lopez*, 173 F. Supp. 3d at 28; *see also id.* at 19 (concluding statement in a press release that a defendant "takes all allegations of discrimination very seriously" was puffery).  And Plaintiffs do not even imply that it was false or misleading for Teleperformance to state it conducted an audit.  (*See generally* Am. Compl.; Resp.).

Still, contrary to Defendants' assertions, Plaintiffs allege that the statement about the *results* of the audit is false or misleading because the information in the *Forbes* and *Time* articles was accurate.  (*See id.* ¶¶ 126, 136).  In other words, Plaintiffs allege the who, what, when, and how of the statement about the audit's results and describe how the statements were false or misleading.  (*See id.* ¶¶ 119, 126, 136).  This statement is thus actionable.

***Julien's statement***.  Defendants correctly point out that Julien's statement characterizing the ensuing "trust crises" as "fabricated" is a nonactionable opinion statement.  (*See* Mot. 17).

"A statement of opinion is actionable under [Rule] 10b-5 only if: (1) the opinion expressed was not sincerely held or (2) the statement included an embedded statement or statements of untrue

facts." *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1256 (S.D. Fla. 2020) (alteration added; citation and quotation marks omitted). The Supreme Court has explained that "a reasonable investor may . . . understand an opinion statement to convey facts about how the speaker has formed the opinion[,]" "[a]nd if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015) (alterations added). "Thus, if a [] statement omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, [it] creates liability." *Id.* at 189 (alterations added).

To be sure, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* at 189–90 (alteration added). To state a claim, then, a plaintiff must allege "particular (and material) facts going to the basis for [the] opinion — facts about the inquiry [the defendant] did or did not conduct or the knowledge [the defendant] did or did not have — whose omission makes the opinion statement at issue misleading[.]" *Omnicare, Inc.*, 575 U.S. at 194 (alterations added).

Here, Julien prefaced his statement that the "trust crisis" was "fabricated" with "according to me" (Am. Compl. ¶ 81) — which is clear language expressing an opinion, *see Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1228 (11th Cir. 2022) (Lagoa, J., concurring) ("[W]ords like 'believe' and 'think,' or phrases like 'In my opinion,' trigger the listener or reader to be aware that the speaker is giving a statement of opinion." (alteration added; quoting *Carvelli*, 934 F.3d at 1322)). And yet, despite this "wishy-washy, subjective framing, [Julien's] statement of opinion" can still

be actionable if Julien either (1) did not actually believe the trust crisis was fabricated or (2) if a supporting fact was untrue.  *Carvelli*, 934 F.3d at 1322–23 (alteration added; citations omitted).

As to the first category, Plaintiffs do not allege that Julien did not sincerely hold the opinion.  (*See generally* Am. Compl.; Resp.).  Instead, they make a general argument — not addressing Julien's statement specifically — that various "opinions contain both false embedded facts and omit material facts."  (Resp. 23).  Neither of these arguments succeeds.

First, Plaintiffs do not allege with particularity which embedded facts are false and how. (*See generally* Am. Compl.; *see also* Resp. 23 (not clarifying which embedded facts in Julien's statement are false)).  Second, to the extent Plaintiffs argue Julien's statements were material omissions, they fail to identify "particular (and material) facts going to the basis for [the] opinion — facts about the inquiry [Julien] did or did not conduct or the knowledge [he] did or did not have — whose omission makes the opinion statement at issue misleading[.]"  *Omnicare, Inc.*, 575 U.S. at 194 (alterations added).  *Omnicare* warns such an endeavor is "no small task[,]" and certainly Plaintiffs have not met this high bar.[4]  *Id.* at 194 (alteration added).

In sum, as currently pled, the only actionable statement related to the *Forbes* and *Time* articles is the spokesperson's statement about the results of Teleperformance's audit.  The remaining statements are either insufficiently alleged to be false or are misleading, puffery, or opinion.

