UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 23-24580-CIV-ALTONAGA/REID

CITY OF WARREN GENERAL  )
EMPLOYEES' RETIREMENT SYSTEM, on  )
Behalf of Itself and All Others Similarly  )
Situated,  )
                                       )
                       Plaintiff,  )
                                       )
     vs.  )
                                       )
TELEPERFORMANCE SE, et al.,  )
                                       )
                Defendants.  )
                                       )
_____  )

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................................1

II.     BACKGROUND ............................................................................................................2

        A.      Factual Background ...........................................................................................2

        B.      The Court's Prior Order .....................................................................................4

III.    ARGUMENT ..................................................................................................................5

        A.      Plaintiffs Adequately Plead False and Misleading Statements and
                Omissions...........................................................................................................6

                1.      Plaintiffs Do Not Allege Statements of Puffery or Opinion ........................6

                2.      The Challenged Statements Are False and Misleading ..............................6

        B.      Plaintiffs Adequately Plead Defendants' Scienter ..................................................10

        C.      Plaintiffs Adequately Plead Loss Causation ..........................................................13

                1.      The August 4, 2022 *Forbes* Article Was a Corrective Disclosure ............14

                2.      The November 9, 2022 *Time* Article Was a Corrective Disclosure ..........15

        D.      The Complaint Adequately Pleads a Claim Under Section 20(a)..........................20

IV.     CONCLUSION................................................................................................................20

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Acerra v. Trulieve Cannabis Corp.*,
2021 WL 1269919 (N.D. Fla. Mar. 18, 2021) ...........................................................................8

*Allegheny Cnty. Emps. Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) .....................................................................................12

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ......................................................................................................19

*Brahman Partners, II, L.P. v. Ocwen Fin. Corp.*,
2018 WL 11450091 (S.D. Fla. Dec. 4, 2018) .........................................................................15

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019) .....................................................................................19

*Brophy v. Jiangbo Pharms., Inc.*,
781 F.3d 1296 (11th Cir. 2015) ..............................................................................................12

*Bush v. Blink Charging Co.*,
2023 WL 8263037 (S.D. Fla. Nov. 27, 2023)..........................................................................10

*Busic v. Orphazyme A/S*,
2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ..........................................................................12

*City of Pompano Beach Gen. Emps. Ret. Sys. v. Synovus Fin. Corp.*,
2012 WL 12886839 (N.D. Ga. Mar. 23, 2012).......................................................................14

*Connor v. Unisys Corp.*,
2024 WL 387633 (E.D. Pa. Feb. 1, 2024) ..............................................................................19

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021)........................................................................................................11

*Damian v. Montgomery Cnty. Bankshares, Inc.*,
255 F. Supp. 3d 1265 (N.D. Ga. 2015)....................................................................................9

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................................13

*Eastwood Enters., LLC v. Farha*,
2009 WL 3157668 (M.D. Fla. Sept. 28, 2009)........................................................................13

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
  595 F. Supp. 2d 1253 (M.D. Fla. 2009)..................................................................10

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016).......................................................................18

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) ..............................................................18, 19

*Feld Motor Sports, Inc. v. Mattel, Inc.*,
  2019 WL 5593281 (M.D. Fla. May 8, 2019)...........................................................18

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) .......................................................................13, 15

*Foley v. Transocean Ltd.*,
  861 F. Supp. 2d 197 (S.D.N.Y. 2012)....................................................................12

*Henningsen v. ADT Corp.*,
  161 F. Supp. 3d 1161 (S.D. Fla. 2015) ....................................................................8

*In re 3M Combat Arms Earplug Prods. Liability Litig.*,
  2021 WL 4146699 (N.D. Fla. Apr. 2, 2021)............................................................14

*In re Acadia Pharms. Inc. Sec. Litig.*,
  2020 WL 2838686 (S.D. Cal. June 1, 2020)........................................................6, 17

*In re Apollo Grp., Inc. Sec. Litig.*,
  2012 WL 2376378 (D. Ariz. June 22, 2012) ...........................................................19

*In re AT&T/DirecTV Now Sec. Litig.*,
  480 F. Supp. 3d 507 (S.D.N.Y. Aug. 18, 2020)........................................................8

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ................................................................................17

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
  2016 WL 215476 (S.D. Tex. Jan. 19, 2016)............................................................17

*In re: Ebix, Inc. Sec. Litig.*,
  898 F. Supp. 2d 1325 (N.D. Ga. 2012).....................................................................9

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019)................................................................6, 9

*In re Flowers Foods, Inc. Sec. Litig.*,
  2018 WL 1558558 (M.D. Ga. Mar. 23, 2018).....................................................10, 13

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 2190904 (M.D. Ga. May 10, 2018) ........................................................................17

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
843 F.3d 1257 (11th Cir. 2016) ..............................................................................................9

*In re Health Ins. Innovations Sec. Litig.*,
2019 WL 3940842 (M.D. Fla. June 28, 2019)........................................................................13

*In re HomeBanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010)...................................................................................12

*In re January 2021 Short Squeeze Trading Litig.*,
620 F. Supp. 3d 1231 (S.D. Fla. 2022) ...................................................................................8

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
939 F. Supp. 2d 360 (S.D.N.Y. 2013)....................................................................................10

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) .........................................................................18

*In re Netbank, Inc. Sec. Litig.*,
2009 WL 2432359 (N.D. Ga. Jan. 29, 2009)...........................................................................8

*In re Paincare Holdings Sec. Litig.*,
541 F. Supp. 2d 1283 (M.D. Fla. 2008)..................................................................................20

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)...........................................................................19

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011).....................................................................................12

*In re Smith Gardner Sec. Litig.*,
214 F. Supp. 2d 1291 (S.D. Fla. 2002) ...................................................................................12

*In re Sunterra Corp. Sec. Litig.*,
199 F. Supp. 2d 1308 (M.D. Fla. 2002)..................................................................................12

*In re Terayon Commc'ns Sys., Inc. Sec. Litig.*,
2002 WL 989480 (N.D. Cal. Mar. 29, 2002)..........................................................................12

*In re Toyota Motor Corp. Sec. Litig.*,
2011 WL 2675395 (C.D. Cal. July 7, 2011)...........................................................................13

*In re Winn-Dixie Stores, Inc. Sec. Litig.*,
531 F. Supp. 2d 1334 (M.D. Fla. 2007)...................................................................................9

*In re Zumiez Inc. Sec. Litig.*,
  2009 WL 901934 (W.D. Wash. Mar. 30, 2009) ........................................................................8

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  620 F. Supp. 3d 167 (D.N.J. 2022) .......................................................................................11

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009).................................................................................................11

*Krukever v. TD Ameritrade, Inc.*,
  337 F. Supp. 3d 1227 (S.D. Fla. 2018) ...................................................................................8

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ..............................................................................................18

