UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-24580-CIV-ALTONAGA/Reid

CITY OF WARREN GENERAL
EMPLOYEES' RETIREMENT
SYSTEM, *et al.*,

      Plaintiffs,

v.

TELEPERFORMANCE SE, *et al.*,

      Defendants.

_____/

## ORDER

    **THIS CAUSE** came before the Court on Defendants, Teleperformance SE, Daniel Julien, Olivier Rigaudy, and Akash Pugalia's Motion to Dismiss [ECF No. 72], filed on June 17, 2024. Plaintiffs, City of Warren General Employees' Retirement System and City of Westland Police and Fire Retirement System filed a Response [ECF No. 73]; to which Defendants filed a Reply [ECF No. 74]. The Court has carefully considered the Second Amended Class Action Complaint ("SAC") [ECF No. 71], the parties' written submissions, and applicable law. For the following reasons, the Motion is denied.

## I. BACKGROUND

    This is a putative securities fraud class action arising from alleged misstatements and omissions made by Defendants between February 20, 2020 and November 9, 2022 (the "Class Period"). (*See* SAC ¶ 1). The Court previously dismissed Plaintiffs' First Amended Complaint without prejudice. (*See generally* May 22, 2024 Order [ECF No. 68]). Plaintiffs have now filed a Second Amended Class Action Complaint. The Court recounts only the relevant facts and assumes the reader's familiarity with the May 22, 2024 Order.

Teleperformance is a French company headquartered in Paris, France.  (*See id.* ¶ 7).  Its shares trade on the Paris Stock Exchange, while its American Depositary Receipts ("ADRs")[1] are traded over the counter in the United States under the ticker symbol "TLPFY."  (*See id.* ¶¶ 7, 13).  Teleperformance provides "outsourced omnichannel customer experience management services and related digital services"; these "include the operation of customer service call centers, handling the recruitment of employees, payment collection services, or content moderation for social media companies."  (*Id.* ¶ 13).  During the Class Period, Julien, Teleperformance's founder, was its Chairman and Chief Executive Officer; Rigaudy was its Deputy Chief Executive Officer and Chief Financial Officer; and Pugalia was its Global President of Trust & Safety.  (*See id.* ¶¶ 8–10).  Plaintiffs purchased Teleperformance ADRs during the Class Period.  (*See id.* ¶¶ 5–6).

Teleperformance entered the content moderation business and began conducting moderation services for TikTok in July 2018.  (*See id.* ¶ 28).  "Content moderation for social media refers to the act of checking user-generated content against applicable laws and regulations and community guidelines" and is intended to "protect the public from bad actors in the digital world."  (*Id.* ¶ 26).  "Content moderation can involve the removal of material that, while impermissible, is not necessarily offensive to the platform's users — for example, the illegal streaming of copyrighted material."  (*Id.* ¶ 31).  It can also involve the removal of offensive or disturbing material — typically referred to as "egregious" content — "such as visual depictions of cannibalism or child sexual abuse material ('CSAM')."  (*Id.* ¶¶ 31–33).

Teleperformance's content moderators are tasked with (1) reviewing profile pictures, feeds, and videos; and (2) filtering, flagging, reviewing, and escalating content that violates the social media platform's policies.  (*See id.* ¶ 29).  Teleperformance's content moderation business

---

[1] ADRs represent one-half of one share of Teleperformance's common stock.  (*See* SAC ¶ 7).

accounts for about 7 percent of its total revenue, and according to Plaintiffs, "was inextricably linked to the moderation of egregious material[.]"  (*Id.* (alteration added)).

During the Class Period, Defendants allegedly made materially false and misleading statements and omissions related to Teleperformance's content moderation business (*see id.* ¶¶ 42–45), and articles addressing the subject (*see id.* ¶¶ 55–69).  According to Plaintiffs, "two investigative exposés published by two preeminent business and news publications in the United States" eventually revealed the truth about Teleperformance: it "subjected its content moderation employees to extremely inappropriate — and potentially criminal — working conditions which directly contradicted Defendants' representations during the Class Period[.]"  (*Id.* ¶ 15 (alteration added)).

Specifically, on August 4, 2022, an article was published in *Forbes* with the title "TikTok Moderators Are Being Trained Using Graphic Images of Child Sexual Abuse[.]"  (*Id.* ¶ 47 (alteration added; quotation marks omitted)).  The article revealed that moderators were shown sexually exploitative images of children as part of their training, and their training materials included a "widely accessible" document containing hundreds of images of naked or abused children.  (*Id.* ¶ 48).  The article suggested Teleperformance's practices had serious negative effects on its moderators and raised concerns about whether Teleperformance was complying with applicable laws and regulations.  (*See id.* ¶¶ 49–50).  The *Forbes* article "sparked intense scrutiny" by the United States Senate.  (*Id.* ¶ 54).

Teleperformance responded to the *Forbes* article, stating through a spokesperson that it took the "allegations very seriously" and had "conducted an internal audit which found no evidence of the use of or access to CSAM images in training."  (*Id.* ¶ 55 (quotation marks omitted)).  Yet, the information contained in the *Forbes* article was corroborated by a confidential

witness "who worked at Teleperformance as a content moderator from June 2020 to February 2021[.]" (*Id.* ¶ 53 (alteration added)). Prior to being hired, the witness "received no psychological testing or screening to evaluate [his or her] resilience or fitness for the content moderation role" and was exposed to "'jaw-dropping' videos[,]" including exposed minors. (*Id.* (alteration added)). The witness further stated that "links to unredacted CSAM were sent to content moderators through TikTok's Lark application" — the same application on which the widely accessible training document with egregious content was stored. (*Id.* (alteration added)).