---

[4] Plaintiffs also argue that Julien needed to disclose that Teleperformance "subjected the[] moderators to a variety of abusive conditions[.]"  (Resp. 23 (alterations added)).  This allegation does not appear in the Amended Complaint.  (*See generally* Am. Compl.; *see id.* ¶ 136 (purporting to explain why Julien's statements were false or misleading)).  Even if it had, "an investor cannot state a claim by alleging only that an opinion was wrong."  *Omnicare, Inc.*, 575 U.S. at 194.

CASE NO. 23-24580-CIV-ALTONAGA/Reid

6.    *Statements regarding Teleperformance exiting the highly egregious content moderation business*

Plaintiffs' last category of alleged false or misleading statements relates to Teleperformance exiting the highly egregious content moderation business.  These include Singh's statements during the November 17, 2022 conference call that the "business that [Teleperformance] w[ould] be giving up does not look substantial" and Julien's statement that he did "not anticipate any ripple effect" because it "represents effectively an extremely small part of the business[.]"  (Am. Compl. ¶ 132 (alterations added; emphases omitted)).  Julien further stated that even in his "worst perception . . . in the case of snowball" it would be "20%, 25% of [Teleperformance's] total business in content moderation."  (*Id.* (alteration added; emphases omitted)).  Plaintiffs also rely on a subsequent "earnings call" held on February 16, 2023, during which Singh, "in response to an analyst question about losing clients as a result of exiting the highly egregious content moderation business, . . . stated that they 'haven't lost anything'" and that "we will grow in this business.'"  (*Id.* ¶ 135 (alteration added; emphases omitted)).

Plaintiffs allege these statements were false or misleading because Defendants did not also disclose that "Teleperformance could not exit the highly egregious portion of the content moderation business without significant harm to its broader content moderation business, which Defendants had repeatedly identified as a key driver of the Company's business and growth prospects."  (*Id.* ¶ 136).  Defendants argue the statements at issue fall within the PSLRA's safe-harbor provision and those that do not, are not alleged to be false.  (Mot. 19–20).  Defendants are correct.

The PSLRA contains a safe harbor provision that immunizes a defendant from liability for certain "forward-looking" statements.  15 U.S.C. § 78u-5(c)(1).  "A forward-looking statement is what it sounds like — a prediction, projection, or plan."  *Carvelli*, 934 F.3d at 1324 (footnote call

number omitted).  Under the safe-harbor provision, an issuer "shall not be liable with respect to any forward-looking statement . . .  if, and to the extent that —

>   (A) the forward-looking statement is —
>
>   >   (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>   >
>   >   (ii) immaterial; or
>
>   (B) the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge by that person that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1) (alteration added).  Often, statements are mixed, in that they include "distinct present-tense . . . components"; in such cases, only the "forward-looking portion" of a statement is entitled to safe-harbor protection, but the present-tense or historical statements of fact are not.  *Carvelli*, 934 F.3d at 1328 (alteration added; citing *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 692 (5th Cir. 2014)).

Here, all the statements are at least in part forward-looking because they provide a "prediction" or "projection" about the effect of Teleperformance exiting the highly egregious content moderation business.  *See id.* at 1324.  The question, therefore, is whether the forward-looking statements (1) included cautionary language; (2) were immaterial; or (3) were made without actual knowledge that they were false or misleading.  *See* 15 U.S.C. § 78u-5(c)(1).

As to Julien's statements, he included cautionary language when stating he "d[id] not anticipate any ripple effect" from Teleperformance exiting the egregious content moderation business (Am. Compl. ¶ 132), because he included a caveat that the "impact may be larger than that[;]" and he was expressing only his "personal" view, which was his "subjective" "perception," "because [he] want[ed] to give . . .  an answer from deep [in his] heart[.]"  (Reply, Ex. 1, Tr. Of

Nov. 17, 2022 Teleperformance SE Shareholder/Analyst Call [ECF No. 67-1] 13).  That is more than enough cautionary language for any investor not to reasonably rely on the statement.  *See Carvelli*, 934 F.3d at 1327 ("Essentially, Ocwen disclosed a present problem . . . , offered a forward-looking prediction . . . , and cabined its expectation with relevant cautionary language . . . ." (alterations added)).