*Longo v. OSI Sys., Inc.*,
  2021 WL 1232678 (C.D. Cal. Mar. 31, 2021).......................................................................19

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ...............................................................................................17

*Luczak v. Nat'l Beverage Corp.*,
  812 F. App'x 915 (11th Cir. 2020) .......................................................................................13

*Mauss v. NuVasive, Inc.*,
  2016 WL 3681831 (S.D. Cal. July 12, 2016) ........................................................................17

*Metro. Trans. Auth. Defined Benefit Pension Plan v. Welbilt, Inc.*,
  2020 WL 905591 (M.D. Fla. Feb. 6, 2020).........................................................................12

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .........................................................................15, 16, 17, 18

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ...............................................................................................18

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ................................................................................................10

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ...............................................................................................19

*Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
  564 F. Supp. 3d 1272 (N.D. Ga. 2021)...................................................................................8

*Shafer v. Global Payments, Inc.*,
  2024 WL 2789447 (N.D. Ga. Mar. 29, 2024)........................................................................17

*Sherleigh Assocs. v. Windmere-Durable Holdings, Inc.*,
 178 F. Supp. 2d 1255 (S.D. Fla. 2000) ...................................................................20

*Southfield Gen. Emps. Ret. Sys. v. Nat'l Vision Holdings, Inc.*,
 2024 WL 1376016 (N.D. Ga. Mar. 30, 2024)............................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)..............................................................................................5, 9, 10

*Theodore v. Purecycle Techs., Inc.*,
 2023 WL 4035880 (M.D. Fla. June 15, 2023)..........................................................11

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
 2017 WL 2378369 (C.D. Cal. May 31, 2017) ...........................................................18

**STATUTES, RULES, AND REGULATIONS**

Federal Rules of Civil Procedure
 Rule 12(b)(6)...........................................................................................................5, 9

Federal Rules of Evidence
 Rule 407....................................................................................................................18
 Rule 408....................................................................................................................18

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint and Incorporated Memorandum of Law ("Motion" or "Mot.") (ECF 72).[1]

## I.  INTRODUCTION

This case is about the inhumane working conditions of Teleperformance's content moderators, and Defendants' decision to mislead the market about those conditions. Defendants' Motion mainly rehashes arguments previously made – and rejected – by the Court in its initial Order on Defendants' motion to dismiss the first Amended Complaint. In fact, the Court's Order only partially granted Defendants' motion to dismiss the first Amended Complaint (ECF 62) without prejudice on curable procedural grounds. The Order, however, also provides the Court's substantive analysis of falsity and scienter, ***rejecting*** the majority of the arguments made in Defendants' current Motion. Notably, the Court has already found that "the statements about Teleperformance's training and support services are actionable" (Op. at 25), rejecting Defendants' arguments that the statements were merely about corporate mismanagement or limited to "'isolated, anecdotal incidents' that the Court should not extrapolate from" (*id.* at 24-25). The Court further rejected Defendants' arguments regarding the falsity of the statements concerning the results of the internal audit, finding such statements to also be actionable. *Id.* at 27. The Court, based on a number of factors, also found scienter as to those statements that survived its previous analysis. None of Defendants' rehashed arguments are meritorious.

The Complaint now includes only those categories of misstatements and omissions that the Court previously determined were actionable. It also alleges additional facts to demonstrate that the November 9, 2022 *Time* article was a corrective disclosure, *i.e.*, that it revealed the falsity of Defendants' prior statements, rather than merely announcing an investigation with a risk of future corrective action. Specifically, the Complaint alleges that Defendants took steps to resolve the

---

[1]  Citations to "¶__" refer to paragraphs of the Second Amended Complaint for Violations of the Federal Securities Laws ("Complaint" or "SAC") (ECF 71). References to "Op." or "Order" refer to the Court's prior ruling in this case (ECF 68). References to the "Amended Complaint" refer to the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 62). All capitalized terms herein shall have the same definitions as set forth in the SAC. Unless otherwise noted, all emphasis is added and citations are omitted.

investigation indirectly, making concessions to labor groups that stood in as surrogates for the Colombian labor authorities.  These facts cure the deficiency previously identified by the Court.

As set forth below, the Complaint establishes that Defendants' actions violated the federal securities laws.  Defendants' Motion should be denied, and the case should proceed to discovery.

## II.    BACKGROUND

### A.    Factual Background

Teleperformance provides a variety of outsourced services for businesses, including, as relevant here, the provision of content moderation services for social media companies.  ¶13.  The Company is headquartered in France and its common shares trade on the Paris Stock Exchange; however, its American Depositary Receipts ("ADRs") – the securities purchased by Plaintiffs and at issue in this action – are traded over-the-counter in the U.S.  *Id.*  In 2018, prior to the start of the Class Period, Teleperformance entered the business of content moderation for social media companies and took on TikTok as a client; since that time, TikTok has become the most popular social media platform in the U.S. and now represents approximately 50% of Teleperformance's content moderation business.  ¶¶23, 28.  The meteoric rise of social media companies, and TikTok in particular, has fueled a corresponding rise in the content moderation industry, and despite its relative youth, Teleperformance's content moderation arm has become a critical driver of the Company's growth and a "big business in itself."  ¶¶36-37.

At all relevant times, Teleperformance held itself out as a good corporate citizen – a premier employer that cared about its employees' wellbeing as a matter of corporate ethics and decency.  ¶16.  In their communications to the market – in the form of press releases, conference calls, regulatory filings, and other formats – Defendants took every opportunity they could to highlight the exceptional treatment of Teleperformance's employees as one of the Company's core values.  *See* ¶¶16-21.  Even the Company's entry into the content moderation business was spun as a feel-good story, with the moderators portrayed as "digital first responders."  ¶40.  Teleperformance assisted in the publication of a white paper boldly proclaiming that "[t]he strategy for handling this content must place the safety and wellness of the employee at the center" and discussing the safeguards necessary to protect content moderators.  ¶¶30, 34-35.  And, as relevant here, Defendants made specific representations about the working conditions of its content

moderators, the training programs in place, and the steps Defendants had taken to protect their wellbeing.  ¶¶42-46, 55, 68.

However, the Company's commitment to the wellbeing of its content moderators was a lie. In truth, the Company's content moderators worked in awful conditions; they were underpaid, overworked, held to unrealistic performance standards, and surveilled in their homes.  *See* ¶¶51, 57-61.  The psychological screening, training, and support programs that Teleperformance highlighted publicly were illusory.  *See* ¶¶51, 53, 57-61.  And most heinously – as first revealed in a *Forbes* article published in August 2022 – Teleperformance trained its moderators with "graphic images and videos of children involved in sexual acts."  ¶¶49, 53, 57-58.  While some degree of exposure to such materials is an unfortunate reality of the content moderation business, it ought to be extremely rare.  Yet Teleperformance unnecessarily exposed its employees to far more of this material than was necessary through training materials, including a spreadsheet known as the "Daily Required Reading[,]" or "DRR[,]" that contained hundreds, or even thousands, of examples of egregious material.  ¶48.  This treatment did not comply with best practices for handling this kind of sensitive material, potentially violated federal law governing such handling, and, most importantly, harmed the mental health of its moderators – who reported symptoms that included suicidal thoughts.  ¶¶49-50.  The allegations in the *Forbes* article were later corroborated by further reporting published in *Time*, as well as a confidential witness.  ¶¶53, 57-61.