On October 20, 2022, another article was published in *Time*, titled "Behind TikTok's Boom: A Legion of Traumatized, $10-A-Day Content Moderators[.]" (*Id.* ¶ 56 (alteration added; quotation marks omitted)). Like the *Forbes* article, the *Time* article "revealed that Teleperformance content moderators were exposed to egregious content that had an adverse effect on their wellbeing." (*Id.* ¶ 57). It also discussed the inadequacy of Teleperformance's mental health support, employee monitoring, and alleged union-busting tactics. (*See id.* ¶¶ 58–61). On November 7, 2022, Teleperformance published a letter explaining that the results of an external audit were consistent with its internal audit and reiterating that no CSAM could be found in its training materials. (*See id.* ¶ 68).

On November 8, 2022, the Colombian minister of labor relations announced a governmental investigation into Teleperformance. (*See id.* ¶ 70). The next day, a second *Time* article was published under the title, "Colombia's Ministry of Labor has launched an investigation into TikTok subcontractor Teleperformance, relating to alleged union-busting, traumatic working conditions and low pay." (*Id.* ¶ 72 (alteration adopted; quotation marks omitted)). The article explained that the Colombian government had opened an investigation into Teleperformance because of the earlier *Time* article. (*See id.*).

After the truth was revealed, "the price of Teleperformance ADRs was hammered by massive sales, causing significant financial losses and economic damage to Plaintiffs and other members of the Class." (*Id.* ¶ 95). The trading price dropped from $168.69 per ADR on August 4, 2022 to $160.94 on August 5, the day after the *Forbes* article was published. (*See id.* ¶ 113). Similarly, the ADR trading price dropped from $132.32 to $107.77 on November 10, the day after the *Time* article was released. (*See id.* ¶ 114).

On November 17, 2022, Teleperformance announced it was exiting the "highly egregious" content moderation business. (*Id.* ¶ 76 (quotation marks omitted)). During a conference call with analysts regarding the exit, an analyst asked "about the share of growth coming from content moderation in 2022 compared to 2021[.]" (*Id.* ¶ 78). Teleperformance's President of Transformation responded that content moderation represented "a lot" of Teleperformance's growth that year. (*Id.* (alteration added; quotation marks omitted)). Ultimately, Defendants were unable to extricate egregious and "nonegregious" content moderation from each other, despite posturing otherwise. (*See id.* ¶ 79). Thus, Teleperformance eventually reentered the highly egregious content moderation business in March 2023. (*See id.* ¶ 89).

Plaintiffs bring this putative class action against Defendants on behalf of all investors who purchased Teleperformance ADRs during the Class Period. (*See generally id.*). In Count I, they allege Defendants made material misrepresentations and omissions during the Class Period, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. section 78j(b), and SEC Rule 10b–5, 17 C.F.R. section 240.10b–5. (*See id.* ¶¶ 128–32). In Count II, they allege the individual Defendants — Julien, Rigaudy, and Pugalia — were controlling persons of the company whose conduct also violated Section 20(a) of the Exchange Act, 15 U.S.C. section 78t(a). (*See id.* ¶¶ 133–34).

As the basis for their present claims, and following the May 22, 2024 Order's conclusions, Plaintiffs now identify only eight misstatements. (*See* SAC ¶¶ 42–46, 55, 68). Plaintiffs' allegations center on Defendants' statements regarding the hiring, training, and treatment of their content moderators. (*See generally id.*). Plaintiffs allege the following statements were false or misleading:

> [**Misstatements 1–3**:] A number of measures have been taken, including hiring people with appropriate profiles and skill, resilience training during the induction seminar, a positive working environment enhanced by a custom-developed infrastructure, expert counseling to foster psychological and emotional well-being and a 24/7 support program.

(*Id.* ¶ 42 (alteration added), *see also id.* ¶ 43 (noting the alleged misstatement was made three times)).

> [**Misstatement 4**:] Specific procedures have been developed for [the content moderators], including:
>
> - an appropriate hiring procedure involving a series of psychometric tests designed to identify resilient candidates suited to this type of position;
>
> - resilience training provided to all managers, trainers, team leaders and advisors to help them identify signs of emotional stress and know how to deal with them;
>
> - personalized organization and infrastructures to provide the right working environment: relaxation times, wellbeing workshops, regular employee surveys, the chance to disconnect, regular rotation on the most sensitive positions;
>
> - continuous access to counseling, including by certified therapists; [and]
>
> - a 24/7 support program during and after the work cycle.

(*Id.* ¶ 44 (alterations added)).

> [**Misstatement 5**:] [Teleperformance has] designed and implemented policies to safeguard the users of these platforms and [its] digital first responders while ensuring brand trust for [its] clients. [It] continues to invest heavily in moderator training, coaching, and education along with multiple additional safeguards to address content moderation realities for all stakeholders including users, brands and clients.

(*Id.* ¶ 45 (alterations added)).

> [**Misstatement 6**:] Teleperformance constantly enhances training, support services and analytical technologies to protect [its] people and to assist [its] clients in identifying and removing harmful content.

(*Id.* ¶ 46 (alterations added; quotation marks omitted)).

> [**Misstatement 7**:] [Teleperformance] take[s] these allegations very seriously[,] and [it] recently conducted an internal audit which found no evidence of the use of or access to CSAM images in training.

(*Id.* ¶ 55 (alterations added; quotation marks omitted)).

> [**Misstatement 8**:] [Teleperformance] found no . . . CSAM . . . content in Company-provided ongoing education materials or guidance documents.

(*Id.* ¶ 68 (alterations added; quotation marks omitted)).