Going further, Plaintiffs do not allege Julien or Singh knew the statements were false or misleading at the time they were made.  (*See generally* Am. Compl.).  Without more, the safe-harbor provision insulates Defendants from liability for these forward-looking statements.

Still, however, Plaintiffs rightly identify embedded — but distinct — present-tense statements that are not entitled to safe-harbor protection.  (*See* Resp. 23 (citing Am. Compl. ¶ 132 ("egregious content moderation represents effectively an extremely small part of the business" (emphasis omitted)); *id.* ¶ 135 (stating Defendants "haven't lost anything" with respect to the content moderation business (emphasis omitted)).  But neither of these statements is actionable, as currently alleged.

First, Plaintiffs do not allege the egregious content moderation business was *not* a "small part" of Teleperformance's business.  (*See generally id.*).  Quite the opposite.  The Amended Complaint acknowledges that Teleperformance's entire content moderation business made up only 7% of Teleperformance's "overall revenues" (*id.* ¶ 35), and the egregious content moderation business accounted for — at most — "a quarter" of that 7%, approximately 1.75% (*id.* ¶ 43).  To say that less than 2% of a company's overall revenue is a "small part of the business" is objectively not false or misleading.

Second, when considered in context, Singh's statement that Defendants "'haven't lost anything' with respect to the content moderation business" (Resp. 14 (emphasis omitted; quoting

Am. Compl. ¶ 135)), related to Teleperformance not losing any "existing contracts" after exiting

the highly egregious content business.   The record reflects the following discussion occurred:

> **Simona Sarli**
> *BofA Securities, Research Division*
> So a couple of them, please. First of all, a quick update on content moderation.  Can
> you please talk a little bit [about] the commercial momentum there?  And also
> following your decision to exit highly egregious content, so far, have you lost any
> of the existing contracts?  And how is impacting your discussions regarding the
> new business?  So I will take the questions one by one.
>
> **Bhupender Singh**
> *President of Transformation*
> Yes.  So answer to your second question, no, you've not lost anything.  And the
> momentum continues. We are forecasting our 2023 content moderation business
> and the wider trust and safety business to be higher than what it was in 2022. So
> despite what we announced, we will grow in this business.

(Mot., Ex. 2, Tr. Feb. 17, 2023 Teleperformance SE FY 2022 Earnings Call [ECF No. 65-2] 23).[5]

Again, it does not appear Plaintiffs allege Singh's assertion was false.  (*See generally* Am. Compl.).

Thus, the existence of embedded facts in the opinion statements is immaterial, since the Amended

Complaint does not allege the embedded facts were false.

In sum, the vast majority of the statements alleged to be false and misleading are not

actionable, with the exception of: (1) statements about the specifics of Teleperformance's hiring

practices and support services; and (2) the spokesperson's statement about the results of the audit.

Dismissal of Count I as to Rigaudy is also appropriate, as he is not alleged to have made any of

the actionable statements.  (*See generally* Am. Compl.).

---

[5] Plaintiffs do not appear to dispute consideration of the entirety of the transcript (*see generally* Resp.),
which appears to satisfy the incorporation-by-reference doctrine, as it is central to the claims, the statements
are referenced in the Amended Complaint, and the transcript's authenticity is unchallenged, *see Baker*, 67
F.4th at 1276.  Since Plaintiffs appear to consent to consideration of the transcript, the Court does not
inquire further.  The Court also notes that the Amended Complaint appears to misquote Singh as stating,
"they haven't lost anything" (Am. Compl. ¶ 135), rather than "you've not lost anything."

CASE NO. 23-24580-CIV-ALTONAGA/Reid

C.    <u>**Scienter**</u>

Having concluded Plaintiffs state a claim with regard to some of the alleged misstatements and omissions, the Court turns to Defendants' next argument for dismissal: that Plaintiffs failed to adequately plead scienter.  (*See* Mot. 24–26).  The Court considers this issue only with respect to the surviving statements.