The publication of the *Forbes* article caused the price of Teleperformance ADRs to fall approximately 5%, and led to a bipartisan U.S. Senate inquiry into the allegations.  ¶¶52, 54.  In the ensuing months, Defendants falsely claimed to have found "no evidence of the use of or access to CSAM images in training."  ¶55; *see also* ¶68.  Defendants also tried to deflect the media scrutiny without providing details, repeatedly referring to the media reports as "misleading" and a "polemic."  ¶¶62-67.  However, on November 9, 2022, *Time* reported that "Colombia's Ministry of Labor has launched an investigation into TikTok subcontractor Teleperformance, relating to alleged union-busting, traumatic working conditions and low pay" and that this investigation was related to prior reporting from *Time* on those subjects.  ¶¶71-72.  On this news, the price of Teleperformance ADRs declined nearly 19%.  ¶73.

Defendants sprang into action to neutralize the impact of this investigation.  On November 14, 2022, Teleperformance announced that it would meet with Colombian government

representatives. ¶75. A few days later, Defendants announced that the Company would exit the egregious portion of the content moderation business. ¶76. Despite its prior hostility to labor groups (¶61), Teleperformance quickly began negotiating agreements with unions – a fact it mentioned to the Colombian labor minister responsible for the investigation when Teleperformance first reached out to discuss the investigation (*see* ¶¶80-86). Indeed, labor groups played a significant role in the resolution of the investigation from the beginning, and the market understood that fact. The November 9, 2022 *Time* article included a statement from labor groups, saying they would cooperate with the ministry in the investigation. ¶72. When Teleperformance reached an agreement with UNI Global Union on December 12, 2022, an analyst report noted that the agreement "should allow it to de-escalate tensions with . . . the Colombian Ministry of Labour." ¶¶83-84. When Teleperformance reached an agreement with the ministry, it included measures that involved union participation. ¶85. And when Teleperformance reached its agreement with UNI Americas in April 2023, the parties' joint announcement credited the Colombian labor minister who had initiated the investigation: "[t]hanks to [his] mediation and the Colombian Ministry of Labour, we reached an agreement beneficial to the parties and undoubtedly to Colombia." ¶86. Likewise, Teleperformance's own press release on the subject "thank[ed] the Colombian Ministry of Labour for working closely with the Group to reach this mutually beneficial agreement." *Id.* These measures were perceived by the market as a direct response to news of the investigation and the accompanying stock drop, and Defendants acknowledged them as such in April 2023. *See* ¶¶81, 84, 88. In short, Defendants' remedial actions were tantamount to a tacit admission of wrongdoing with respect to the topics under investigation in Colombia. ¶94.

### B. The Court's Prior Order

On May 22, 2024, after a fully briefed motion to dismiss, the Court issued a 45-page Order granting the motion in part, giving Plaintiffs leave to amend to cure certain procedural deficiencies that were easily remedied. *See* Op. at 12, 44. The Court also addressed the substance of the allegations against Defendants "[i]n an effort to narrow the issues that might be raised in a challenge to a second amended complaint[.]" *Id.* at 12. In doing so, the Court found that "Teleperformance's statements about its workplace policies allegedly omitted material information about the true nature of the employment conditions revealed by the news articles: long hours, under grueling conditions, with little pay," and that "statements about Teleperformance's

training and support services are actionable." *Id.* at 24-25.  In other words, the Court has already concluded that Plaintiffs have adequately alleged falsity with respect to these statements. Moreover, the Court also found scienter and loss causation as to the misstatements that survived the falsity analysis.  *See id.* at 39, 43-44.

Consistent with the Court's ruling, the SAC is limited to those misstatement categories that the Court has already deemed actionable, and does not include various previously alleged misstatements that the Court deemed puffery.  Plaintiffs have now cured the procedural issues, as conceded by the absence of any arguments on puzzle pleading and extraterritoriality in Defendants' Motion.  As a result, there are only three "new" questions before the Court, related primarily to the element of loss causation.  First, whether Misstatement 8 is actionable for the same reasons identified by the Court in analyzing Misstatement 7.[2]  *See infra* at 9-10.  Second, whether the August 4, 2022 *Forbes* article is a corrective disclosure for purposes of loss causation – a point that Defendants did not previously contest.  See §III.C.1., *infra* at 14-15; Op. at 43-44.  Third, whether the November 9, 2022 *Time* article qualifies as a corrective disclosure, when evaluated with the additional allegations in the SAC regarding Teleperformance's subsequent attempts to defuse the investigation.  *See* §III.C.2., *infra* at 15-20.  While these are the only issues not addressed in the prior Order, Plaintiffs will nevertheless address each of the arguments in Defendants' Motion.

## III.    ARGUMENT

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court considers the SAC in its entirety, "accept[s] all factual allegations . . . as true[,]" and construes all reasonable inferences in Plaintiffs' favor.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10, 322 (2007).  The SAC amply pleads violations of Section 10(b), Rule 10b-5, and Section 20(a). Defendants make three core arguments, each of which fail for the reasons set forth below.

---

[2]    In the Order, the Court did not specifically address Misstatement 8's falsity.  However, the content of Misstatement 8 is substantially the same as Misstatement 7, which the Court held was actionable.  Op. at 27.  The SAC also clarifies that Rigaudy signed the letter that Misstatement 8 appeared in, a fact not alleged in the first Amended Complaint and therefore, presumably, not considered by the Court when dismissing the claims against Rigaudy.

A.    **Plaintiffs Adequately Plead False and Misleading Statements and Omissions**

1.    **Plaintiffs Do Not Allege Statements of Puffery or Opinion**

As explained above, the Court has already found the categories of statements alleged in the SAC to be actionable.  In response, Defendants mischaracterize portions of Misstatements 1-4 and 7 as inactionable puffery previously dismissed by the Court.[3]  Mot. at 6.  But Misstatements 1-4 referenced by Defendants are not about the Company's "generalized" commitment to its employees and "positive working environment" – as evidenced by the specific grounds for falsity provided alongside them in the SAC.  Rather, as previously recognized by the Court, these statements were among the "many material misstatements and omissions about Teleperformance's internal controls" related to training and support services.  Op. at 23-25; *see also In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1217–18 (N.D. Ga. 2019) (analyzing allegations of misstatements about the adequacy of certain internal controls and finding them to be actionable).  After analyzing each set of alleged misstatements, the Court explicitly found that "the statements about Teleperformance's training and support services are actionable" and that they "omitted material information about the true nature of the employment conditions . . . long hours, under grueling conditions, with little pay."  Op. at 24-25.  Similarly, Plaintiffs' allegations regarding Misstatement 7 do not concern whether Defendants took the allegations "seriously[.]"  Rather, the statement was false because Teleperformance's training practices did, in fact, include both "use of" and "access to" CSAM.[4]  ¶55; *see* Op. at 27 (finding Misstatement 7 actionable).