Defendants seek dismissal of the Second Amended Class Action Complaint, with prejudice, for failure to state claims upon which relief can be granted. (*See generally* Mot.; Reply).

## II.  DISCUSSION

As stated, Plaintiffs bring claims for securities fraud and to impose liability on control persons. (*See generally* SAC). To state a claim for securities fraud in Count I, Plaintiffs must sufficiently allege "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called loss causation." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019) (quotation marks and citation omitted). Defendants argue Plaintiffs (1) do not plead an actionable misrepresentation or omission (*see* Mot. 12–17)[2]; (2) fail to show scienter (*see id.* 17–22); and (3) do not sufficiently allege loss causation (*see id.* 23–26).

---

[2] The Court relies on the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

Regarding Count II, Section 20(a) of the Exchange Act imposes liability on control persons of companies that violate the securities laws. *See* 15 U.S.C. § 78t(a). To state a Section 20(a) claim, Plaintiffs must allege:

> (1) [the corporate entity] committed a primary violation of the securities laws; (2) the Individual Defendants had the power to control the general business affairs of [the corporate entity]; and (3) the Individual Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability.

*In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017) (alterations added; quotation marks omitted; quoting *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001), *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)). If a plaintiff does not adequately plead that the corporate defendant violated Section 10(b) and Rule 10b-5, a claim under Section 20(a) necessarily fails. *See id.* (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)). Defendants argue that because Plaintiffs fail to sufficiently allege a Section 10(b) violation, Count II also fails to state a claim. (*See* Mot. 26).

### A.   <u>Count I</u>

Plaintiffs allege Defendants committed securities fraud by making the eight identified misstatements or omissions concerning Teleperformance's content moderators. (*See id.* 12–17; *see also* SAC ¶¶ 41–69). Defendants argue Plaintiffs do not state claims for securities fraud because their allegations of falsity, scienter, and loss causation are insufficient. (*See* Mot. 17–26). The Court addresses each of these requirements in return, concluding — with a few exceptions — that Plaintiffs plausibly allege the challenged elements of their claim.

1.      **Falsity**

First, Defendants argue misstatements 1–4 and 7 are not false because they contain inactionable puffery; and, separately, that the misstatements have not been adequately alleged to be false. (*See id.* 12–17). Neither argument is persuasive.

a. *Puffery*

Beginning with puffery, Defendants assert the Court previously dismissed portions of misstatements 1–4 and 7 as corporate puffery and opinion and argue the Court should do so again. (*See id.* 12 (citing SAC ¶¶ 42–44, 55; May 22, 2024 Order 17–22)). Corporate puffery consists of "generalized, vague, nonquantifiable statements of corporate optimism[,]" *Carvelli*, 934 F.3d at 1318 (alteration added; citation omitted); as opposed to "determinate, verifiable statement[s,]" *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015) (alteration added). The puffery doctrine "presumes a relatively (but realistically) savvy consumer — the general idea being that some statements are just too boosterish to justify reasonable reliance." *Carvelli*, 934 F.3d at 1318; *see also City of Monroe Emp.'s Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (noting that "statements describing a product in terms of 'quality' or 'best' or benefitting from 'aggressive marketing' are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.").

The Court previously concluded that many, but not all, of Defendants' alleged misstatements regarding the content moderators were inactionable as puffery. (*See generally* May 22, 2024 Order). Several of the earlier misstatements in Plaintiffs' Amended Complaint were generalized commitments to employee wellbeing and affirmations that Defendants were committed to keeping their employees safe. (*See id.* 22). Defendants argue Plaintiffs are once

more seeking to bring claims based on language that is mere puffery and opinion, pointing to phrases like "special attention, positive working environment enhanced by a custom-developed infrastructure[,] . . . personalized organization and infrastructures to provide the right working environment[,]" and "we take these allegations very seriously[.]" (Mot. 12 (quoting SAC ¶¶ 43–44, 55; alteration adopted; other alterations added; quotation marks omitted)).

Yet, Plaintiffs do not allege these phrases to be the basis of their claims. A close read of the Seconded Amended Class Action Complaint reveals that, while some of the misstatements contain language similar to the previously rejected statements, Plaintiffs' focus is on the actionable portions of the alleged misstatements. (*See, e.g.*, SAC ¶¶ 42–46, 55, 68).

Regarding misstatements 1–4, Plaintiffs target specific and quantifiable portions of what Defendants stated they did — specifically, "[a] number of measures" allegedly taken to protect content moderators, including the implementation of specialized hiring practices, resilience training, and counseling and support services. (*Id.* ¶ 42 (alteration added)). Plaintiffs allege Defendants' statements were "false and misleading" because no such actions were taken. (*See id.*). Because the targeted portions of Defendants' statements use concrete language, "represent[ing] tangible, verifiable actions[,]" these statements are not objectionable as puffery. *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020) (alterations added).

Similarly, Plaintiffs do not allege misstatement 7 was false because Defendants failed to take "allegations very seriously"; rather, Plaintiffs allege falsity regarding the performance and adequacy of an audit. (*See* SAC ¶ 55). Again, Plaintiffs' allegation, if proven, would show that Defendants falsely claimed they performed an audit; or if they performed such an audit, that it was insufficient. (*See id.*). In other words, the allegation targets a "tangible, verifiable action[]" that can be proven or disproven. *Tung*, 454 F. Supp. 3d at 1257 (alteration added).

To summarize, Plaintiffs' allegations are supported by concrete portions of misstatements 1–4 and 7; and not the puffery or opinions that Defendants identify (and that the Court already rejected).  (*See* SAC ¶ 55; Resp. 13 n.4).