Recall that the PSLRA requires plaintiffs to state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter that "must be more than merely plausible or reasonable[.]"  *Tellabs, Inc.*, 551 U.S. at 314 (alteration added).  Like materiality, scienter presents a "mixed question[] of law and fact that must typically be resolved by the factfinder."  *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020) (alteration added; citing *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007)).  Thus, a complaint will survive a motion to dismiss "only if a reasonable person would — not just could — deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged[.]"  *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d at 1281 (alteration added; citations and quotation marks omitted).  This inquiry necessitates a "comparative evaluation" of the "inferences urged by the plaintiff" and any "competing inferences rationally drawn from the facts alleged."  *Tellabs, Inc.*, 551 U.S. at 314.

The Eleventh Circuit has not explicitly decided whether the PSLRA's scienter requirement can be satisfied by "group pleading," that is, by "a presumption of group responsibility for statements and omissions" when a complaint fails to attribute fraudulent statements or acts to each individual defendant.  *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1018–19 (11th Cir. 2004).  Many courts in this Circuit have rejected the applicability of the group pleading doctrine to the PSLRA.  *See Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v. Welbilt, Inc.*, No.

18-cv-3007, 2020 WL 905591, at *4 (M.D. Fla. Feb. 6, 2020); *In re Health Ins. Innovations Sec. Litig.*, No. 17-cv-2186, 2019 WL 3940842, at *22 n.10 (M.D. Fla. June 28, 2019); *Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1359 (S.D. Fla. 2015).   Even if the group pleading doctrine is prohibited, plaintiffs may still "aggregate facts to imply scienter as to each [d]efendant[.]" *Stevens v. GlobeTel Commc'ns Corp.*, No. 06-21071-Civ, 2007 WL 9701197, at *10 n.4 (S.D. Fla. Apr. 4, 2007*) (citing *Phillips*, 374 F.3d at 1017)); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) (urging courts to "assess all the allegations holistically"); *Bush v. Blink Charging Co.*, No. 20-23527-Civ, 2023 WL 8263037, at *9 (S.D. Fla. Nov. 27, 2023) ("[T]he Court does not have to infer scienter from individual facts alone.   Rather, scienter can be inferred from an aggregation of particularized facts.").

Plaintiffs argue five grounds collectively establish scienter: (1) content moderation was a "critical driver of the Company's growth"; (2) "[D]efendants repeated their misstatements at every opportunity during the Class Period"; (3) "Defendants' public statements regarding the safeguards in place for content moderators demonstrate their knowledge of the harm that exposure to egregious content would have on the moderators"; (4) Defendants' "handling of the backlash" regarding Teleperformance's content moderation business; and (5) the "Colombian government's investigation into Teleperformance's labor practices[.]"  (Resp. 15–18 (alterations added)).   While some of these grounds are insufficient to show scienter, Plaintiffs plead enough to raise a compelling inference of scienter regarding the surviving misstatements.

That content moderation was a "critical driver of [Teleperformance]'s growth" can bolster an inference of scienter.   (Resp. 16 (alteration added); *see* Am. Compl. ¶¶ 142–44).   This is commonly referred to as the "core operations doctrine," which the "Eleventh Circuit has never adopted[.]"  *Plymouth Cnty. Ret. Sys. v. Carter's Inc.*, No. 08-cv-02940, 2011 WL 13124501, at

*17 (N.D. Ga. Mar. 17, 2011).  "Courts analyzing the doctrine recognize that . . . it very rarely can create a strong inference of scienter on its own[,]" *id.* (alteration added), but where additional allegations support scienter, the doctrine can bolster the inference, *see, e.g.*, *In re Flowers Foods, Inc. Sec. Litig.*, No. 16-cv-222, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018).