2.    **The Challenged Statements Are False and Misleading**

**Misstatements 1-4.**    Contrary to Defendants' assertions, the SAC demonstrates the inaccuracy of their statements about Teleperformance's training and support services,

---

[3]    Defendants' criticism of the phrase "[s]pecial attention" (Mot. at 6) is misplaced, as the phrase was alleged as context rather than a false statement (¶42).  Defendants recognized as much because – setting aside the propriety of Defendants' Appendix, *cf. In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *3 (S.D. Cal. June 1, 2020) – the Appendix does not include that phrase (ECF 72-1, at 1).  And, even taking Defendants' argument at face value, Defendants request the dismissal of only "portions" of Misstatements 1-4 and 7 – they do not argue that puffery is a sufficient basis to dismiss any Misstatement entirely.  *See* Mot. at 6.

[4]    The SAC specifically explained why Misstatement 7 was misleading – an explanation devoid of any reference to whether Defendants took the "allegations very seriously."  ¶55.

highlighting, *inter alia*, that: (a) Teleperformance trained social media content moderators with illicit images of child sexual exploitation; (b) Teleperformance's content moderator hiring process did not include psychometric tests designed to identify resilient candidates; (c) Teleperformance had failed to provide adequate training or emotional and psychological support to content moderators; (d) Teleperformance had imposed unreasonable time and performance targets; and (e) Teleperformance had failed to implement or maintain the working conditions represented to investors, including by subjecting the Company's content moderation workers to widespread occupational trauma without psychological support, and with paltry pay, punitive salary deductions, and extensive surveillance.  ¶¶42-44.  These explanations are supported by both reputable reporting and a confidential witness. *See, e.g.*, ¶¶58, 64, 116.

Defendants' challenges to the timing of the misstatements are unavailing. The August 4, 2022 *Forbes* article, released only a few months after Misstatement 4, revealed the harsh conditions content moderators faced in their role as well as the falsity of Defendants' claims concerning their training and support services.  ¶¶48, 51.  The article was corroborated by then current and former employees, including one moderator that, after a year of working for Teleperformance, was "struggling to just function properly" and "frequently loses her train of thought, becomes filled with rage at random and has feelings of suicide." ¶49.  That moderator's employment timeline sheds light on the lack of support and adequate hiring procedures during the time period in which the Misstatements were made.  The claims made in the *Forbes* article were further corroborated by a confidential witness who worked for Teleperformance from June 2020 to February 2021, the same time Defendants disseminated Misstatement 2 in their Universal Registration Document filed with the AMF. *See* ¶¶43, 53.  Prior to being hired, CW received no psychological testing or screening to evaluate CW's resilience or fitness for the content moderation role.  CW confirmed that the "jaw-dropping" videos shown during training included "a lot of very young girls" (three to six years of age) with their genitals exposed, as well as "little boys" lying on beds in rooms filled with adult males. ¶53. Thus, CW's accounts further confirm allegations made in the August 4 *Forbes* article, while directly refuting Defendants' claims of profile and skill screening through psychometric tests along with resilience training during the induction period.  A October 20, 2022 *Time* article further confirmed the August 4 *Forbes* article and therefore the falsity in Misstatements 1-4, including employee reports that psychological support was "woefully

inadequate" and "just for show." ¶58. Taken together, Plaintiffs "allege widespread issues with employee support services and training that bely the assurances given by Teleperformance." Op. at 25. Defendants' citations to cases describing isolated incidents or anecdotal reports are therefore inapposite, as the Court previously rejected that line of argument.[5] *Id.* at 24. Lastly, to the extent Defendants contend that the *Forbes* and *Time* articles and witness accounts do not contradict Defendants' statements, such issue raises a factual dispute, which is inappropriate to resolve at the motion to dismiss stage of litigation. *See, e.g.*, *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at \*5 (N.D. Ga. Jan. 29, 2009); *Krukever v. TD Ameritrade, Inc.*, 337 F. Supp. 3d 1227, 1237 (S.D. Fla. 2018) (Altonaga, J.).

**Misstatements 5-6.** Defendants argue that these statements, when read in context, are about maintaining the safety of their users, not the safety of their content moderators. Not so. The statements, on their face, plainly refer to the safety of the moderators. ¶45 ("We have designed and implemented policies to ***safeguard*** the users of these platforms and ***our digital first responders***[.]"); ¶46 ("Teleperformance constantly enhances training, support services and analytical technologies to ***protect our people***[.]"). To be sure, they also reference the safety of users. But the presence of some non-misleading references does not cure the misleading nature of the statement as applied to the safety of the moderators. *See, e.g.*, *Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1288 (N.D. Ga. 2021) ("[A] defendant may not deal in half-truths."); *In re January 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1263 (S.D. Fla. 2022) (Altonaga, C.J.) (explaining that even "literally true statements . . . will support claims for securities fraud" if they "create a materially misleading impression"); ¶¶45-46 (alleging Misstatements 5-6 were false and misleading for reasons related to the treatment of content moderators). Moreover, the Court has already rejected Defendants' attempts to characterize

---

[5]   *See* Op. at 24-25 (distinguishing *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1198 (S.D. Fla. 2015)); *see also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 526 (S.D.N.Y. Aug. 18, 2020) (allegation that some customers enrolled through physical stores did not undermine claim that Defendants "could and did enroll subscribers online"); *Acerra v. Trulieve Cannabis Corp.*, 2021 WL 1269919, at \*5 (N.D. Fla. Mar. 18, 2021) (allegation of a single mold recall was insufficient to demonstrate that cannabis company's claim of using "greenhouse style" grow houses contained an actionable omission as to the use of low quality "hoop houses"); *In re Zumiez Inc. Sec. Litig.*, 2009 WL 901934, at \*9 (W.D. Wash. Mar. 30, 2009) (declining to rely on witnesses that "provide little to no indication as to when these problems occurred").