### b.  *Pleading Falsity*

Moving on, Defendants argue Plaintiffs do not adequately plead the falsity of each of the alleged misstatements because: (1) the Second Amended Class Action Complaint fails to show the statements were false when they were uttered; (2) the Second Amended Class Action Complaint does not identify enough contradictory facts to plead falsity; and (3) Defendants' omissions of the alleged unnecessary exposure to CSAM and grueling working conditions do not make the statements misleading by omission, as they were inconsequential and "isolated" occurrences.  (*See* Mot. 13–17).  The Court begins with Defendants' first two arguments, which are essentially the same, and then turns to Defendants' third argument.

### i.  *Contemporaneous and Contradictory Statements*

Defendants' first two arguments attempt to identify essentially the same flaw with Plaintiffs' pleading: Defendants argue Plaintiffs do not meet the requisite pleading standard because they do not allege contemporaneous false statements or contradictory facts.  (*See id.*). Plaintiffs insist they have done so.  (*See, e.g.*, Resp. 14–17 (citing SAC ¶¶ 58, 64, 116)).

Defendants' arguments are unavailing for a more fundamental reason, however.  It appears "Defendants' argument[s] conflate[] the heightened pleading standard for scienter with the lower standard for pleading a false or misleading statement." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1214 (M.D. Fla. 2014) (alterations added).  While pleading fraud *does* subject Plaintiffs to a heightened pleading standard, it does *not* demand they plead precise, contemporaneous accounts contradicting the alleged misstatements.  *See id.*  Defendants' emphasis on the existence

11

of contemporaneous statements and contradictory facts holds Plaintiffs to a standard not required by the Federal Rules of Civil Procedure or the Private Securities Litigation Reform Act ("PSLRA").  (*See* Mot. 13–15).

In fact, Plaintiffs need only (1) comply with Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA; (2) satisfy the plausibility standard of *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007); and (3) plead an adequate foundation for their confidential witness's account.  *Mogensen*, 15 F. Supp. 3d at 1214 (citation omitted).  The Court considers whether Plaintiffs satisfy these requirements, finding they have.

*Rule 9(b) and the PSLRA.*  To satisfy Rule 9(b), Plaintiffs must state:

(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*Mogensen*, 15 F. Supp. 3d at 1214 (citing *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011)).  Additionally, Plaintiffs can satisfy the PSLRA's pleading standard by "specify[ing] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u–4(b)(1) (alterations added).

Plaintiffs satisfy Rule 9(b) and the PSLRA for misstatements 1–6.  Plaintiffs allege misstatements 1–3 were misleading,

because Teleperformance's hiring process for content moderators was not designed to identify candidates with resilient profiles and did not include psychological testing or screening, resulting in lasting psychological trauma to those moderators; and Teleperformance's purported counseling and support programs were "woefully inadequate" and "just for show[.]"  Furthermore, this statement omitted material information from investors, specifically, that Teleperformance's training procedures were inadequate and included needless exposure to CSAM and other horrific content; and that Teleperformance's content moderators worked long hours, with little pay, under grueling conditions that included oppressive video

surveillance in their homes, an inability to take breaks, and inadequate access to
support services[.]

(SAC ¶ 42 (alterations added; in-text citations omitted; citing *id.* ¶¶ 47–51, 53, 57–61)).

Further, Plaintiffs allege Defendants made these statements on February 20, 2020,
February 25, 2021, and February 28, 2022, in each year's respective Universal Registration
Documents.  (*See id.* ¶ 43).  Plaintiffs claim these statements were false, considering contrary
statements from former employees which were published in *Forbes* and *Time*.  (*See id.* ¶¶ 49, 53,
57–58).  Lastly, Plaintiffs allege content moderation was a significant portion of Defendants'
business, and Defendants financially benefitted from hiding damaging information about this
aspect of their business.  (*See id.* ¶¶ 36–40, 95).  With that, Plaintiffs satisfy the requirements of
Rule 9(b) and the PSLRA.

Similarly, misstatements 4–6 are alleged to be false because Teleperformance did not
implement — or, at least, implement adequately — any of the safeguards it claimed it had put in
place for content moderators.  (*See* SAC ¶¶ 44–46).  Again, Plaintiffs point to a source for the
alleged misstatements, allege when they were published, and explain — based on published news
articles — why they were false.  (*See id.*).  Plaintiffs thus meet the standards set by Rule 9(b) and
the PSLRA for these statements as well.

Finally, Plaintiffs allege misstatements 7–8 were "false and misleading and omitted
material information from investors because, to the extent any audit was performed, it was
inadequate and failed to address the numerous, contemporaneous reports from Teleperformance
employees that demonstrated both the 'use of' and 'access to' CSAM during the training of
Teleperformance content moderators."  (*Id.* ¶ 55 (citations omitted); *see also id.* ¶ 68).  The Court
need not consider the falsity of these statements because, for the reasons stated below, these

statements — true or not — were not accompanied by a corrective disclosure and cannot support a claim under Count I.

*Twombly.*   Plaintiffs also meet *Twombly*'s plausibility standard.   Taking Plaintiffs' allegations as true, it is plausible that misstatements 1–6 were false when made; Plaintiffs have put forth multiple accounts from former content moderators describing how they were needlessly shown CSAM, given little training or breaks, and not given promised psychological counseling or support.  (*See id.* ¶¶ 48–51, 57–58).  These accounts contradict Defendants' statements.  (*See, e.g.*, *id.* ¶¶ 42, 43).