Defendants insist that courts applying the doctrine do so when the type of business accounts for a large share of a company's revenue.  (*See* Mot. 22 (citing *Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1303–05 (N.D. Ga. 2021) (40% of total sales); *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *8, *14 (84% of total sales))).  Plaintiffs cite persuasive authority, however, holding that even when an operation accounts for a much smaller percentage of revenue but is characterized by the defendant as key to the company's growth, the business segment can be a core operation.  (*See* Resp. 25 (citing *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 219 (5th Cir. 2023) (finding segment that was 3% of a large company's revenue was a core operation because the company portrayed it as a "key growth driver" and it had notably high operating revenue margins)).  Similarly, Plaintiffs argue, "the inference applies where a project has 'independent reputational value.'"  (*Id.* (quoting *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 232 (E.D. Pa. 2021) (applying core operations doctrine to project representing approximately 4.5% of the company's EBITDA but which represented the largest component of its expenditures))).

Here, Plaintiffs allege Defendants described content moderation as a significant driver of Teleperformance's growth and a "big business in itself."  (Am. Compl. ¶¶ 79, 142–43).  Teleperformance held out content moderation as a noble undertaking (*see id.* ¶ 47), and explained its short-lived exit from the business as a response to the backlash and "perception" of that business to "mitigate[] reputational and ESG concerns[.]"  (*Id.* ¶¶ 78–79, 87 (alterations added)).  The Court

agrees with Plaintiffs that, as pled, content moderation and egregious content moderation could be a core operation — a fact question the Court does not answer here.

At minimum, the allegations weakly boost an inference of scienter based on how important content moderation seemed to Teleperformance. *See Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9 (1st Cir. 2021) (noting that "the importance of a particular item to a defendant can support an inference that the defendant is paying close attention to that item," and holding that allegations of misrepresentations that concerned "an important product" supported "a very strong inference that the senior executives who gave those apparently prepared remarks touting the product would have paid at least some attention to the product's status" (quotation marks omitted)).

Plaintiffs are also correct that repetition of misstatements supports a finding of scienter. "When a defendant makes a statement or statements repeatedly, it can more strongly evince an inference that the defendant spoke with scienter." *Theodore v. Purecycle Techs., Inc.*, No. 21-cv-809, 2023 WL 4035880, at *6 (M.D. Fla. June 15, 2023) (collecting cases); *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("[T]he most powerful evidence of scienter is the content and context of [the] statements themselves." (alterations added)).   As Plaintiffs aptly describe, "[r]epetition diminishes the likelihood that a misstatement was made out of carelessness[.]"  (Resp. 26 (alterations added; footnote call number omitted)).  Teleperformance repeatedly made statements about its hiring practices and internal support policies (*see, e.g.*, Am. Compl. ¶¶ 109, 111, 112), a factor which weighs in favor of finding scienter.

Plaintiffs' third argument — that Defendants' public statements about public safeguards for moderators demonstrate their awareness of harm caused by exposure to egregious content (*see* Resp. 26) — is unconvincing.  The inquiry is whether Defendants knew their misstatements were

false when made, *see Douglas*, 2021 WL 1378296, at *8, and Plaintiffs do not allege Defendants denied being aware of the risk of harm to content moderators (*see generally* Am. Compl.).

Additional facts identified in Plaintiffs' fourth and fifth arguments further weigh in favor of finding scienter.

Julien allegedly made several statements that downplayed or dodged questions about the investigation into the allegations about content moderation practices at the company. For example, he repeatedly characterized the allegations as "misleading" or a "polemic" and would not offer specifics about the findings of the investigations; in other instances, he stated he did not understand why Teleperformance was facing scrutiny or tried to deflect focus from the media. (*See* Am. Compl. ¶¶ 69–72, 84, 125, 134, 147 (quotation marks omitted)). Pugalia likewise declined to answer clarifying questions about the *Forbes* piece. (*See id.* ¶ 147).