Plaintiffs' allegations as mere corporate mismanagement.  Op. at 23-24 (citing *In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1340 (N.D. Ga. 2012); *Equifax*, 357 F. Supp. 3d at 1217-18). As a result, Defendants' reliance on cases alleging such allegations is misplaced.[6]

**Misstatements 7-8.**    Contrary to Defendants' assertions, "Plaintiffs allege the who, what, when, and how of the statement about the audit's results and describe how the statements were false or misleading." Op. at 27; *see* ¶¶55, 68.  As the Court previously found in regards to Misstatement 7, "the statement about the ***results*** of the audit is false or misleading because the information in the *Forbes* and *Time* articles was accurate. . . . This statement is thus actionable."[7] Op. at 27 (emphasis in original).[8]  And, given that the crux of Misstatement 8 mimics that of Misstatement 7 (*i.e.*, that the Company performed an audit that found no use of CSAM in training materials) the Court's analysis and findings should apply equally to Misstatement 8.

Defendants argue Plaintiffs fail to allege facts "bearing on the process, findings, or adequacy of the internal and external audits mentioned in Statements 7 and 8." Mot. at 10.  Not so.  Plaintiffs allege facts directly contradicting the purported findings of the audits – moderators sharing their accounts of the use of and access to horrific CSAM during their training.  ¶¶48-49, 57.  Given that under Fed. R. Civ. P. 12(b)(6), the Court considers the SAC in its entirety, "accept[s] all factual allegations . . . as true[,]" and construes all reasonable inferences in Plaintiffs' favor (*Tellabs*, 551 U.S. at 309-10, 322), the audits conducted on Teleperformance were

---

[6]    *See* Mot. at 9-10 (citing *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1348 (M.D. Fla. 2007); *Southfield Gen. Emps. Ret. Sys. v. Nat'l Vision Holdings, Inc.*, 2024 WL 1376016, at *15 (N.D. Ga. Mar. 30, 2024)).

[7]    Defendants' claim that "Teleperformance's decision not to publish its internal findings does not render voluntary statements about those results false or misleading" (Mot. at 10-11, n.2), mischaracterizes the SAC.  That decision is relevant to scienter, as part of Defendants' pattern of evasion.  *See* §III.B, *infra* at 12-13.  But they have no bearing on falsity; Misstatements 7-8 are actionable because they directly contradicted the *Forbes* and *Time* reports.  Op. at 27. Accordingly, Defendants' reliance on cases disclaiming an affirmative duty to disclose information is irrelevant.  *See In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1274-75 (11th Cir. 2016); *Damian v. Montgomery Cnty. Bankshares, Inc.*, 255 F. Supp. 3d 1265, 1280 (N.D. Ga. 2015).

[8]    The falsity of Misstatements 7-8 is also supported by other pleaded facts, including the CW's description of the working conditions and the remedial measures taken by Defendants in response to the November 9, 2022 *Time* article.

inadequate in that they failed to reveal the use and access to CSAM in moderator's training materials. The cases relied upon by Defendants did not involve allegations that the reported findings of the audit were inaccurate, and are therefore inapposite. *See Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1282 (M.D. Fla. 2009) (rejecting argument that auditor violated PCAOB auditing standards without identifying facts establishing the violation); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 387-88 (S.D.N.Y. 2013) (declining to infer that auditor defendant performed "no audit at all" where "year after year, [it] identified problems . . . and then made plans to address those problems").

## B.     Plaintiffs Adequately Plead Defendants' Scienter

As with falsity, the Court has already rejected Defendants' arguments as to scienter. In the Order, the Court found that four factors, viewed holistically, "raised[d] a compelling inference of scienter regarding the surviving misstatements." Op. at 35; *see also id.* at 39. Those factors were that: (i) "content moderation was a critical driver of the Company's growth"; (ii) "Defendants repeated their misstatements at every opportunity during the Class Period"; (iii) "Defendants' handling of the backlash regarding Teleperformance's content moderation business"; and (iv) "the Colombian government's investigation into Teleperformance's labor practices." *Id.* at 35.[9] These same factors apply to the SAC, and Defendants have offered no legitimate reason for the Court to depart from its previous findings.

*First*, content moderation's status as a critical driver of the Company's growth supports a finding of scienter, because courts make the common sense inference that executives are provided with information about the critical operations of their companies. *See, e.g.*, *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018). Here, Defendants told the market that content moderation was a significant driver of the Company's growth (¶97) and "a big business in itself" (¶37), while also portraying content moderation as a noble endeavor that burnished the Company's CSR-friendly image (¶40). These facts contribute to the inference of scienter. *See Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 219 (5th Cir. 2023) (finding segment was a core operation because the company portrayed it as a "key

---

[9]     This holistic analysis was appropriate; at the pleadings stage, courts must accept Plaintiffs' scienter allegations as true and "assess all the allegations holistically." *Tellabs*, 551 U.S. at 310; *see Bush v. Blink Charging Co.*, 2023 WL 8263037, at *9 (S.D. Fla. Nov. 27, 2023).

growth driver"); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 196 (D.N.J. 2022) ("A product need not have an outsized impact on a company's financial performance to constitute a 'core operation'; products that present substantial reputational risk may suffice as well."). As a result, the Court previously found that they contributed to its finding of scienter. Op. at 37 ("The Court agrees with Plaintiffs that, as pled, content moderation and egregious content moderation could be a core operation – a fact question the Court does not answer here. At minimum, the allegations weakly boost an inference of scienter based on how important content moderation seemed to Teleperformance.") (citing *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9 (1st Cir. 2021)).

In an attempt to escape this ruling, Defendants argue that the Order took a broad view of core operations that "include[ed] Teleperformance's CSR programs and its announced exit from (and re-entry into) the egregious content moderation market[,]" and that broad scienter analysis is no longer on point with respect to the narrowed allegations of the SAC. Mot. at 15-16. This definition is invented out of whole cloth, and conflicts with the plain text of the Order. The operation in question has always been content moderation, and nothing in the Order ever suggested Defendants' newfound alternative. *See* Op. at 36-37. Moreover, the Court explicitly stated that it conducted its scienter analysis ***only*** as to the categories of misstatements that it had already found actionable (Op. at 34) – that is, the categories of statements that were pleaded in the SAC. *See* §II.B, *supra*. The Court should reject this argument out of hand.

***Second***, the "repetition of [the] misstatements supports a finding of scienter" because "[r]epetition diminishes the likelihood that a misstatement was made out of carelessness." Op. at 37 (citing *Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *6 (M.D. Fla. June 15, 2023); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009)). Here, Misstatements 1-3 are nearly verbatim copies of one another, Misstatement 4 covered the same topics in slightly more detail, and Misstatements 5-6 cover a subset of the topics in Misstatements 1-4. *See* ¶¶42-46. Likewise, Misstatements 7-8 are substantially the same, in that they both deny the presence of CSAM in Company training materials. ¶¶55, 68. And all of these misstatements were made against a constant drumbeat of statements reiterating Teleperformance's commitment to its employees. ¶¶16-21. Defendants made no attempt to address this repetition in their Motion, and it continues to support scienter here.