Similarly, taking these accounts as true, Teleperformance's statements about its workplace policies also omitted material information about the true nature of the employment conditions revealed by the news articles.  (*See, e.g.*, *id.* ¶¶ 44–46).[3]  It is plausible that — at the time Defendants issued their reassuring public statements to investors — the moderation program was, in fact, overwhelmed and unable to properly address the challenges of this rapidly developing portion of Defendants' business.  Certainly, the Court can "draw the reasonable inference that [Defendants are] liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alterations added; citation omitted).

*Sufficient Factual Basis.*  Finally, the Second Amended Class Action Complaint establishes a sufficient factual basis for the witness account Plaintiffs rely on.  (*See* SAC ¶ 53 (identifying the dates of the witness's employment, his or her work location, roles within the company, and experiences as a content moderator)); *cf. Mogensen*, 15 F. Supp. 3d at 1215 (noting that a pleading detailed "the positions that [confidential] witnesses held, the stores they supervised, and the duration of their employment" (alteration added; citation omitted)).

---

[3] Plaintiffs allege Defendants omitted the same information from misstatements 1–6.  (*See* SAC ¶¶ 42–46).

The articles discussing Defendants' actions further bolster these accounts.  One moderator interviewed for the October 20, 2022 *Time* article revealed she sought help for months but was ultimately told to "seek out support through the Colombian healthcare system."  (SAC ¶ 58).  Another claimed to be shown CSAM material as part of his training "a few days into onboarding[.]"  (*Id.* ¶ 49 (quotation marks omitted; alteration added)).  The *Forbes* 2022 article also stated employees were "under-trained and overworked, and that, in order to keep up with TikTok's demand for content moderation, management pressured trainers to go ahead and get the people through even with inadequate preparation."  (*Id.* ¶ 51 (quotation marks omitted)).

To summarize, Plaintiffs adequately plead falsity.  Their allegations do not focus on puffery and otherwise satisfy the relevant pleading standards.  The Court now turns to Defendants' final argument regarding falsity: whether any statements were misleading by omission.

### ii. Omissions

Defendants argue misstatements 1–6 are not misleading by omission.  (*See* Mot. 15–16).  Defendants assert that even if they allegedly omitted information about working conditions for content moderators, misstatements 1–6 would not be misleading by omission because Plaintiffs' allegations identify "isolated accounts" involving an "isolated operational problem[.]"  (*Id.* 14–15 (alteration added; citations and quotation marks omitted)).

The Court previously rejected this argument and rejects it again now.  (*See* May 22, 2024 Order 25).  The severity of the allegations, the apparent interest of the United States and Colombian governments, and the drop in Teleperformance's stock price coincidental with the August 2022 *Forbes* article all weigh against Defendants' characterization of an "isolated operational problem[.]"  (Mot. 14 (alteration added; quotation marks omitted); *see also* SAC ¶¶ 54, 70, 113–14).

Moreover, while Defendants "do not have an obligation to offer an instantaneous update of every internal development," they "must disclose a negative internal development [] if its omission would make other statements materially misleading." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) (alteration added; citations omitted). Here, misstatements 1–6 were, in essence, assuring Defendants' investors that, while content moderation has uniquely challenging issues, Defendants provided their employees the tools to deal with and overcome such issues. (*See* ¶¶ SAC 44–46). Plaintiffs' allegations that Defendants omitted information about how content moderators were needlessly shown CSAM and endured terrible working conditions could render Defendants' assurances false — or, at the very least, misleading — by omission. (*See, e.g., id.* ¶¶ 47–51, 57, 61).

### 2.    Scienter

The Court next turns to Defendants' arguments that Plaintiffs fail to adequately plead scienter. (*See* Mot. 17–23). The Court previously concluded that "[a] reasonable person would deem the inference of scienter as cogent and as compelling as any opposing inference one could draw from the facts alleged." (May 22, 2024 Order 39 (alteration added)). Defendants argue the Court should depart from its previous finding for two reasons: (1) the Second Amended Complaint has been narrowed to a set of only eight statements, and so Plaintiffs cannot show scienter for the individual Defendants (*see* Mot. 18); and (2) the Court cannot consider content moderation a core business "[n]ow [that] the challenged statements involve only training and support services" (*id.* 21 (alterations added)).

Plaintiffs point to language showing the Court only considered Defendants' previous scienter arguments regarding the Amended Complaint with respect to the surviving misstatements in that pleading. (*See* Resp. 18; May 22, 2024 Order 34). Plaintiffs argue those surviving

misstatements are largely the same as misstatements 1–6 here.  (*See* Resp. 18).  They also readopt their arguments as to whether content moderation was one of Defendants' core operations.  (*See id.*).

        *a.  Repeating Arguments*

        To start, the surviving statements from the Amended Complaint are very similar, and in some cases identical, to the misstatements alleged in the Second Amended Class Action Complaint.  (*See generally id.*; SAC).  For example, misstatements 4–6 are repeated nearly verbatim in both the Amended and Second Amended Class Action Complaints.  (*Compare* Am. Compl. ¶¶ 47, 52, 109; SAC ¶¶ 44–46).[4]  The Court already concluded these statements were actionable because Plaintiffs adequately plead that Julien and Pugalia "acted with scienter[.]" (May 22, 2024 Order 39 (alteration added)).  Because the alleged misstatements in the Second Amended Class Action Complaint are largely identical to the surviving misstatements from the first Amended Complaint, the Court sees no reason to change its position.

        Indeed, the arguments addressed in the Court's previous Order apply with equal force here.  Plaintiffs' allegations permit the inference of scienter because (1) content moderation was a "critical driver of the Company's growth[;]" (2) "repetition of [the] misstatements supports a finding of scienter[;] (3) Defendants' evasive responses to questions about the allegations contribute to a finding of scienter[;]" and (4) "the existence of the Colombian government's investigation into Teleperformance 'further bolsters the inference of scienter.'"  (Resp. 17–20 (alterations added; citing May 22, 2024 Order 37–39)).  The Court also noted that Julien's and

---

[4] Misstatements 1–3, while not appearing in both pleadings, "cover[] the same topics [as misstatement 4] in slightly more detail." (Resp. 18 (alterations added)).