"[D]irectly nonresponsive" answers to questions have been held to support a "strong inference of scienter[.]" *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011). So, too, have "evasive" responses. *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, No. 00-Civ-01967, 2002 WL 989480, at *12 (N.D. Cal. Mar. 29, 2002); *see also Busic v. Orphazyme A/S*, No. 21-Civ-3640, 2022 WL 3299843, at *22 (N.D. Ill. Aug. 11, 2022) ("That [the defendant] appeared to be attempting to evade analysts' questions about whether a new clinical trial was necessary further strengthens the inference that he knew — and intentionally failed to disclose — that FDA approval was contingent on the company conducting a new clinical trial." (alteration added; citations omitted)).

The Colombian government's investigation into Teleperformance's labor practices (*see* Am. Compl. ¶ 146), likewise bolsters the inference of scienter. While a government investigation, without more, is insufficient to create a compelling inference of scienter, *see Thorpe*, 111 F. Supp.

3d at 1376, "[c]ourts commonly hold that pending government investigations are relevant and provide notice of a possible fraud, *i.e.*, that the pendency of an investigation serves to suggest that a fraud may have occurred and may not be ignored[,]" *Eastwood Enters., LLC v. Farha*, No. 807-cv-1940, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) (alterations added; collecting cases). Plaintiffs are correct that the existence of the Colombian government's investigation into Teleperformance's labor practices further bolsters the inference of scienter.

Individually, many of these facts would be insufficient to demonstrate scienter. But each fact is "one more piece of the puzzle[.]" *Thorpe*, 111 F. Supp. 3d at 1376 (alteration added; citation and quotation marks omitted). Considering Plaintiffs' allegations holistically, the Amended Complaint raises a strong inference that Teleperformance, Julien, and Pugalia acted with scienter as to the two categories of misstatements held to be actionable. A reasonable person would deem the inference of scienter as cogent and as compelling as any opposing inference one could draw from the facts alleged.

Having concluded that Plaintiffs have adequately pleaded actionable misstatements and omissions made with scienter, the Court turns to Defendants' final arguments about loss causation.

### D.    <u>Loss Causation</u>

Defendants argue Plaintiffs do not adequately plead loss causation — *i.e.*, the "causal connection" between the alleged misstatements and the alleged economic harm. *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1242 (11th Cir. 2023). The loss causation element requires "that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses." *Id.* at 1241 (citation and quotation marks omitted). A plaintiff can plead this by alleging a "corrective disclosure," *i.e.*, "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud[,]" showing a price drop soon

after the corrective disclosure, and eliminating other explanations for the price drop. *FindWhat*, 658 F.3d at 1311 (alteration added; citation and footnote call number omitted). "Corrective disclosure 'can come from any source' and 'take any form from which the market can absorb [the information] and react,' so long as the disclosures 'reveal[ed] to the market the falsity of the prior misstatements.'" *MacPhee*, 73 F. 4th at 1242–43 (alteration in original; quotation marks omitted; quoting *FindWhat*, 658 F.3d at 1311 n.28).

Plaintiffs purport to plead loss causation based on three corrective disclosures through which the truth "seeped into the market" over a seven-month period (Am. Compl. ¶ 140): (1) the August 4, 2022 *Forbes* article (*see id.* ¶¶ 53–56); (2) the November 9, 2022 *Time* article (*see id.* ¶ 74); and (3) Teleperformance's March 22, 2023 announcement (*see id.* ¶ 86). Defendants argue the latter two of these disclosures were not corrective and any claims based upon them should be dismissed. (*See* Mot. 26–27).

### 1.    November 9, 2022 Time article

Plaintiffs allege the *Time* article announcing the Colombian government's investigation into Teleperformance's labor practices revealed the truth about the company. According to Defendants, "the mere announcement of an investigation 'is insufficient to constitute a corrective disclosure for the purposes of [Section] 10(b)'" because "announcement of an investigation 'reveals just that — an investigation — and nothing more.'" (Mot. 26 (alteration added; quoting *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013))).