***Third***, Defendants' evasive responses to questions about the allegations contribute to a finding of scienter.  When confronted by analysts and reporters about the horrific working conditions of Teleperformance content moderators, Defendants chose to deflect.  In the abstract, Julien told analysts that the reports were misleading, repeatedly referred to them as a "polemic," and complained that he did not understand the scrutiny, but when it came to specifics, Defendants refused to answer questions and refused to publish the audit reports.  ¶¶62-67, 100; *see* Op. at 38 (relying on these facts).  As the Court previously held, Defendants' decision to downplay or dodge questions about the allegations contributes to a finding of scienter.  Op. at 38 (citing *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011); *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, 2002 WL 989480, at \*12 (N.D. Cal. Mar. 29, 2002); *Busic v. Orphazyme A/S*, 2022 WL 3299843, at \*22 (N.D. Ill. Aug. 11, 2022)); *see also Allegheny Cnty. Emps. Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 229 (E.D. Pa. 2021).

Defendants' only attempted rebuttal to this point is to argue that evasive answers may indicate scienter at the time of the evasion, but not before.  Mot. at 14-15.  But none of their cited cases support that argument; they do not actually involve any evasive answers.  *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1331 (M.D. Fla. 2002); *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1360 (N.D. Ga. 2010); *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015); *Metro. Trans. Auth. Defined Benefit Pension Plan v. Welbilt, Inc.*, 2020 WL 905591, at \*4 (M.D. Fla. Feb. 6, 2020); *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002).  Once again, Defendants fail to provide a compelling reason to depart from the rationale of the Order.[10]

---

[10]  While not directly related to this factor, Defendants also argue that, notwithstanding their refusal to publish the full results, the audits contribute to an inference of good faith, relying on *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 211 (S.D.N.Y. 2012).  That reliance is misplaced.  In *Transocean*, the defendants commissioned a legitimate audit that surfaced significant safety problems in their operations.  No one disputed the veracity of those findings, and plaintiffs argued that, because an audit turned up negative information, the Defendants must have known that information earlier.  This case involves nearly the opposite situation – Defendants are trying to use the (selectively disclosed) purported lack of findings as a shield, despite Plaintiffs' allegations that "to the extent any audit was performed, it was inadequate[.]"  ¶¶55, 68.  In short, the *Transocean* audit was commissioned to find the truth, while Teleperformance's were intended to hide it.

***Fourth***, the Court found that the existence of the Colombian government's investigation into Teleperformance "further bolsters the inference of scienter." Op. at 39 (citing *Eastwood Enters., LLC v. Farha*, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009)). The underlying rationale for this factor is that the investigation puts company executives on notice. *Eastwood*, 2009 WL 3157668, at *4 (collecting cases). Given the narrowed scope of the SAC, it does not allege any misstatements post-dating the announcement of the Colombian labor investigation. However, it does allege statements that occurred after the *Forbes* article and bipartisan Senate inquiry into the same subject matter. *See* ¶¶55, 68. The same rationale therefore applies to the SAC – in the wake of that scandal, it would defy reason for Defendants to ignore the reports and maintain their purported ignorance. *See In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011) (finding scienter in part because the "issues were drawing enough media scrutiny . . . that it is unlikely that management would not have been informed of the issues involved").

In sum, the Court should adhere to the reasoning of its prior ruling, and reject Defendants' attempts to re-litigate the same issues.

### C.      Plaintiffs Adequately Plead Loss Causation

Defendants next challenge loss causation. But loss causation is a "simple test," and to meet it, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). "In order to qualify as corrective, the disclosure must share the same subject matter" but need not "precisely mirror" the misstatement, or provide a fact-for-fact disclosure of the relevant truth. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011). In other words, "Plaintiff need not allege an express admission of fraud . . . the relevant truth concealed by the defendant's misrepresentations may be disclosed directly or indirectly." *Flowers Foods*, 2018 WL 1558558, at *20 (cleaned up). Disclosures "can come from any source, and can take any form . . . so long as [they] reveal[] to the market the falsity of the prior misstatements"; moreover, the relevant truth can leak out "gradually" through a "series of partial disclosures." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 921 (11th Cir. 2020). Finally, the comparison of Defendants' share prices to competitors' and/or to market indexes (*see* ¶¶113-114) contributes to a finding of loss causation by eliminating other potential causes. *See In re Health Ins. Innovations Sec. Litig.*,

2019 WL 3940842, at *32 (M.D. Fla. June 28, 2019) ("Lead Plaintiff also eliminates other possible explanations for this price drop, alleging that the NASDAQ Composite Index declined by merely 0.6% and the average share price of [defendant's] main competitors increased by 0.23% on [the corrective disclosure date]."); *City of Pompano Beach Gen. Emps. Ret. Sys. v. Synovus Fin. Corp.*, 2012 WL 12886839, at *25 (N.D. Ga. Mar. 23, 2012) ("By alleging that the stock price dropped and that the drop was not related to macroeconomic or industry factors, the court finds that Plaintiffs have sufficiently alleged loss causation.").  The SAC alleges two corrective disclosures, both of which adequately plead loss causation.

### 1.    The August 4, 2022 *Forbes* Article Was a Corrective Disclosure

Defendants, tellingly, did not challenge the *Forbes* article in their original motion to dismiss (*see generally* ECF 65), and so the Court accepted the sufficiency of Plaintiffs' allegations on that point.  Op. at 44.  Having now been given a second bite at the apple, Defendants argue, for the first time, that "even assuming the *Forbes* article allegations as true" (Mot. at 18), the *Forbes* article does not relate to Misstatements 1-6.  Defendants are incorrect for two reasons.

**First**, and foremost, Defendants make no attempt whatsoever to address the fact that the *Forbes* article revealed information that was **omitted** from Misstatements 1-6, specifically, that Teleperformance's training procedures were inadequate and included needless exposure to CSAM and other horrific content (¶¶47-51).  For that reason alone, Defendants' challenge to the *Forbes* article must fail.  *See In re 3M Combat Arms Earplug Prods. Liability Litig.*, 2021 WL 4146699, at *4 n.8 (N.D. Fla. Apr. 2, 2021) ("Defendants' motion does not address [plaintiff's] omission theories.   Accordingly, the Court construes Defendants' motion as seeking partial summary judgment on [plaintiff's] affirmative representation-based theories.  Defendants' motion is denied to the extent it seeks summary judgment on [plaintiff's] omissions-based theories.").