Pugalia's evasive responses supported an inference of scienter for them as individual Defendants. (*See* May 22, 2024 Order 38 ).[5]

Despite this, Defendants again argue Julien's and Pugalia's responses are insufficient to show scienter. (*See* Mot. 20–21). Defendants assert Julien's and Pugalia's after-the-fact responses to questions regarding the negative news articles "cannot support an inference of scienter for earlier statements." (*Id.* 20 (emphasis omitted; citing *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1331 (M.D. Fla. 2002))). Plaintiffs insist Defendants' cited authorities do not support Defendants' argument, as their cases have nothing to do with evading or failing to respond to questions. (*See* Resp. 19). The Court agrees with Plaintiffs.

Defendants' argument conflates after-the-fact statements with evasive or nonresponsive answers. (*See* Mot. 21 (citing *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1360 (N.D. Ga. 2010) (concluding that "after-the-fact events" do not support an inference of scienter))). In *In re Sunterra Corporation Securities Litigation*, an after-the-fact statement was made in a press release and not in response to a question. *See* 199 F. Supp. 2d at 1331. The court concluded that such a statement "d[id] not contribute to or create on its own an inference of scienter." *Id.* (alteration added).

Julien's and Pugalia's statements were not merely made after the fact; they were prompted by questions they ultimately failed to address. (*See* May 22, 2024 Order 38). "Directly nonresponsive" and "evasive" answers have been held to show "a strong inference of scienter." (*Id.* (alterations adopted; quotation marks omitted; quoting *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011); *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, No. 00-01967-Civ, 2002 WL 989480, at *12 (N.D. Cal. Mar. 29, 2002); other citations omitted)).

---

[5] For reasons explained below, because Count I is dismissed against Rigaudy, the Court does not discuss whether he acted with scienter.

Defendants further argue Plaintiffs are "subjective[ly] characteri[zing]" Julien's and Pugalia's statements. (Reply 12 (alterations added; citations omitted)). Plaintiffs are free to do this. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1367 (11th Cir. 1997). ("[T]he complaint must be construed in a light most favorable to the plaintiff[.]" (alterations added; citations omitted)). The Court remains unconvinced by Defendants' argument and again finds Plaintiffs adequately plead scienter as to Julien and Pugalia.

### b. *Core Operations*

Defendants' new argument is that the "core operations" doctrine no longer applies. (*See* Mot. 21 (alteration added)). The "core operations" doctrine allows a court to infer that officers of a company have knowledge of critical facts related to its core operations. *See Plymouth Cnty. Ret. Sys. v. Carter's Inc.*, No. 08-cv-02940, 2011 WL 13124501, at *17 (N.D. Ga. Mar. 17, 2011). The Eleventh Circuit has not adopted the doctrine, and "[c]ourts analyzing the doctrine recognize that . . . it very rarely can create a strong inference of scienter on its own." *Id.* (alteration added). Nonetheless, where additional allegations support scienter, the doctrine can bolster the inference. *See, e.g.*, *In re Flowers Foods, Inc. Sec. Litig.*, No. 16-cv-222, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018).

The Court previously found that Plaintiffs' allegations warranted application of the doctrine. (*See* May 22, 2024 Order 36–37). Defendants argue circumstances have changed because the challenged statements are narrower in scope. (*See* Mot. 21 (alteration added)). Again, the Court's previous application of the "core operations" doctrine only considered the surviving misstatements, which overlap significantly with the present allegations. (*See* May 22, 2024 Order 34–35).

Defendants also argue Plaintiffs do not plead enough to show content moderation was a core operation of Teleperformance. (*See* Mot. 21–22). Not so. According to Plaintiffs, Defendants described content moderation as a significant driver of Teleperformance's growth and a "big business in itself." (SAC ¶¶ 28, 37, 97 (quotation marks omitted)). Teleperformance also held out content moderation as a noble undertaking (*see id.* ¶ 98) and emphasized its commitment to employee wellbeing as part of its positive corporate image (*see id.* ¶¶ 16–21, 40). As pleaded, content moderation and egregious content moderation *could* be one of Teleperformance's core operations — a fact question the Court does not answer.

Again, at a minimum, the allegations weakly boost an inference of scienter based on how important content moderation seemed to Teleperformance. *See Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9 (1st Cir. 2021) (noting "the importance of a particular item to a defendant can support an inference that the defendant is paying close attention to that item," and holding that allegations of misrepresentations concerning "an important product" supported "a very strong inference that the senior executives who gave those apparently prepared remarks touting the product would have paid at least some attention to the product's status" (quotation marks omitted)).

Having concluded that Plaintiffs adequately plead actionable misstatements and omissions made with scienter, the Court turns to Defendants' final argument regarding loss causation.

### 3.    Loss Causation

Defendants argue Plaintiffs do not adequately plead loss causation — *i.e.*, the "causal connection" between the alleged misstatements and the alleged economic harm. *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1242 (11th Cir. 2023). The loss causation element requires "that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses."