Plaintiffs respond by pointing out important language from *Meyer* that Defendants omit (*see* Resp. 28): "the commencement of an [] investigation, *without more*, is insufficient to constitute a corrective disclosure[.]" *Meyer*, 710 F.3d at 1201 (emphasis and alterations added). Plaintiffs insist the "more" exists because the *Time* article (1) was related to allegations of

employee abuse also appearing in the article and comments from workers' rights groups and (2) the market interpreted the disclosure as corrective because the ADRs dropped sharply while Teleperformance's competitors' share prices and the S&P 500 rose.  (*See* Resp. 28).  Defendants argue this is not the "more" the Eleventh Circuit spoke of; "the something 'more' must be a 'later finding of wrongdoing.'"  (Reply 15 (quoting *Meyer*, 710 F.3d at 1201 n.3)).  The Court agrees with Defendants.

In *Meyer*, although a defendant's stock prices fell 7 percent and 9 percent after the disclosure of informal and later, formal, SEC investigations, respectively, the Eleventh Circuit concluded the disclosures were not corrective because "the SEC never issued any finding of wrongdoing or in any way indicated that the [c]ompany had violated the federal securities laws." 710 F.3d at 1201 (alteration added). The drop in stock price is easily explained by the "added risk of future corrective action" and did not convert the investigation into a corrective disclosure because it did not "reveal to the market the falsity of a prior misstatement." *Id.* (emphasis omitted). The court included a caveat that "[i]t may be possible, in a different case, for the disclosure of an SEC investigation to qualify as a partial corrective disclosure for purposes of opening the class period when the investigation is coupled with a later finding of fraud or wrongdoing." *Id.* at 1201 n.13 (citations omitted).

That is not the case here.  The commencement of the Colombian government's investigation cannot serve as a corrective disclosure because, like in *Meyer*, Plaintiffs do not allege a "later finding of wrongdoing[.]" *Id.* (alteration added).

2.     *March 22, 2023 press release*

Plaintiffs also allege Teleperformance's March 22, 2023 announcement that it was reentering the highly egregious content moderation business revealed the falsity of its misstatements about the effects of exiting that line of business. (*See* Am. Compl. ¶¶ 78, 86).

Of course, a corrective disclosure, followed with a truthful and complete version of events, need not always be an admission by a defendant that its prior statement was false or misleading, although this is the traditional form of a corrective disclosure. *See In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-Civ-5571, 2009 WL 10695884, at *9 (S.D.N.Y. Apr. 6, 2009) (citations omitted). "For a disclosure to be 'corrective,' it 'need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company.'" *MacPhee*, 73 F.4th at 1243 (quoting *Meyer*, 710 F.3d at 1197).

Defendants contend that reversal of business decisions does not imply falsity. (*See* Mot. 27 (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010))). Plaintiffs agree that not all changes in strategy constitute corrective disclosures but insist "this one does" — without citation to any authority. (Resp. 28). Plaintiffs theorize that the November 2022 statements about the minimal effects caused by withdrawal from the egregious content moderation business, reaffirmed in February 2023 and coupled with a swift reentry into the line of business just five weeks later, demonstrate content moderation was inextricably intertwined with the broader business such that exiting was impossible. (*See id.* 29). Defendants have the better argument.

In *In re Omnicom Group Inc. Securities Litigation*, the defendant restructured losing investments into a private investment company but later sought to buy back two firms, leading

some to speculate whether the initial transaction lacked board approval.  *See* 541 F. Supp. 2d at 548–50.  Plaintiffs alleged the offloading and buyback of the two firms was a corrective disclosure revealing the initial transaction was a sham.  *See id.* at 550, 552.  The court disagreed, explaining that "[a] decision to reverse course, particularly in a dynamic business environment, does not imply that the earlier business strategy was a subterfuge."  *Id.* at 552–53 (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 165 (2d Cir. 2005) (concluding that downgrades from "accumulate" to "neutral" and "buy" to "accumulate" were not corrective disclosures "because they do not reveal to the market the falsity of the prior recommendations" (quotation marks omitted))).