**Second**, contrary to Defendants' view, the SAC does allege affirmative misrepresentations that are contradicted by the *Forbes* article.  The article revealed, among other things, that: (a) Teleperformance moderators were "shown sexually exploitative imagery of kids as part of [their] training" and that there was a "widely accessible" "document, called the 'DRR,' short for Daily Required Reading" that was "filled with material determined to be violative of TikTok's community guidelines, including hundreds of images of children who were naked or being abused"; (b) Teleperformance's practices had adverse effects on the mental wellbeing of its content

- 14 -

moderators; and (c) Teleperformance's content moderators were "under-trained and overworked," and that, in order to keep up with TikTok's demand for content moderation, management pressured trainers "to go ahead and get the people through even with inadequate preparation[,]" resulting in "a chaotic training department rife with communication problems and high turnover that often left young or inexperienced employees leading the work." ¶¶47-49, 51, 53. These revelations directly contradict Defendants' statements that Teleperformance invested heavily in training, coaching, and education to safeguard content moderators. *See* ¶¶42-43 (Misstatements 1-4); *FindWhat*, 658 F.3d at 1311 n.28 (explaining that "the disclosure must share the same subject matter as the prior misstatement" but it "need not precisely mirror the earlier misrepresentation"). Accordingly, the August 4, 2022 *Forbes* article was a corrective disclosure.

### 2. The November 9, 2022 *Time* Article Was a Corrective Disclosure

The Court previously ruled, relying on *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013), that the November 9, 2022 *Time* article was not a corrective disclosure. Op. at 40-41. But the Court also acknowledged that *Meyer* did not categorically exclude investigation announcements from being corrective disclosures (*id.*); rather, "the commencement of an . . . investigation, **without more**, is insufficient to constitute a corrective disclosure[.]" *Meyer*, 710 F.3d at 1201. This is because, without further information, "the investigation can be seen to portend an added **risk** of future corrective action" rather than "reveal[ing] to the market that a company's previous statements were false or fraudulent." *Id.* (emphasis in original). That is not what happened here, as evidenced by the price movements on November 8-10. The SAC clarifies that the original announcement that Colombia's labor ministry had opened an investigation into Teleperformance occurred on November 8. ¶70. But that November 8 announcement did not disclose the specific subject matter of the investigation, and the market did not react. *Id.* It was not until the next day, when the November 9, 2022 *Time* article revealed that the investigation was related to abusive working conditions for content moderators, that the market reacted violently. ¶73. These facts show that the market was not reacting to the mere risk of future corrective action, but to the revelation that Teleperformance had misled the market. *Compare Brahman Partners, II, L.P. v. Ocwen Fin. Corp.*, 2018 WL 11450091, at *8 (S.D. Fla. Dec. 4, 2018) (finding investigation announcement insufficient under *Meyer* where the "[a]nnouncement gives no detail or clue as to the subject of the [agency's] concerns"), *with id.* at *6 n.2 (finding a letter from the same agency

- 15 -

was a corrective disclosure where it "revealed not just the fact of the [agency's] concerns, but also the *subject* of those concerns") (emphasis in original).  In addition, as detailed below, the SAC specifically alleges the something "more" missing in *Meyer*; namely, that: (a) Defendants' actions in the aftermath of the *Time* article were, in fact, efforts to resolve the Colombian labor investigation; and (b) the investigation was specifically related to prior media scrutiny.

**a.**      **Teleperformance's Subsequent Actions Demonstrate Loss Causation**

Immediately after the November 9, 2022 *Time* article, Teleperformance launched a campaign to neutralize the investigation.  For example, on November 14, 2022, Teleperformance issued a press release entitled, "Teleperformance Colombia to meet with representatives of the Colombian government" to discuss its Colombian operations.  ¶75.  Then, a mere eight days after the *Time* article, Teleperformance announced its exit from the highly egregious part of the Trust and Safety business, which was an indication that, in fact, conditions within the Company were not as innocent as investors were led to believe.  ¶76.  In addition to announcing that exit, Teleperformance also attempted to address the pending investigation by the Colombia labor ministry by negotiating and signing agreements with labor unions and workers' rights groups. ¶80. On December 1, 2022, less than a month after the *Time* publication, Teleperformance issued a press release announcing that it had signed a global agreement with UNI Global "to strengthen shared commitments to workers' rights . . . while advancing principles on key issues such as health and safety and workplace monitoring" – a complete reversal from the Company's protracted resistance to collective bargaining.  ¶83.  These negotiations with labor groups were an attempt to resolve the investigation, and amounted to an implicit admission of wrongdoing.  ¶94; *see supra* at 3-4.  And the market recognized that connection between the investigation and the labor negotiations.  *See* ¶84.

Indeed, Julien himself acknowledged that these actions were a direct response to the allegations of abusive working conditions.  The day after the *Time* article was published, Teleperformance held a conference call where Julien opened by stating that he had received a "very violent wake-up call with the news of a massive sale of the Teleperformance stock on the market" and attributing this loss to the investigation.  ¶74.  Then, after the corrective steps were taken, during a conference call on April 13, 2023, Julien stated that, due to allegations "related to the Teleperformance working conditions in the U.S. and Colombia" there had been "a 38% drop

in our shares in just one day." He continued: "What was our response? We launched a series of measures." Those measures included the decision to "put an end to the most offensive segments of content moderation," "a series of meetings with the new Colombian government," and a "global agreement with the Union Federation, unique Global Union that had to be done." ¶88.

These facts present the "something more" that was absent in *Meyer*. Defendants' argument to the contrary hinges on the absence of formal findings against Teleperformance by the Colombian labor ministry. Mot. at 19. But *Meyer* should not be read so narrowly as to mean that ***only*** explicit findings of wrongdoing in the announced investigation can support loss causation. 710 F.3d at 1201 n.13 ("[O]ur unremarkable holding—that an SEC investigation, standing alone, is insufficient to qualify as a corrective disclosure—is dispositive of the case before us."); *see, e.g.*, *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 2190904, at *1 (M.D. Ga. May 10, 2018) ("The Court agrees with Plaintiff that *Meyer* did not create a bright-line rule that the announcement of a government investigation is never relevant unless a court or agency later find fraud or similar wrongdoing."); *Shafer v. Global Payments, Inc.*, 2024 WL 2789447, at *12 (N.D. Ga. Mar. 29, 2024) (finding that a Consumer Financial Protection Bureau complaint qualified as a corrective disclosure under *Meyer* and *MacPhee*). Indeed, Department of Justice and SEC investigations are very often settled without any such findings – but the investigation announcements still suffice to allege loss causation. *See, e.g.*, *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *11 (S.D. Cal. July 12, 2016) ("[T]he fact that [defendant] and the DOJ settled ***allegations*** without findings of liability is . . . inconsequential.") (emphasis in original); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 215476, at *2, 6 (S.D. Tex. Jan. 19, 2016) (SEC investigation announcement qualified as a corrective disclosure despite later terminating with no recommendation for enforcement action); *Acadia Pharms.*, 2020 WL 2838686, at *8 (announcement of FDA investigation was a corrective disclosure despite FDA's later decision to reaffirm approval of the drug).