CASE NO. 23-24580-CIV-ALTONAGA/Reid

*Id.* at 1241 (citation and quotation marks omitted).   A plaintiff can plead this by alleging a "corrective disclosure," *i.e.*, "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud[,] . . . showing a price drop soon after the corrective disclosure, and . . . eliminating other explanations for the price drop." *FindWhat*, 658 F.3d at 1311–12 (alteration added; citation and footnote call number omitted). "Corrective disclosure 'can come from any source' and 'take any form from which the market can absorb [the information] and react,' so long as the disclosures 'reveal[ed] to the market the falsity of the prior misstatements.'"   *MacPhee*, 73 F. 4th at 1242–43 (alteration in original; quotation marks omitted; quoting *FindWhat*, 658 F.3d at 1311 n.28).

"In order to qualify as corrective, the disclosure must share the same subject matter as the prior misstatement; only then can the disclosure be said to have a 'corrective effect,' rather than merely a 'negative effect.'"   *FindWhat*, 658 F.3d at 1311 n.28 (emphasis omitted; quoting *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005)).   "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but its subject matter must at least relate back to the misrepresentation and not to some other negative information about the company." *Id.* (alteration adopted; quotation marks omitted; quoting *In re Williams Sec. Litig. — WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)).

Plaintiffs allege loss causation based on two corrective disclosures through which the truth was revealed to the market: the August 4, 2022 *Forbes* article and the November 9, 2022 *Time* article.   (*See* SAC ¶ 111).   Defendants argue neither disclosure was corrective, and any claims based upon them should be dismissed.   (*See* Mot. 23–26).   Defendants' first Motion to Dismiss did not challenge the *Forbes* article, and the Court concludes this time that it was a corrective disclosure.   (*See* May 22, 2024 Order 40).   Conversely, the Court's previous Order rejected the

*Time* article as a corrective disclosure, and the Court again reaches the same conclusion. (*See id.* 40–41).

### a.  August 4, 2022 Forbes Article

Defendants argue the August 4, 2022 *Forbes* article was not a corrective disclosure because, while it had a "negative effect[,]" it "did not reveal to the market the falsity of any of Defendants' statements[.]" (Mot. 24 (alterations added; quotation marks and citations omitted)). Plaintiffs argue "the [Second Amended Class Action Complaint] does allege affirmative misrepresentations that are contradicted by the *Forbes* article." (Resp. 21 (alteration added)).[6] Plaintiffs are correct.

A disclosure must share the same subject as the prior misstatement to be considered corrective, but "the disclosure need not precisely mirror the earlier misrepresentation[.]" *FindWhat*, 658 F.3d at 1312 n.28 (alteration added; citations and quotation marks omitted). The *Forbes* article meets this standard.

According to Plaintiffs, the *Forbes* article states content moderators were

shown sexually exploitative imagery of kids as part of their training and that there was a widely accessible document, called the 'DRR,' short for Daily Required Reading[,] that was filled with material determined to be violative of TikTok's community guidelines, including hundreds of images of children who were naked or being abused.

(SAC ¶ 48 (alterations adopted; other alteration added; quotation marks omitted)).

Further, Plaintiffs allege the article revealed that one of Defendants' moderators was "struggling to just function properly" because of her exposure to harmful videos (*id.* ¶ 49 (quotation marks omitted)); Defendants' moderators were "under-trained and overworked" (*id.* ¶

---

[6] Plaintiffs correctly note that Defendants' argument on this issue is focused solely on whether the *Forbes* article contradicted any alleged *misrepresentations*; Defendants do not argue that the *Forbes* article affected whether any of their alleged *omissions* was misleading. (*See* Resp. 21; Mot. 24).

51 (quotation marks omitted)); and Teleperformance was overwhelmed with the number of videos it needed to moderate, resulting in employees beginning work "with inadequate preparation" (*id.* ¶ 51 (quotation marks omitted)).   These statements in the *Forbes* article contradict alleged misstatements 1–6.  (*See* Resp. 21–22).  The August 4, 2022 *Forbes* article is thus both a negative and a corrective disclosure as to misstatements 1–6.

### b. November 9, 2022 Time Article

Next, Plaintiffs allege the *Time* article announcing the Colombian government's investigation into Teleperformance's labor practices revealed the truth about the company.  (*See* SAC ¶ 111).  The Court previously agreed with Defendants that "the mere announcement of an investigation is insufficient to constitute a corrective disclosure for the purposes of Section 10(b) because the announcement of an investigation reveals just that — an investigation — and nothing more."  (May 22, 2024 Order 40–41 (alteration adopted; citations omitted)).  In doing so, the Court considered *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013).  (*See id.*).

*Meyer* involved a defendant's stock prices falling after the disclosure of informal and later, formal, SEC investigations into the defendant's "policies and practices [of] impairment of investment in real estate assets[.]"  710 F.3d at 1200–01 (alterations added).  The Eleventh Circuit concluded the disclosures were not corrective because "the SEC never issued any finding of wrongdoing or in any way indicated that the [c]ompany had violated the federal securities laws."  *Id.* at 1201 (alteration added).  The court ascribed the drop in stock price as an "added risk of future corrective action[;]" the stock drop did not convert the investigation into a corrective disclosure, as there was no revelation of a prior statement as false.  *Id.* (alteration added; emphasis omitted).  The court noted, however, that "[i]t may be possible, in a different case, for the disclosure of an SEC investigation to qualify as a partial corrective disclosure for purposes of opening the class

period when the investigation is coupled with a later finding of fraud or wrongdoing." *Id.* at 1201 n.13 (citations omitted).

Plaintiffs now argue that *Meyer* "did not categorically exclude investigation announcements from being corrective disclosures" and that only "the commencement of an investigation, *without more*, is insufficient to constitute a corrective disclosure." (Resp. 22–23 (alteration adopted; emphasis in original; quoting *Meyer*, 710 F.3d at 1201)). Plaintiffs insist that, on November 8, 2022, the Colombian government announced its investigation, and the November 9, 2022 *Time* article then provided the "more": a description of what the Colombian ministry of labor was investigating, and the reason for Defendants' actions. (*See id.* 23).