Here, likewise, Teleperformance's quick reentry into the egregious content moderation business does not reveal the falsity of its statements about the minimal effects of exiting the business.  It does not demonstrate that the ripple effect was not small; rather, it merely shows Teleperformance changed its mind.  To be sure, the meaning Plaintiffs extrapolate from the press release — "the inability of Teleperformance to seamlessly exit highly egregious content moderation" — is certainly *possible*.  But it is not *plausible*.  Plaintiffs must allege more than the "mere possibility of loss causation[;]" and here, they have not.  *Pub. Emps. Ret. Sys. of Miss. Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014) (alteration added; citing *Twombly*, 550 U.S. at 557–58; *Dura*, 544 U.S. at 346).  Lacking additional argument from Plaintiffs or any citation to authority to suggest otherwise (*see generally* Resp.), the Court concludes the March 22, 2023 press release was not a corrective disclosure.

The Court's conclusion provides clear alternative grounds to dismiss claims arising from the statements about Teleperformance's exit from the content moderation business.  Defendants do not, however, attack the sufficiency of the August 4, 2022 *Forbes* article as a corrective

disclosure.  The Court consequently declines to engage in a further assessment of which claims are tied to the *Forbes* corrective disclosure.

### E.      Section 20(a) Claim

Finally, Defendants seek dismissal of Plaintiffs' Section 20(a) claim in Count II, arguing only that the claim is dependent on sufficiently pleading an underlying securities violation by the company.  (*See* Mot. 27 (citations omitted)).  Defendants offer no other argument for dismissal of the Section 20(a) claim (*see generally id.*), and since the Court concludes the Section 10(b) and Rule 10b-5 claim against Teleperformance survives, the Court declines to dismiss the Section 20(a) claim.

## IV.  CONCLUSION

In sum, the Amended Complaint must be dismissed as it fails to sufficiently allege a domestic transaction and violates the prohibition on puzzle pleading.  Nonetheless, construing the Amended Complaint generously, and relying on Defendants' attempts to organize the alleged misstatements, a few of the alleged misstatements, as pled, are actionable.  Further, those that are actionable appear to sufficiently plead scienter and loss causation.  Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motion **[ECF No. 65]** is **GRANTED** in part.  The Amended Complaint **[ECF No. 62]** is **DIMISSED without prejudice**.  Plaintiffs have until **June 3, 2024** to file an amended complaint correcting the foregoing deficiencies.  In addition, the parties shall submit a joint scheduling report no later than **June 5, 2024**.

Plaintiffs are cautioned that any amended complaint must clearly identify (1) whether a statement is alleged to be false or misleading (as opposed to providing background or context); (2) what specific portion of the alleged statement is false, misleading, or both; and (3) exactly why — with citations to other paragraphs, if necessary — the statement is false, misleading, or both.

Plaintiffs shall also number the alleged misstatements and omissions in the body of the amended complaint.[6]

      **DONE AND ORDERED** in Miami, Florida, this 22nd day of May, 2024.


                *Cecilia M. Altonaga*
                **CECILIA M. ALTONAGA**
                **CHIEF UNITED STATES DISTRICT JUDGE**


cc:      counsel of record

---

[6] Plaintiffs could (but need not) use the following format:

    14. In an August 13, 2023 press release, Defendants falsely stated they "decreased expenditures by 20%." (Misstatement 1). In reality, as described in paragraphs 7 through 10, the company's expenditures had risen by 2.7%, making the August 13, 2023 statement false.

    15. The next quarter, during a November 3, 2023 conference call with analysts, Executive John Smith stated the company "was committed to decreasing expenses and increasing revenue and had great plans for the next fiscal year and <u>since the August 13, 2023 press release, decreased expenditures by another 8%</u>." (Misstatement 2). The underlined portion of this statement was false because, as explained in paragraphs 7 through 12, the company's expenditures had remained the same since the August 13, 2023 press release.

    16. Later that same month, the company issued a lengthy statement that included assertions that it had "cut costs in its marketing department." (Misstatement 3). This statement was misleading because, as stated in paragraph 13, Defendants failed to disclose that the company had just hired two marketing executives whose salaries exceeded the amount of costs cut.