The Ninth Circuit's rulings on loss causation are particularly instructive because it has, in explicit reliance on *Meyer*, likewise held that the announcement of an investigation, "standing alone" and "without more," cannot support allegations of loss causation. *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 & n.3 (9th Cir. 2014). And in subsequent cases, it had explained that the something "more" can take many forms. *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 793 (9th Cir. 2020) (filing of a lawsuit against the company revealed the falsity of

- 17 -

misstatements, and "[i]f the market regarded his factual allegations as credible and acted upon them on the assumption that they were true . . . [the] allegations established fire and not just smoke"); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210-11 (9th Cir. 2016) (finding investigation announcement was corrective where the defendant subsequently announced it was charging off loans); *see also Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 676 (D.S.C. 2016) (finding that the disclosure of government investigations was corrective when considered "holistically, rather than considering each as an allegation of a full disclosure in and of itself") (citing *Meyer*, 710 F.3d at 1201). There are an "infinite variety" of ways to allege loss causation. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 (N.D. Cal. 2019) (quoting *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018)). "Indeed, any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false." *Lloyd*, 811 F.3d at 1210. Accordingly, corrective steps taken by a company in response to an investigation can support loss causation. *See Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at \*18-19 (C.D. Cal. May 31, 2017) (finding investigation announcement was a corrective disclosure where it was followed by a "voluntary recall . . . to quell doubts") (cleaned up); *see also In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at \*12 (C.D. Cal. Jan. 26, 2021) (finding investigation announcement was a corrective disclosure because the defendant subsequently cancelled a bond offering).

Defendants' attempted reliance on Rules 407 and 408 of the Federal Rules of Evidence to limit the inferences the Court may draw (Mot. at 20) has no legitimate basis. As a threshold matter, they are rules of *evidence* and do not apply here. *See, e.g.*, *Feld Motor Sports, Inc. v. Mattel, Inc.*, 2019 WL 5593281, at \*3 (M.D. Fla. May 8, 2019) (rejecting argument that statements were barred under Rule 408 "because the issue of whether the statements are admissible is not relevant at the motion to dismiss stage, where the Court must assume the truth of the factual allegations"). Even if they did apply, the SAC alleges these actions not to show that Defendants committed any wrongdoing, but for purposes of demonstrating loss causation – a purpose not forbidden by either Rule. And finally, most of Defendants' cases do not cite any rule of evidence, and their relevance

to the argument Defendants advance is unclear.[11]  *See, e.g.*, *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 101 (2d Cir. 2023) (explaining, in the context of class certification, that the materiality inquiry prevents plaintiffs from identifying "generic" risk disclosures "such as that company's commitment to complying with the law").

Accordingly, the November 9, 2022 *Time* article, coupled with the subsequent remedial actions taken by Defendants, qualify as a corrective disclosure.

### b. The Prior Media Scrutiny Further Supports Loss Causation

It is also relevant that the November 9, 2022 *Time* article was not the only indication the market had that Teleperformance might have committed misconduct.  Several courts have found that the announcement of an investigation qualifies as a corrective disclosure where, as here, the investigation follows media scrutiny.  *See, e.g.*, *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *22-23 (C.D. Cal. Oct. 1, 2013); *see also Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *11 (C.D. Cal. Mar. 31, 2021) (finding loss causation where investigation announcement followed negative reports from short sellers).  Other courts have found that the opposite order – *i.e.*, an investigation followed by media reports – suffices.  *See, e.g.*, *Evanston*, 411 F. Supp. 3d at 605; *Connor v. Unisys Corp.*, 2024 WL 387633, at *12 (E.D. Pa. Feb. 1, 2024).  As a result, the media scrutiny of Teleperformance provides additional support for a finding that the November 9, 2022 *Time* article was a corrective disclosure.

In short, this is not a case where the market's reaction reflected only the risk of future action.  The factual context demonstrates that the market interpreted the November 9, 2022 *Time*

---

[11]  Defendants cite only one case involving subsequent remedial measures or corrective action in response to an investigation alleged as support for loss causation.  *See In re Apollo Grp., Inc. Sec. Litig.*, 2012 WL 2376378, at *8 (D. Ariz. June 22, 2012).  But that case is inapposite because the court's rejection of those remedial measures was about state of mind, not whether the announcement disclosed new information to the market.  The court concluded that the remedial measure had not shown the past statements to be "knowingly false[,]" noting the pitfalls that would arise "if a company could be sued for securities fraud every time it corrected problems . . . without showing that Defendants were previously aware of those problems and purposefully misrepresented the nature of the problems to investors[.]"  *Id.* at *8-9.  Here, the remedial measures are primarily alleged to support loss causation, as well as falsity, rather than scienter.

article as revealing the truth of Defendants' prior misrepresentations. Plaintiffs, therefore, adequately allege loss causation.

**D. The Complaint Adequately Pleads a Claim Under Section 20(a)**

To state a claim under Section 20(a) of the Exchange Act, a plaintiff need only allege: (1) a violation of Section 10(b); and (2) that the alleged control person actually controlled the primary violator when Section 10(b) was violated. *Sherleigh Assocs. v. Windmere-Durable Holdings, Inc.*, 178 F. Supp. 2d 1255, 1280 (S.D. Fla. 2000). Defendants request dismissal of Section 20(a) claims solely based on the purported absence of a primary violation. Mot. at 20. Because, as discussed above, Plaintiffs have pled a primary Section 10 violation, this argument fails. *See* Op. at 44 (declining to dismiss §20(a) claim); *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1294 (M.D. Fla. 2008).

**IV. CONCLUSION**

Defendants' Motion should be denied in its entirety.

DATED: July 1, 2024

> ROBBINS GELLER RUDMAN
>   & DOWD LLP
> STEPHEN R. ASTLEY (SBN 0139254)
> SABRINA E. TIRABASSI (SBN 25521)
> LUKE GOVEAS (admitted *pro hac vice*)
> ALEX KAPLAN (SBN 1030761)

> *s/ Stephen R. Astley*
> ─────────────────────────────
> STEPHEN R. ASTLEY

> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432
> Telephone: 561/750-3000
> 561/750-3364 (fax)
> sastley@rgrdlaw.com
> stirabassi@rgrdlaw.com
> lgoveas@rgrdlaw.com
> akaplan@rgrdlaw.com

> *Lead Counsel for Lead Plaintiffs*

- 20 -

MONTELEONE LAW OFFICES, P.L.L.C.
JASON R.N. MONTELEONE
(*pro hac vice* forthcoming)
JACOB D. BOTTARI
(*pro hac vice* forthcoming)
350 North Ninth Street, Suite 500
Boise, ID  83702
Telephone:  208/331-2100
208/947-2424 (fax)
jason@treasurevalleylawyers.com
jake@treasurevalleylawyers.com

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
(*pro hac vice* forthcoming)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
mvanoverbeke@vmtlaw.com
tmichaud@vmtlaw.com

*Additional Counsel for Lead Plaintiff*