Additionally, Plaintiffs argue that Teleperformance's own actions, such as "negotiating and signing agreements with labor unions[,]" also constituted something *"*more" for the purposes of *Meyer*. (*Id.* (alteration added)). Lastly, Plaintiffs argue that "media scrutiny" after an investigation is sufficient to make a disclosure corrective. (*Id.* 26). Defendants again insist this is not the "more" the Eleventh Circuit spoke of; according to them, "the something 'more' must be a 'later finding of wrongdoing.'" (Reply 14–15 (internal quotations and citations omitted; quoting May 22, 2024 Order 41)).

The Court agrees with Defendants. As Defendants point out, the facts of *Meyer* involved an investigation where the SEC also announced the subject matter of the investigation — yet, in that case, and others, the investigation alone was not tantamount to a corrective disclosure. (*See* Mot. 25 (citing *Meyer*, 710 F.3d at 1200–01; other citations omitted)).

Further, Plaintiffs' argument that Defendants' actions after the announcement of the investigation are evidence of wrongdoing is unconvincing. Plaintiffs seem to analogize Defendants' subsequent actions to settlements. (*See* Resp. 24). But Defendants' actions are not

analogous to a settlement, considering the Colombian ministry of labor had not filed a lawsuit. (*See generally* SAC).  Defendants point to caselaw showing that "working with [a regulatory agency] to remain in compliance" is not the "more" contemplated by *Meyer*.  (*See* Reply 15 (citing *Hattaway v. Apyx Med. Corp.*, No. 22-cv-1298, 2023 WL 4030465, at *15 (M.D. Fla. June 15, 2023) (alterations added))).  This is closer to what Plaintiffs allege.  (*See* SAC ¶¶ 78–85).

Lastly, Plaintiffs' argument regarding media scrutiny constituting a corrective disclosure is unconvincing.  *Meyer* stated an investigation with a "later finding of wrongdoing" may serve as a corrective disclosure.  710 F.3d at 1201 n.13.  Media scrutiny is neither a finding from an investigation, nor an admission of guilt.  While Plaintiffs cite cases involving media scrutiny, each of the cited cases involved multiple news articles and events.  (*See* Resp. 25 (citing *Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014) (combining five events, such as resignations and articles, which "collectively constitute[d] and culminate[d] in a corrective disclosure that adequately plead[ed] loss causation" (alterations added)); *In re Questcor Sec. Litig.*, No.  12-cv-01623, 2013 WL 5486762, at *23 (C.D. Cal. Oct. 1, 2013) (finding an investigation announcement was part of a corrective disclosure when it "came on the heels" of a bulletin and multiple reports); *Longo v. OSI Sys., Inc.*, No. 17-cv-8841, 2021 WL 1232678, at *11 (C.D. Cal. Mar. 31, 2021) (finding loss causation where an investigation announcement followed "a series of disclosures"))).  The only media events regarding the Colombian investigation Plaintiffs allege are the announcement itself and the subsequent *Time* article.  (*See* SAC 14–15).  This is not, in the Court's view, media scrutiny sufficient to give rise to a corrective disclosure.

In sum, the commencement of the Colombian government's investigation does not serve as a corrective disclosure because, as in *Meyer*, Plaintiffs do not allege a "later finding of

wrongdoing[.]"  710 F.3d at 1201 n.13 (alteration added).  This means misstatements 7 and 8 cannot serve as support for Count I.  Those misstatements occurred after the *Forbes* article; thus, that article cannot serve as a corrective disclosure for purposes of showing loss causation.  *See MacPhee*, 73 F.4th at 1242–43 (explaining that a corrective disclosure should reveal the falsity of "*prior* misstatements" (emphasis added; citation and quotation marks omitted)).  Moreover, because Rigaudy is only alleged to have made misstatement 8 (*see* SAC ¶ 68), Plaintiffs do not state a claim against him individually.  *See, e.g.*, *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1279 (M.D. Fla. 2009).

Otherwise, the Court is satisfied Plaintiffs meet the requirements for pleading falsity, scienter, and loss causation regarding misstatements 1-6 and state a securities fraud claim based on those misstatements.

### B.   <u>Count II</u>

Defendants seek dismissal of the Count II Section 20(a) claim, arguing in conclusory fashion that the claim is dependent on sufficiently pleading an underlying securities violation by the company.  (*See* Mot. 26).  Defendants offer no other argument for dismissal.  (*See generally id.*).  Because Plaintiffs' first claim survives, the Section 20(a) claim is not dismissed.[7]

### III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants, Teleperformance SE, Daniel Julien, Olivier Rigaudy, and Akash Pugalia's Motion to Dismiss **[ECF No. 72]** is **DENIED**.  The parties

---

[7] Although Count I cannot stand against Rigaudy because he is not alleged to have made any actionable misstatements, Plaintiffs allege Rigaudy "acted as [a] controlling person[]" and "had the power and authority to cause Teleperformance to engage in the wrongful conduct" described in Count I.  (SAC ¶ 134 (alterations added)).  Defendants do not dispute this in their Motion or seek dismissal of any individual Defendant.  (*See generally* Mot.; Reply).  Count II is therefore not dismissed against Rigaudy.

CASE NO. 23-24580-CIV-ALTONAGA/Reid

are directed to prepare and file a joint scheduling report, as required by Local Rule 16.1, by **September 6, 2024**.

      **DONE AND ORDERED** in Miami, Florida, this 28th day of August, 2024.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:    counsel of record